SD03 (Rev. 9/97)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

Malissa Renee Harmon

(Enter above the full name of the plaintiff in this action)

:

RECEIVED

AUG 16 2019

RICHARD W. NAGEL
Clerk of Court
CINCINNATI, OHIO

2019 AUG 16 PM 12: 25

v.                                          :          Case No.  1:19CV670

Honeywell Intelligrated                     :                    J. BARRETT

_____                    :                    M.J. LITKOVITZ

                                                       COMPLAINT UNDER
_____                    :         42 U.S.C. 2000e-5(f)(1)

_____

(Enter the above full name of the defendant or    :
defendants in this action)

---

## I.     Parties

(In item A below, place your name in the first blank and place your present address and telephone number (or telephone number where you can be reached) where indicated in the following blanks.)

A.    Name of Plaintiff   Malissa Renee Harmon

      Address   1512 N Breiel Blvd   Middletown OH 45042

      Telephone No. (513) 499-7093

Under 42 U.S.C. 2000e-5(f)(1) suit may only be "brought against the respondent named in the charge" of unlawful employment practice you filed with the Ohio Civil Rights Commission and/or the Equal Employment Opportunity Commission. ATTACH A COPY OF THE CHARGE YOU FILED WITH THE OHIO CIVIL RIGHTS COMMISSION AND/OR THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION TO THIS COMPLAINT. In item B below list the name and address of the employer against whom you filed the charge. In item C below, list the name and address of any other person(s) you named in the charge you filed with the Ohio Civil Rights Commission and/or the Equal Employment Opportunities Commission.

B.    Defendant   Honeywell Intelligrated
                  (As named in the attached charge)
      Address   7901 Innovation Way

                Mason, OH 45040

Additional defendants (as named in the attached charge):

## II. The Court has jurisdiction under 42 U.S.C. §2000e-5(f)(1).

A. The date the notice of right to sue was issued by the Equal Employment Opportunity commission was ___May 24, 2019___.

B. The date you received the notice of right to sue was ___May 31, 2019___.

C. ATTACH A COPY OF THE NOTICE OF RIGHT TO SUE TO THIS COMPLAINT.

## III. Statement of Claim

The Equal Employment Opportunities Act provides, in part, that

    (a)   it shall be an unlawful employment practice for an employer --

        (1)   to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. §2000e-2(a)(1). Other unlawful employment practices are set out in 42 U.S.C. §2000e-2(a) through (d).

State here as briefly as possible the *facts* of your case. Describe how each defendant is involved. Include also the names of other persons involved, dates, and places. Do not give any legal arguments or cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Use as much space as you need. Attach an extra sheet if necessary.

## IV.   Relief

(*State briefly exactly what you want the Court to do for you*. Make no arguments. Cite no cases or statutes.)

_____

(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

8/16/19

(Date)                                              (Signature of Plaintiff)

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Malissa R. Harmon**<br>**1512 Breiel Blvd.**<br>**Middletown, OH 45042** | From: | **Indianapolis District Office**<br>**101 West Ohio St**<br>**Suite 1900**<br>**Indianapolis, IN 46204** |

[ ] *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| **22A-2017-03871** | **Jeremy A. Sells,**<br>**State & Local Coordinator** | **(317) 226-7221** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[ X ] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[ X ] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ X ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Michelle Eisele*

Enclosures(s)

**Michelle Eisele,**
**District Director**

May 24, 2019

*(Date Mailed)*

cc: **HR Director**
**HONEYWELL INTELLIGRATED**
**7901 Innovation Way**
**Mason, OH 45040**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI


| | | |
|---|---|---|
| **MALISSA R. HARMON,** *pro se* | : | **Case No:** _____ |
| **1512 N. Breiel Road** | | |
| **Middletown, Ohio 45042** | : | |
| | | |
| *Plaintiff,* | : | |
| | | |
| **vs.** | : | |
| | | |
| **HONEYWELL INTELLIGRATED** | : | **COMPLAINT** |
| **Corporation Service Company** | | **AND JURY DEMAND** |
| **7901 Innovation Way** | : | |
| **Mason, Ohio, 45040** | | |
| | : | |

*Defendant.*

Plaintiff Malissa Harmon for her Complaint against Honeywell Intelligrated ("Honeywell") alleges as follows:

**THE PARTIES**

1.     Honeywell Intelligrated is a leading North-American-based, single-source provider of automated material handling solutions and intelligent software that drive fulfillment productivity for retailers, manufacturers and logistics providers around the world.

2.     Misty Sanderson ("Sanderson") is Honeywell Intelligrated's Senior Administrative Assistant - IT and was Plaintiff's immediate supervisor at the time she went on medical leave.

3.     Ryan Balzer ("Balzer") is Honeywell Intelligrated's Manager of Installation and is Sanderson's immediate supervisor.

1

4.     Bernie Hess ("Hess") is Honeywell Intelligrated's Director of Human Resources.

5.     Marilia Vidal-Clarisey ("Vidal-Clarisey") is Honeywell Intelligrated's Human Resources Generalist.

6.     Jeanette Guerra ("Guerra') is an investigator from Honeywell's Global Security Group.

7.     Nick Choi ("Choi") is Honeywell Intelligrated's VP. of Field Operations and is Balzer's immediate supervisor.

8.     Andrew Geyer ("Geyer") is Honeywell Intelligrated's Director Mechanical Installation Services.

9.     Jim Hueker ("Hueker") is Honeywell Intelligrated's Manager, Installation Services and becomes Sanderson's immediate supervisor.

10.     Melissa Maynard ("Maynard") is Honeywell Intelligrated's Supervisor, Electrical Installation Services.

11.     Tricia Haworth ("Hayworth") is Honeywell Intelligrated's Manager, Accounts Payable and was Jessica Holland's former Manager.

## JURISDICTION AND VENUE

12.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

13.     Venue is proper under 28 U.S.C. §1391(b)(1)(2).

2

## FACTUAL ALLEGATIONS

### Background Information Intelligrated, Honeywell, and Plaintiff's employment history.

### Exhibit A

14.     Intelligrated operated as an independent company until 2016 when Honeywell purchased Intelligrated and integrated it into its other business operations.

15.     According to the attached Equal Employment Opportunity Policy, Honeywell Intelligrated is committed to providing equal employment opportunity without discrimination based on any protected category, including race and color. Honeywell Intelligrated has also implemented policies prohibiting unlawful discrimination, harassment, and retaliation in the workplace (Attachment A-1). Under the Code of Business Conduct, every Company employee is responsible for reporting any incident of inappropriate conduct through proper channels. The Company considers retaliation to be a serious violation of the Company's Code of Business Conduct. The Company strongly encourages the prompt reporting of any workplace harassment (Attachment A-2). Honeywell Intelligrated frequently sends out company-wide emails to address the Integrity and Ethics in Financial Reporting (Attachment A-3), Finance Purchase Order Policy (Attachment 4), Respecting others and Promoting a Positive Workplace (Attachment A-5), Financial Reporting (Attachment 6) and 8 Honeywell Behaviors that challenges their Employee's to "Take bold action on what you believe is right" (Attachment A-7). Unethical practices according to Honeywell could affect the integrity of their Brand and will not be tolerated.

16.     Plaintiff began her employment with Intelligrated on September 27, 2010. During her career with both Intelligrated and Honeywell Intelligrated, Plaintiff has held several positions and received two promotions. Plaintiff's most recent position was Senior Administrative

Assistant - Customer Production Support. Plaintiff's title prior to the purchase of Intelligrated by Honeywell was Senior Installation Administration Specialist.

**Plaintiff transitioned into her newly created role in order to provide checks and balances to the department. The Installation department was not adhering to the company-wide purchasing policies at the time of Plaintiff's promotion. Plaintiff created a departmental spreadsheet to balance that departments vendor labor. Plaintiff advised Company officials of balancing issues and solutions.**

### Exhibit B

17.     In the newly created role as Installation Administrative Specialist, Plaintiff was in charge of transitioning the Installation Department to adhere to company-wide purchasing policies and procedures. Plaintiff coordinated with outside departments Finance, Payroll and Accounting to learn all required purchasing rules in order to provide proper training to Installation Management and Installation personnel that was involved in purchasing to adhere to the company-wide purchasing policies and processes (Attachment B-1).

18.     Plaintiff later took over the department's contracted vendor labor purchasing responsibilities from Installation Managers to bring checks and balances to the department and was referred to as the Vendor Labor Coordinator, departments SME and main contact for the Installation department.

19.     Plaintiff was also the main backup to Cindy Levitz, former Supervisor, Installation Administration. Plaintiff's level of authority mirrored Cindy Levitz, former Supervisor, Installation Admin. Plaintiff also had editing rights to the Installation Procedures (see **Exhibit D** Attachment D-5). Plaintiff helped train and manage the Installation Field Administration team before going on maternity leave in August 2015.

20.     Plaintiff's was tasked with creating a department balancing spreadsheet in order to keep the company updated on contracted vendor labor purchase activity. Per Nick Choi, VP

4

Installation Services "the vendor labor tracking impacts us across multiple departments" (see **Exhibit C** Attachment C- 6). The spreadsheet allowed the Plaintiff to view and track the department's contracted vendor labor purchasing activity. Other responsibilities included tracking requisitions, purchase orders, On Time Labor (OTL) hours/timesheets submitted and invoiced, and maintaining the balancing spreadsheet created to track contracted vendor labor for the Installation department (see **Exhibit C** Attachment C- 1).

21.     Plaintiff provided updates to Installation Management. Plaintiff was also responsible for administering subcontractor and labor vendor requisitions and invoicing. Specifically, when the company initiates business with a subcontractor or vendor labor, Plaintiff was responsible coordination of the department's requisitions submitted by Installation Managers in order to obtain company approval for purchase orders for the goods and/or services billable against a project.

22.     After the subcontractors/labor vendors submitted invoices to the company, Plaintiff was responsible for reconciling the invoices against the applicable purchase orders. After the acquisition, Plaintiff continued to coordinate subcontractor requisitions as normal but because the company transitioned to a single source for temporary labor, she also became responsible for assisting and coordinating directly with Installation Management team to process TAPFIN requisitions and purchase orders. Plaintiff also reconciled and tracked TAPFIN invoices for Installation including being the approver of TAPFIN timesheets. None of Plaintiff's tasks were ever cross-trained as she was the Vendor Labor Coordinator. Plaintiff was the point of contact for Honeywell Intelligrated and assisted with the coordination of contracted vendor labor for North America including international purchasing for the Installation department.

23.    February 4, 2015 Cindy Levitz, Supervisor Installation Admin sent Plaintiff an email advising her that "we cuss a lot…. I'm just warming you up haha" Plaintiff replied that 'it's cool' but the Plaintiff didn't know that the cursing would turn into being discriminatory (Attachment B-2).

24.    February 4, 2017 Prior to transitioning to the Installation department the Plaintiff emailed Cindy Levitz, Supervisor, Field Administration and mentioned that she was reviewing Installation Procedures because she wanted to be prepared. Levitz responded and advised "Oh honey, don't go by those haha…those have very little to do with the actuals 😊 But is nice that you're looking" (Attachment B-2a).

25.    March 5, 2015 Cindy Levitz emails Plaintiff to advise that she will be taking over purchasing for Ryan Balzer for the ISC (Attachment B-3).

26.    March 10, 2015 Plaintiff received notice from Susan Smith, Payroll Administrator that Plaintiff moved from "salary to hourly" and would only be paid for 40 hours for week ending February 7, 2015 (Attachment B-4).

27.    April 14, 2015 Plaintiff complained of a wage discrepancy when she received her pay. Plaintiff reached out to Cindy Levitz, Payroll and Human Resources. Plaintiff complained that her wages were not accurately calculated and disagreed with the way her promotion merit was applied. Plaintiff held a 'salary' position prior to being promoted. The promotion was to a 'hourly' position (Attachment B-5).

28.    April 14, 2015 6:13pm Nick Choi sent Plaintiff and email asking 1.) What opportunities do you see for the Department to improve? 2.) What can the department do to help you? 3.) What are your goals? and 4.) What do you want to do within the Installation Department? During the meeting Nick Choi also brought up concerns of Cindy Levitz's future

with Intelligrated and specifically asked how comfortable would the Plaintiff be with managing the Installation Field Admins should Cindy Levitz relationship with Intelligrated be terminated. Plaintiff advised Nick Choi that she felt very comfortable with transitioning into that role if needed, considering that Plaintiff was already trained to mirror Cindy Levitz's responsibilities (Attachment B-6).

29.    April 23, 2015 Cindy Levitz emails Plaintiff to advise that Plaintiff will be taking over the purchasing card log/transaction coding responsibilities from Levitz. Chris Forte, Treasury Director emails Cindy Levitz giving Plaintiff same purchasing rights as Levitz, Supervisor, Field Administration (Attachment B-7).

30.    May 29, 2018 Plaintiff emailed Install Admin's to schedule a meeting with them in order to introduce the new balancing system that the Plaintiff created to track the contract vendor labor (Attachment B-8).

31.    June 3, 2015 Plaintiff reached out to Payroll to understand how Installation affects the Payroll Department. Susan Smith, Payroll Administer agrees to meet with Plaintiff but "Preferably when Cindy Levitz, Installation Admin Supervisor is not in the office". Susan Smith too advised Plaintiff of suspected fraudulent activity from within the Installation Department with regards to payroll activity (Attachment B-9).

32.    June 3, 2015 Plaintiff had to send out a reminder to the Installation Field Admins to enter OTL vendor labor hours by the given deadline (Attachment B-10).

33.    June 4, 2015 Plaintiff sent an email to Tricia Hayworth, Manager, Accounts Payable to review accounting's current processes and to understand how the Installation affects their department. Plaintiff wanted to discuss the areas of concerns related to vendor invoicing issues (Attachment B-11, B-12).

7

34.    June 4, 2015 Plaintiff sent emailed Nick Choi to schedule a meeting to provide him findings based off the contract vendor labor created to balance and track expenses for the Installation department. Plaintiff advised that there were issues that needed to be addressed in order to balance correctly (Attachment B-13).

35.    June 4, 20015 Plaintiff email thread with Misty Sanderson when her title was Installation Field Admin (Administrative Assistant), email contains the projects that she was providing support on for Brett Sanderson, some accounts include United States Postal Service project located in Oak Haven, TN (Attachment B-14).

**By mid-2015 shortly after Plaintiff transitioned into her new role, Plaintiff complained to Company officials about suspected fraudulent accounting practices and activity taking place within the Installation Department. Plaintiff also complained of racial discrimination and the resistance of the Installation Management team responding to her requests, which was not allowing her to complete her job and/or tasks. Plaintiff complained that she was being taunted and accused of auditing the Installation Department.**

**Exhibit C**

36.    June 5, 2015 Plaintiff sent email to Bart Tolleson, former Director, Installation Mechanical and David Clarke, Installation Mechanical Manager to advise them of the new vendor labor tracking implementations and the findings. Plaintiff wanted to schedule a meeting to review the areas of concern that were contributing to the invoice holds (Attachment C-1).

37.    June 5, 2015 Plaintiff advised Nick Choi that Installation Field Admins who coordinated vendor labor timesheets for the Field Supervisors were falsely adjusting vendor labor timesheets to match invoices being sent from vendors. The Installation Field Admin in question was Misty Sanderson. At this time Plaintiff had already advised Nick Choi of other suspected fraudulent activity related to vendor labor invoices being paid without proper

verification/approval and invoices were being received for services not approved on open
purchase orders, see email dated June 4, 2015 in section Exhibit B (Attachment C-2).

38.     June 5, 2015 Plaintiff reaches out to Tony Keri, Sr. Manager, Project and Costing
Accounting to have him clarify the Company process regarding vendor labor timesheets
(Attachment C-3).

39.     June 9, 2015 Meeting scheduled by Nick Choi, VP Installation to meet with
Plaintiff regarding her training and assigned responsibilities (Attachment C-4).

40.     June 10, 2015 Meeting organized by Cindy Levitz for "Site Admins" also known
as "Installation Field Admins". Plaintiff and Levitz organized weekly meetings with Site Admins
in order to provide updates and training (Attachment C-5).

41.     June 12, 2015 After Plaintiff made a few more complaints about Cindy Levitz's
lack of cooperation and training with the Plaintiff. Nick Choi emailed Plaintiff, with a copy to
Cindy Levitz, he had met with Cindy so that she was aware that Choi was giving direction for
Plaintiff to talk to Install Field Admins in order to find opportunities for improvement for the
Installation Department. Nick also advised Plaintiff to move forward with her tasks if Cindy
Levitz is not available (Attachment C-6).

42.     June 15, 2015 Plaintiff sent an email to the Install Field Admins (Site Admins) to
review their current contract vendor labor payroll verification and processes and to introduce the
vendor labor tracking spreadsheet to advise what will now be tracked. Plaintiff also was trying to
meet with the Install Field Admins in order to understand their areas of concern per the direction
of Nick Choi (Attachment C-7).

43.     June 17, 2015 11:50am Plaintiff emailed Nick Choi again to advise of the
continued resistance she was receiving from her Supervisor, Cindy Levitz. Plaintiff complained

that she was falling behind because of Cindy's continued lack of organization, training and her refusal to allow the Plaintiff to discuss and coordinate the Install Field Admins to adhere to new purchasing and administration processes as directed by Nick Choi (Attachment C-8).

44.  June 17, 2015 4:37pm Nick Choi forwarded an email to the Plaintiff that he sent to Cindy Levitz directing Cindy Levitz to fully turn over vendor labor tracking to the Plaintiff by the end of the week and to also advise Levitz to give Plaintiff full authorization to review the times and processes with the "Site Admins" aka Install Field Admins (Attachment C-9).

45.  June 18, 2015 Plaintiff sent a second email regarding the implementing of the new vendor labor tracking system which would allow the department to track and balance the vendor labor for the entire Installation Department. The email advised the Install Field Admins that the new vendor labor tracking system would take the "Install Field Admins" out of the process of reconciling and receiving/approving the contract vendor invoices themselves and that the responsibility would not be handled by the Plaintiff (Attachment C-10).

46.  June 18, 2015 Plaintiff sent email to Tricia Hayworth, Manager, Accounts Payable to clarify how her Accounts Payable personnel enters travel expenses in Oracle (per diem), Plaintiff was trying to clear up the holds issues regarding invoices that billed travel expenses. Plaintiff had explained that both Cindy Levitz and David Clarke were entering prior purchase orders incorrectly and are now trained to submit purchase order revisions through proper channels in order to accurately track contract vendor labor (Attachment C-11).

47.  June 30, 2015 Plaintiff had to send another email to Nick Choi to advise that she had been sending emails to both Cindy Levitz, former Installation Admin Supervisor and David Clarke, former Installation Mechanical Manager, and they are refusing to respond. Plaintiff advised that the invoices will continue to be on hold unless issues are resolved in a timely

manner. Plaintiff asked Nick Choi if he could have a small discussion with both Cindy Levitz

and David Clarke so that everyone is on the same page and understand what Nick's expectations

are (Attachment C-12).

48.     June 30, 2015 10:50pm Nick Choi sent an email to Plaintiff, David Clarke and

Cindy Levitz to advise Clarke and Levitz to clear open invoices quickly (Attachment C-13).

**Outside Departments start to complain of undocumented vendor hours and missed
deadlines. Plaintiff continued to complain to Company officials about being treated unfairly
by members within Installation Management team and complained that issues were starting
to escalade.**

### Exhibit D

49.     July 1, 2015 Ashley Fitzgerald, Financial Analyst emailed Installation

Management team including Plaintiff, it included; Nick Choi, VP Installation, David Clarke,

Installation Mechanical Manager, Tony Keri, Sr. Manager, Project and Costing Accounting,

Bryan Jones, VP Finance and Strategic Sourcing and Plaintiff to advise of continued timing

issues with invoices and timecards, including missing timecards for 4th week of June

(Attachment D-1).

50.     July 2, 2015 9:24am Bryan Jones, Vice President Finance and Strategic Sourcing

sent an email to the Installation Management team including Plaintiff, it was directed to Cindy

Levitz, Installation Supervisor but also included; Nick Choi, VP Installation, David Clarke,

Installation Mechanical Manager, Tony Keri, Sr. Manager, Project and Costing Accounting. The

email slammed Cindy Levitz for not meeting month end deadline and how it impacted reporting

and forecasting (Attachment D-2).

51.     July 2, 2015 9:26am Plaintiff sent an email to Nick Choi to complain about being

pulled into a meeting by David Clarke, Installation Manager and was cursed at in a loud tone,

11

questioned and ridiculed for doing her job and was told to "stop rocking the boat". Although Plaintiff advised Choi that she felt she could handle the situation for the time being, she asked if she needed help if she could contact him. Choi said "ok." (Attachment D-3).

52.    By then Plaintiff had already advised Nick Choi about the way David Clarke discriminates against minorities out loud in the office and that it made her feel uncomfortable because she set outside of his office and could hear his conversations (see email dated February 4, 2015 **Exhibit B** Attachment B-2, Cindy Levitz advises Plaintiff that "they cuss a lot" in Installation). The email also implies that the Installation Department does not follow the written Installation procedures per Cindy Levitz "Oh honey, don't go by those haha...those have very little to do with the actuals, but is nice that you're looking" (**Exhibit B** Attachment B-2a).

53.    July 15, 2015 Per Levitz request the Plaintiff emailed Levitz al list of her current responsibilities as of that date (Attachment D-4).

54.    Plaintiff was secondary for editing rights on Procedures INS as Plaintiff wrote the written procedures in order to transition the Installation department to adhere to Honeywell purchasing requirements and policies (Attachment D-5).

55.    July 15, 2015 At a Staff meeting regarding the Installation Field Admin team it was discussed, due to upcoming projects the department was in need of 4-5 more "Installation Field Admins" prior to Plaintiff going on maternity leave. Nick Choi instructed Plaintiff to update Cindy Levitz on the meeting and to do what we need to get this task accomplished and to follow up with Nick at a later time for an update. Plaintiff updated Cindy Levitz by email but a meeting never took place regarding the Install Field Admins, Plaintiff went on maternity leave without a meeting taken place with Cindy Levitz (Attachment D-6).

56.     July 31, 2015 Jeff Noble, Inside Sales CBT solutions, overheard an argument that Cindy Levitz and Plaintiff had regarding Plaintiff needing to coordinate with the Installation Field Admins in order to make the Field communication better (Attachment D-7).

**After Plaintiff returned from maternity leave, she complained to Company officials about being passed up on an opportunity for promotion to the Installation Admin Supervisor position, as Cindy Levitz was terminated while Plaintiff was out on maternity leave. Plaintiff complained to Company officials that once Misty Sanderson was promoted to the Installation Admin Supervisor position, the Installation Department became hostile and started to harbor discrimination against the Plaintiff.  After several attempts of trying to get issues handled internally within the Installation Department Plaintiff then complained to Human Resources that Installation Management personnel including Misty Sanderson was trying to eliminate her role because she had continued to advise upper Management regarding suspected fraudulent activity taking place within the Installation Department and that her manager, Ryan Balzer and supervisor, Misty Sanderson did not want the Plaintiff to talk to anyone.**

### Exhibit E

57.     October 7, 2015 Plaintiff emailed Nick Choi, VP Installation and Ryan Balzer, Installation Operations Manager to advise that she was returning from maternity leave on October 15, 2015. Nick Choi replied and advised Plaintiff that Cindy Levitz was no longer with Intelligrated and that Misty Sanderson, former Installation Field Admin had transitioned as acting Installation Admin Supervisor while Plaintiff was out on maternity leave. The Position was never posted nor offered to Plaintiff. Misty Sanderson was later promoted to Installation Admin Supervisor (Attachment E-1).

58.     In Mid-October upon returning from maternity leave, Plaintiff immediately questioned Company officials of the appointment of Misty Sanderson former Installation Field Admin (wife of Brett Sanderson, Manager, Mechanical Installation) that Plaintiff had already been managing for 6 months prior to her maternity leave, including the fact that the Plaintiff was already trained to mirror the former Installation Admin Supervisor duties and was the primary

13

backup when Cindy Levitz was out of the office. Plaintiff was just told Misty Sanderson knew the Field better.

59.     Due to the tracking of contract vendor labor Company officials discovered that Installation Field Admins were receiving Per Diem for travel expenses, during this time many of the Installation Field Admins worked from home on a daily basis and did not travel. In fact, Misty Sanderson in her former role as Installation Field Admin was also receiving per diem on a weekly basis of $560 (tax free) including her weekly labor hours estimated 50 hours per week or more. The Installation Field Admin position was a level lower than the Plaintiff's however at one-point Install Field Admins were receiving $560 per week (tax free) in travel expenses including their weekly labor hours which averaged weekly at 50 hours per week. After this finding Company officials stated that Installation Field Admin positions were never eligible for Per Diem and therefore travel expenses were taken away from Installation Field Admins. No action was taken against Misty Sanderson nor any of the Installation Field Admins for collecting fraudulent travel expenses. (meeting included Plaintiff, Nick Choi, Misty Sanderson, Bernie Hess and Jenifer Phelps from Human Resources).

60.     Shortly after the per diem was taken from all Install Field Admins that reported to Sanderson she then "promoted" all Installation Field Admins Judy McClure (Caucasian, wife of former Supervisor, Installation Electrical, Toni Milne (Caucasian, wife of Tyler Milne Supervisor, Install Mechanical), Lucy Gomez (Hispanic, wife of David Gomez, Manager, Install Mechanical ) to the Plaintiff's title and position Installation Administrative Specialist, this included a pay raise to accommodate their loss in pay. After Plaintiff started to question Sanderson, she became frustrated and replied that "she had to take care of the Field and if it wasn't for the Field the Plaintiff wouldn't have a job". Plaintiff continued to feel disparity in pay.

14

As none of the newly promoted Installation Admin Specialist had the essential functions, qualifications, skills and abilities required for 1481 Installation Administration Specialist or 1842 Sr. Installation Administration Specialist according to Honeywell's job description dated November 15, 2014 (**Exhibit P** P-9).

61.     Over the next months the Plaintiff was directed to train Misty Sanderson on all the tasks she was trained by Cindy Levitz, former Supervisor Install Admins and Misty Sanderson trained the Plaintiff on her previous Install Field Admin responsibilities. While Sanderson was transitioning into her new role, she transited all of her projects to the Plaintiff because she didn't feel comfortable with the other Admins handing her projects because of mistakes she complained they made. Plaintiff began to provide Install Field Admin support to Brett Sanderson, Manager, Mechanical Installation. Plaintiff also continued to handle her normal contract vendor related duties including still trying to get the Installation Department to adhere to Company purchasing policies. Plaintiff continued to document advising Installation Management of continued fraudulent accounting and payroll activity which continued internally within the Installation Department. Plaintiff provided supporting documentation as requested by Company officials, still nothing being resolved. Plaintiff started to feel more hostility and resentment attitudes against her during this time.

62.     October 21, 2015 Plaintiff training Sanderson on requisitions for contract labor vendors (Attachment E-2).

63.     October 23, 2015 Email thread includes Sanderson sending an email to notify the Mechanical and Electrical Management team of a new requisition request form that needs to be submitted when requesting a vendor purchase order. The email also confirms that Plaintiff was the creator of the organizational flow chart for our contract vendor labor, it also confirms that

15

Plaintiff was creator of the written procedural draft. Sanderson did not lead the efforts because she was not qualified nor experienced enough to handle vendor contract labor (Attachment E-3).

64. Sanderson would send weekly memos to the Admins team in order to direct the Admins to help coach a Field Supervisor on how to get questionable and unverified payroll/expenses to be approved. Sanderson would always manipulate the payroll rules whenever Payroll, Benefits or HR questioned activity (Attachment E-4).

65. November 6, 2015 Andrew Geyer, Director, Mechanical Installation Services (replaced Bart Tolleson former Director, Mechanical Installation) sent an email to Misty Sanderson regarding charging "training hours" to the department in order to keep Field Employee's benefits paid after they have exhausted their paid days or if a Manager approval was given. Misty Sanderson then mismanages and instructs the Install Admins to help coordinate payroll by billing false training hours to the department for Field Employees that have a Manager's Approval" in order to keep their benefits from being terminated. Plaintiff would later be denied approval for using "vacation hours" that she had available because Ryan Balzer would later refuse to answer Plaintiff's emails, in which she ended up taking a loss in pay. (Attachment E-5).

66. Plaintiff continued to advise Misty Sanderson how she didn't feel comfortable with processing questionable project purchase orders, vendor labor payroll, internal payroll and project expense requests that were being given to her by other Installation Managers including Brett Sanderson, Installation Mechanical Manager (Husband of Misty Sanderson). Misty Sanderson told Plaintiff it's not any of her business to question anything once a Manager approves it and advised Plaintiff to do what she says. Plaintiff complained to Ryan Balzer, Sanderson's direct Manager that she was starting to be segregated from the Install Managers

16

meetings and was directly told to start copying Misty Sanderson on all communication with outside departments including all other correspondence that the Plaintiff may be privy to. Plaintiff started to notice that after complaining to Ryan Balzer, Manager, Installation Operations of Misty Sanderson's bullying treatment Sanderson started to retaliate against the Plaintiff by slowing transitioning the Plaintiff's normal responsibilities to other Install Admin Specialists as she stated that the Plaintiff was complaining to much and focusing on the wrong things.

67. November 19, 2015 Due to a backlog of vendor invoices not being able to be processed Plaintiff requests to speak with Andrew Geyer, (new) Director Mechanical Installation Services that Mechanical Managers are not following Company purchasing process. Plaintiff also advised invoices are being received without a requisition being submitted. Plaintiff explained the purchasing process to Andrew Geyer since he was new to the department and also explained that these unresolved invoices are affecting the Accounting Department as well as the balancing of our contract vendor log. Plaintiff advised that she had already spoken with Misty Sanderson multiple times but she was not doing anything to resolve issues and that the unresolved issues were not allowing her to complete her job responsibilities. Plaintiff felt that because she questioned Misty Sanderson's husband's projects and other questionable field expenses and invoicing that it presented a conflict of interest, as Misty Sanderson would direct Plaintiff to continue to process questionable department invoices and timesheets even after expressing stating that they are falsifying and charging projects for services and goods not rendered or properly approved through the Company purchasing policy (Attachment E-6).

68. December 2, 2015 Plaintiff was scheduled to train Sanderson on contract vendor labor activates (Attachment E-7).

17

69.     December 9, 2015 Plaintiff was scheduled to train Sanderson on purchase order receiving related to contract vendor labor activates (Attachment E-8).

70.     December 10, 2015 Plaintiff meeting invite from Lydia Stevens, Executive Assistant to Nick Choi, the meeting was regarding the "Installation Supervisor's meeting and Agenda". Only members of management attended these meetings. Plaintiff was always invited and attended each meeting however her title was not a manager's title (Attachment E-9).

71.     December 22, 2015 Plaintiff advises Bob Mummaw, Director, Electrical Installation Services that the department is currently not tracking travel expenses as Sourcing (Purchasing) would like purchase orders to be itemized so that activity could be tracked. Misty Sanderson and Nick Choi were both copied on the email thread (Attachment E-10).

72.     April 28, 2016 As the Vendor Labor Coordinator Plaintiff sent email to Installation Management to advise of Mandatory Installation Requisitions/Purchase policy "Effective immediately when forecasting travel and/ Per Diem they must be entered separately on its own line to be properly captured on reporting for our Installation Department" "Going forward if these forms are not completed correctly they will be automatically rejected" (Attachment E-11).

73.     April 29, 2016 Plaintiff emailing Melissa Maynard, Administrative Assistant, that supported the electrical side of projects related to contract vendor labor. Plaintiff also trained Maynard, Administrative Assistant along with the rest of the Installation office team the new purchasing guidelines (Attachment E-11).

74.     May 13, 2016 Plaintiff sent an email to the Install Admin team to remind them to copy Plaintiff on all timesheets including those that are edited after the payroll cut off. At this time, we were experiencing an increase of invoices that did not match vendor timesheets. Vendor

invoices were billing for more hours and expenses than listed on the vendor timesheets and/or the purchase order, this required research to find out the reasons why before approving timesheets (Attachment E-12).

75.    May 17, 2016 Nick Choi, VP Installation emailed Misty Sanderson to question why was the Installation Department starting to receive an increase of invoices were a proper requisition was not processed and approve. Because Misty Sanderson was not involved with the coordination of contract vendor labor activity, she forwarded the email to the Plaintiff to respond. This was one of the main issues Plaintiff was advising Installation Management (Attachment E-13).

76.    Plaintiff was involved in multiple investigation meetings regarding David Clarke, former Manager Mechanical Installation. Plaintiff was questioned by Hilary Campbell, Installation Financial Analyst if she knew if David Clarke or other Installation Managers were receiving kickbacks from our contract vendors that provided outside labor to support on projects. Plaintiff advised yes and provided supporting backup. David Clarke will later resign in November 2016.

77.    By June 2016 the Installation Department still had multiple issues regarding unresolved billing issues, issues with vendors changing vendor timesheets, invoices being received in the office with no purchase order

78.    June 7, 2016 Plaintiff emailed contract vendor Catalyst to advise them not to make any adjustments to our Company timesheets changes must be updated by our Install Admins. Plaintiff continued to coordinate the Contract Vendors to adhere to Company's purchasing policies (Attachment E-14).

79.     June 8, 2016 The email thread includes Plaintiff advising Catalyst they are not authorized to make edits on Company timesheets submitted to them by Installation. Plaintiff also sent Andrew Geyer an email to advise him on new issues surrounding contact vendors adjusting Company vendor timesheets after they have been submitted by our Install Admin team. Plaintiff asked Geyer to send an email to his Manager teams to advise that "No Contract Vendor should ever adjust/edit a Company vendor timesheet; all adjustments must go through the Install Admin team and that the Plaintiff must be copied (Attachment E-15).

80.     June 8, 2016 Andrew Geyer replied it would be received better from me or Misty since he is only over the mechanical employees. He also congratulated the Plaintiff on her work "p.s. Excellent work on the getting our contactors in line!" (Attachment E-16).

81.     June 20, 2016 Plaintiff meeting invite to Installation Smart Goals Meeting, these meetings are scheduled to discuss department goals for Installation. These meetings were only attended by Management team members, again Plaintiff attended but was not a part of the management team.  The meeting organizer was Nick Choi, VP Installation Services (Attachment E-17).

82.     July 20, 2016 Plaintiff meeting invite to 2016 Superintendent Planning Meeting. These meetings were only attended by Management team members, again Plaintiff attended but was not a part of the management team.  The meeting organizer was Nick Choi, VP Installation Services (Attachment E-18).

83.     July 20, 2016 Plaintiff meeting invite to Installation Smart Goals Meeting these meetings are scheduled to discuss department goals for Installation. These meetings were only attended by Management team members, again Plaintiff attended but was not a part of the

management team. The meeting organizer was Nick Choi, VP Installation Services (Attachment E-19).

84.     August 30, 2016 Andrew Geyer emailed Plaintiff to ask Plaintiff if she had a received/not received list for each vendor with an open purchase orders that could be sent out the day after you expected invoice date for each month. He stated the Department needed to track vendor months invoicing for forecasting more accurately for Honeywell. Because Misty Sanderson was copied, Sanderson replied to the email before the Plaintiff could (Attachment E-20).

85.     Plaintiff complained to Andrew Geyer that Misty Sanderson was not allowing her to do her job and that Sanderson was upset that Installation Management including outside Departments always contacts the Plaintiff. Misty Sanderson would yell at the Plaintiff "Why are you going what they want you to do, I am your Supervisor you do what I tell you to do". Plaintiff again expressed her concerns to Ryan Balzer because she felt that Misty Sanderson was abusing her powers to create havoc in the Installation Department.

86.     September 13, 2016 Plaintiff meeting invite to Installation Smart Goals Meeting these meetings are scheduled to discuss department goals for Installation. These meetings were only attended by Management team members, again Plaintiff attended but was not a part of the management team. The meeting organizer was Nick Choi, VP Installation Services. During this meeting it was discussed that some of the Installation Field Admins are not working during regular office hours (Attachment E-21).

87.     September 13, 2016 5:02pm Misty Sanderson sent an email to the Install Admin team because multiple complaints were being received that Install Admins "that don't go to a

jobsite or office everyday" (working from home) were not working during business hours and were not being available with the Install Supervisors needed them (Attachment E-22).

88.     October 11, 2016 Plaintiff for the 1st time involved Human Resources and spoke with Jennifer Phelps, Installation HR Generalist. Plaintiff complained of suspected fraudulent activity that has been ongoing under the direction of Misty Sanderson and others within the Installation Team. Plaintiff explained how Sanderson abuses her authority to direct Install Admins to submit fraudulent payroll and expenses. Plaintiff advised of a mutiny within the Company and how Misty Sanderson keeps telling the Install Admins "I don't want them to take payroll from me". Plaintiff provided Jen Phelps with backup to support suspected purchasing, payroll and expense fraud. Plaintiff also advised that she had already advised Installation Management multiple times with nothing being done.

89.     October 14, 2016 Plaintiff again brought up issues of the continued fraudulent payroll activity to the attention of Nick Choi, VP Installation Services. Plaintiff emailed Nick Choi because she wanted to make sure he was fully aware of what was going on as Ryan Balzer and Misty Sanderson was advising the Plaintiff to mind her own business (Attachment E-23).

90.     November 17, 2016 Sanderson sent out her weekly memo providing updates on per diem rules. Sanderson also started to closed down on Install Admins answering questions from Payroll, HR and Benefits in doing this she directed her team to add Sanderson to all emails that she is not copied on (Attachment E-24).

91.     November 17, 2016 David Clarke resigned from company. Plaintiff is certain that it had something to do with the investigation Hilary Campbell was doing and the questions Plaintiff was being asked (Attachment E-25).

22

92.     November 18, 2016 Andrew Geyer, Director Mechanical Installation Services emailed Plaintiff to ask if our current contract vendor log had any conditional formatting that will alert a Manager to review a purchase order if it drops down to 30% or 20% of the purchase order total. Plaintiff worked with Andrew Geyer including the help of Amanda Hale to get the formatting added to the current vendor labor log that was created and maintained by the Plaintiff (Attachment E-26).

93.     November 20, 2016 Contact vendor labor transitioned to one point of contact for temporary vendor labor through TAPFIN. Plaintiff and Sonja Sales, TAPFIN Coordinator worked together to train each other on the others processes. Plaintiff was responsible of coordinating TAFPIN requisitions and approving TAPFIN timesheets in Fieldglass. Plaintiff was the inside contact between TAPFIN and Honeywell/Intelligrated.

94.     November 22, 2016 Plaintiff thread regarding Stephen Hull, Supervisor, Mechanical Installation was submitting questionable payroll in order to receive a full week of per diem including holiday pay. Brett Sanderson, Manager, Mechanical Installation provided approval to pay (Attachment E-27).

95.     November 30, 2016 Plaintiff brought to Misty Sanderson's attention that Brett Sanderson was approving travel expenses outside of Company policy and felt that she needed to involve Sanderson as she didn't feel comfortable processing questionable payroll. Misty Sanderson and Brett Sanderson argues about the proper payroll policies (Attachment E-28).

96.     Between December 2 - 14, 2016 Plaintiff reached out to Hilary Campbell, now the Financial Analyst Manager, Operations to provide her with back up to support the suspected payroll and expense fraud that was happening within the Installation Department. Including Admin meeting notes that created by Misty Sanderson giving conflicting processes. When

outside departments questioned an Install Admins submittal of payroll Misty Sanderson would not allow Install Admins to respond they had to forward the emails to Misty Sanderson and/or Amanda Hale (Caucasian), Installation Administration Specialist (daughter of Installation Mechanical Supervisor) (Attachment E-29).

97.    December 7, 2016 Jessica Holland (African American), Installation Admin Specialist forwarded an email to the Plaintiff to show how Ryan Balzer and Misty Sanderson continued to treat other Installation Admins Specialist outside the protected class more favorably in allowing them to transfer from Sanderson's supervision. Toni Milne (Caucasian) wife of Supervisor Mechanical) was offered to transfer to a different Supervisor after complaining about hostile work environment she had to deal with. Toni Milne was transferred to Melissa Maynard, Supervisor Electrical Installation (also a former Installation Field Admin that was also allowed not to have to report to Misty Sanderson. Melissa Maynard (Caucasian) (wife of Ken Maynard, Manager Electrical Installation) was promote twice while reporting to the Installation Department her titles changed from: Installation Admin Assistant to Installation Electrical Coordinator to Supervisor Electrical Installation all within. Plaintiff trained Melissa Maynard while she was an Installation Admin Assistant. Maynard never reported to Sanderson due to the hostile attitude that Misty Sanderson had including her micro managing (Attachment E-30).

98.    December 12, 2016 Honeywell provided Plaintiff with her new title and new hourly rate due to the acquisition (Attachment E-31).

99.    December 13, 2016 Plaintiff sent an email to Andrew Geyer, Director, Mechanical Installation Services to advise that one of the Plaintiff's 2017 Smart Goals was to create a 2017 functional contract vendor log that would accurately capture the true information needed to keep the mechanical and electrical teams on top of forecasting and invoicing. Andrew

Geyer advised that the 2016 contract vendor log already provides everything they need his only suggestion at the time was to add a Table of Contents that is hyperlinked to each of the contractor tabs. Plaintiff advised that that task was given to Misty Sanderson but was never completed (Attachment E-32).

**Throughout the entire 2017 year the Plaintiff continued to advise the Installation Department on invoice issues while simultaneously endured and complained to Company officials' numerous times regarding her continued mistreatment, retaliatory harassment, race discrimination, age discrimination, loss in pay, loss of enjoyment of job, intentional infliction of emotional distress, falsification of PIP documents and complained of aiding and abetting discrimination by Company officials.**

### Exhibit F

100.　When Plaintiff raised more suspicions about possible payroll or expense fraud Sanderson would become more frustrated and remove the responsibility from Plaintiff. Sanderson told Plaintiff that if a manager approved an item, "don't question it and that it's not any of her business to question".

101.　January 20, 2017 Plaintiff emailed Ryan Balzer and Nick Choi to complain about continued mistreatment and harassment by Misty Sanderson. Plaintiff explained that it is becoming hard to complete her work due to the constant harassment from Misty Sanderson. Ryan Balzer responded that he will discuss the incident on Monday and asked Plaintiff to type up some notes about what is going on and send it to him. Nick Choi responded simply for Plaintiff to try and work it out with Balzer (Attachment F-1).

102.　January 25, 2017 A second outburst in the office where Misty Sanderson verbally attacks Plaintiff because she was upset that Installation Managers continue to direct the Plaintiff to complete tasks that Sanderson is not privy to. Plaintiff emails Ryan Balzer and Andrew Geyer regarding an outburst that happened in the office no Manager was available so Plaintiff emailed

Ryan Balzer and Andrew Geyer to say she needed to talk to someone ASAP she needed a mediator and needed someone to respond immediately (Attachment F-2).

103.    January 25, 2017 Incident Report was filed regarding the incident with Company officials (Attachment F-3).

104.    January 26, 2017 Ryan Balzer sent a follow-up email regarding the incident from the day before. Ryan characterized the incident "as a minor disagreement that escalated in part due to elevated stress levels within our department". Plaintiff still felt that nothing was resolved and questioned why does she need to continue to copy Misty Sanderson on everything that she does, even information that Sanderson is not privy to. Plaintiff advised she needed to know that Sanderson trusts that Plaintiff knows how to do her job (Attachment F-4).

105.    January 31, 2017 Plaintiff sent a notice to the Installation Management team including Misty Sanderson advising why invoices are going on hold. Plaintiff advised that when Install Management is contracting services, they must make sure to tell vendors Plaintiff must be copied on all invoices, as she must make sure all invoices are received monthly and before month-end (Attachment F-5).

106.    February 9, 2017 Plaintiff sent email to Accounting copying Misty Sanderson, Tricia Hayworth, Manager Accounts Payable and Andrew Geyer including a few others on the Management team advising that Plaintiff uncovered an invoicing issue where TAPFIN invoices are billing for Electrical expenses and Mechanical expenses on the same purchase order (Electrical and Mechanical teams keep separate budgets and are tracked separately per purchase order.) (Attachment F-6).

107.     Plaintiff advised Misty Sanderson that because the issues are not being resolved before approving TAPFIN timesheets in Fieldglass system it is contributing to the mixed billings. Misty Sanderson refused to listen to Plaintiff.

108.     February 28, 2017 Plaintiff sent an email to Misty Sanderson to express her concerns about how approving timesheets in Fieldglass without proper review/verification it would cause a mess which would affect the Department. Sanderson refused to address the issues and told Plaintiff "just do as I told you to do because you are waiting time verifying each timesheet", even after Plaintiff advised that there are still billing discrepancies that needed to be resolved and corrected. Plaintiff emailed Andrew Geyer to advise him the Sanderson just told her to approve all vendor timesheets without reviewing them for accuracy. Plaintiff didn't agree and advised Andrew Geyer "it could be an issue if we do that" (Attachment F-7).

**Plaintiff has a flurry of emails directed to the Installation Management including Misty Sanderson and Ryan Balzer that advises of the continuing billing issues related to vendor invoicing, subcontractor invoices coming in with no approved purchase order, services and goods being charged to the incorrect purchase orders.**

### Exhibit G

109.     March 14, 2017 Plaintiff emailed Andrew Geyer to advise of new issues that she discovered and possible solutions (Attachment G-1).

110.     March 15, 2017 Hilary Campbell, Manager, Financial Analyst emailed Misty Sanderson "who is the primary vendor for TAFPIN labor? Is it Manpower? Sanderson forwarded the email to Plaintiff because Sanderson did not know that TAPFIN was Manpower, Plaintiff answered question (Attachment G-2).

111.     April 24, 2017 Brett Sanderson sent out an email to Misty Sanderson, Tonya Seiwert and Plaintiff with a copy to TAPFIN personnel regarding meeting with TAPFIN. For the

27

Intelligrated side invoicing issues go to Plaintiff and Seiwert and for project extensions Plaintiff and Seiwert would be set up as delegate to do this for managers" (Attachment G-3).

112.    May 3, 2017 Plaintiff emails Hetal Petal, TAPFIN Coordinator advising Petal to keep Plaintiff informed of any changes on that she may see on her end to existing TAPFIN purchase orders so that Plaintiff can make sure purchase orders are accurate prior to timesheet approvals so invoices do not go on hold (Attachment G-4).

113.    May 15, 2017 Sanderson advised Plaintiff that she should no longer work from home. Plaintiff had always had the ability to work from home which was promised to her when she accepted the Installation Admin Specialist position.  Plaintiff had an appt to enroll her son into daycare and worked from home so that she didn't have to exhaust any paid time she had available. Misty Sanderson still allowed other members of her team work from home even while at home sick (Attachment G-5).

114.    May 18, 2017 Plaintiff emailed Andrew Geyer, Director Mechanical Installation Services to advise that the department needed a dedicated Installation Labor Contract Coordinator for the department and express her desire to not have to report to Misty Sanderson and the fact that Sanderson keeps pulling her back from helping. Plaintiff advises that she's ready to take the next step in and help coordinate for his team Managers, in which she handled prior to Misty Sanderson removing her from Manager meetings etc. Geyer responds "You would be my first choice for a position like this, if it were to come up" (Attachment G-6).

115.    May 18, 2017 Plaintiff emailed Melissa Maynard, Supervisor Electrical Installation Services to see if she had an opportunity within her team that the Plaintiff could transfer to. Plaintiff advised that her current role has drastically changed since Sanderson has managed her. Plaintiff advises that she wants an opportunity to grow and would like a

responsibility she can take ownership of. Maynard responded "I know you have the potential- I will keep my eyes open" (Attachment G-7).

116. May 22, 2017 Sanderson emailed the Installation Admin team to advise that she is transitioning responsibilities around again. Plaintiff had already complained to Ryan Balzer about Sanderson starting to remove her normal job duties because she stated Plaintiff was making her look bad by complaining of issues within the department (Attachment G-8).

117. May 24, 2017 Plaintiff emailed Justin Best, Manager, Installation Services regarding her workload and to advise why she is behind. Plaintiff advises because of transition changes it's not allowing her to stay on top of her office responsibilities that she normally is always on top of. Melissa Maynard was also in the email thread. Plaintiff then advised Maynard of issues with other Install Admins not being able to keep up with their workload and now Sanderson is shifting their loads on Plaintiff and Holland. Plaintiff is also Hollands main back up during this time as well (Attachment G-9).

118. May 25, 2017 Plaintiff emailed Ryan Balzer in regards to her current backload and the issues that are causing her workload not to be completed. Plaintiff advised Ryan Balzer that many of the Field Admins are not qualified enough to handle their workload and the unfair shift of assignments transitioned to/from Plaintiff by Sanderson was causing her to be behind and miss deadlines that she is responsible for. Plaintiff complained that Misty Sanderson was shifting and removing her duties in retaliation because she complained to Ryan Balzer (Attachment G-10).

119. On June 5, 2017 Ryan Balzer scheduled a quick discussion with Plaintiff to advise her that Misty Sanderson was probably stressed and overwhelmed and wanted the Plaintiff to just relax. Ryan Balzer stated that Plaintiff need to be more like Jessica Holland (the only other

29

African American employee out of 30-40 estimated Install Admins that report to Sanderson) and just do her job.

120.    On June 5, 2017 Ryan Balzer scheduled a meeting titled "Workplace Harassment" due to the current issues within the Installation Admin team under that supervision of Misty Sanderson. During the meeting Ryan Balzer announced that Lucy Gomez was no longer with the Company. Balzer mentioned that Human Resources was involved and found no issues of a hostile work environment (Attachment G-11).

121.    June 6, 2017 Plaintiff advised Misty Sanderson of the escalated issues that were growing with TAFPIN regarding crossed purchase orders and incorrect billings due to corrections not being made BEFORE a timesheet was approved in Fieldglass. Misty Sanderson continued to direct Plaintiff to blind approve all vendor timesheets in Fieldglass which were now beginning to cause a backload the Accounting Department. Misty Sanderson was still refusing to allow Plaintiff to talk or advise the Installation Management team on escalated issues.

122.    On June 6, 2017 Installation Department Management team was notified that TAPFIN has threaten pull over 100 workers from various projects across North America due to non-payment of invoices. Plaintiff has a slew of emails that confirms she tried on multiple occasions to advise the Installation team on relevant issues pertaining to invoice holds and solutions and no one bothered to correct them (Attachment G-12).

123.    June 20, 2017 Honeywell emails "Integrity and Ethics in Financial Reporting Video email to all Employees. The email express importance for "maintaining accuracy in our accounting", "Integrity and Ethics is the accuracy of our books and records", further states "Something seemingly as small as delaying a scheduled payment to a vendor can affect our financial reporting and, ultimately, the integrity of our brand" (Exhibit A Attachment A-3).

124.    June 22, 2017 Plaintiff sent email to Andrew Geyer, Director Mechanical Installation to advise to him that the mechanical team and electrical team are playing a big role in creating the invoicing issues because his team is not adhering to the Company purchasing process, which is to notify and coordinate with Plaintiff to get an approval from Sourcing first before contracting services with vendors (Attachment G-13).

125.    June 26, 2017 Misty Sanderson transitions Tonya Siewert (Caucasian), new Installation Admin Specialist into clearing the contract vendor related invoices for Brett Sanderson, Manager, Installation Services (husband of Misty Sanderson) and Garland Floyd, Mechanical Installation Coordinator. Plaintiff warned with this transition it can easily cause invoicing to get behind. Plaintiff mentioned that TAPFIN was approved to be paid on a weekly basis and that invoicing issues can cause TAPFIN to not get paid and will affect the Accounting Department (Attachment G-14).

126.    June 26, 2017 Tonya Seiwert (Caucasian) left work early due to a family emergency, she was able to work from home without having to exhaust her personal days as Sanderson made Plaintiff. When plaintiff requested to work from home due to personal reasons, she made Plaintiff exhaust per personal paid time and did not allow Plaintiff to work from home, however allowed other similar situated Install Admins outside the protected class to continue to work from home (Attachment G-15).

127.    July 6, 2017 Misty Sanderson notice for recurring Install Meeting for all Install Admins that handle duties Supervised by Sanderson attendees include: Maria Floyd, Install Admin, office Install Admins and Site Admins all that take direction from Sanderson on a daily basis (Attachment G-16).

128.    July 21, 2017 Due to the growing issues related to contract vendor labor Melissa Maynard, Supervisor, Electrical Installation sent an email to the Installation Management including Misty Sanderson, Andrew Geyer, Director Installation Services, Nick Choi, VP Installation Services and Plaintiff that she is going to schedule a meeting with TAPFIN regarding several billing issues. Andrew Geyer replies to Maynard's emails and states "We also need to make sure to state that invoices that are not correct or lacking in validation will be rejected or held until 100% confirmed" (Attachment G-17).

129.    July 21, 2017 Misty Sanderson sent an email to Brian Auden and Jen Klehr to advise "We are having a hard time keeping up with all of the invoicing mistakes with the current Field glass process we have in place" Sanderson advises that Chase Stoltz is asking for payment for invoices on hold in our system due to invoicing issues. He is stating that because we approved these hours on a timesheet, we have to pay the costs on the invoices". On this same email Sanderson also, asks "should we stop approving timecards until corrections have been made?" Plaintiff told the Installation team back in February 2017 that approving timesheets in Fieldglass without properly verifying if there is an invoice that needed to be updated/changed/researched will cause a MESS with TAPFIN invoicing and no one in Management listened nor tried to resolve (Attachment G-18).

130.    July 25 2017 Email thread that includes: Installation, Accounting and TAPFIN regarding expedited payments in order to clear up TAPFIN invoices (Attachment G-19).

131.    July 25, 2017 Tricia Hayworth, Manager, Accounts Payable was on an email thread with TAPFIN officials regarding payment on invoices. Hayworth added Plaintiff, Sanderson to the email thread the next day so that all parties were updated on payment status of TAPFIN invoices. Sanderson states "we will be rejecting time and expenses until they are

corrected on TAPFIN's end instead of getting billed incorrectly". Plaintiff had been telling Sanderson including other members of management that Sanderson was forcing Plaintiff to approve all TAPFIN timesheets without verification including approving expenses (Attachment G-20).

132.    July 26, 2017 Plaintiff providing research for the Accounting department for TAPFIN invoices. Plaintiff advises that she used the headcount report. Sanderson stated that Plaintiff refused to use the 'headcount report", Sanderson was copied on this exact email (Attachment G-21).

133.    July 27, 2017 Plaintiff sent an email to the Installation Team as issues were now escaladed up to Executive level both with Honeywell/Intelligrated and Tapfin. Plaintiff sent the email to the Installation Management so that they were ALL aware of the expedites and issues regarding TAPFIN invoicing and why she is behind on her workload. Plaintiff advised that Installation needed a dedicated person inside the Installation team to handle these responsibilities and that until the team communicates better and works quickly to resolve the open issues Installation will continue to have ongoing issues. Plaintiff again involve Ryan Balzer to directly tell him why she is behind on her work and that she is running in circles researching on the same issues and that someone needs to do something. Also advised him that Sourcing, Finance and Accounting has been asking her questions about what is going on within the department (Attachment G-22).

134.    On July 28, 2017 Misty Sanderson pulled Plaintiff into a meeting room and directed Plaintiff to refrain from emailing anyone in Management regarding any of her complaints. Sanderson stated that "no one is going to respond to her".

135.    On July 28, 2017, Plaintiff went down stairs crying and spoke with Vidal-Clarisey, Installation HR Generalist, to advise that the hostile environment has become so unbearable that it is beginning to make her feel sick because no one is doing anything to stop the continued discrimination and harassment by Misty Sanderson. Plaintiff asked how to immediately report work harassment against Misty Sanderson. Vidal-Clarisey advised that she would forward the Plaintiff Honeywell's Global helpline information in order to report her complaint, per Company policy.

136.    Later that evening Vidal-Clarisey emailed Plaintiff and advised her she needed to speak with her. Vidal-Clarisey advised after speaking with her manager Bernie Hess, Director Human Resources, she was advised to tell me not to contact the Honeywell Global Integrity helpline and that she can handle my complaint since she was my HR Generalist, and ONLY if it needs to be expedited will they involve Honeywell (Attachment G-23).

137.    Because Plaintiff did not feel confident that her complaint would be heard Plaintiff, per Honeywell policy the Plaintiff called the Honeywell Global Integrity helpline to report her discrimination and work harassment complaint (Honeywell promotes contacting the Integrity line to report suspicion of fraudulent activity). The Honeywell hotline advised Plaintiff to call back in 2 weeks for an update and issued Report #258870809401

138.    July 31, 2017 Plaintiff coordinating with Sonja Sales, TAPFIN Coordinator researching using the "Headcount" report, Misty Sanderson was copied on email (Attachment G-24).

139.    Plaintiff contacted the Honeywell Global Integrity helpline for an update and was advised "not enough information had been given to pursue an investigation". Plaintiff knew at that time that nothing was going to be resolved and she was running out of options for help.

140.    August 2, 2017 Melissa Maynard sent an email to the Plaintiff and Sanderson also copying Nick Choi, VP Installation Services to advise that TAPFIN report is showing flat rates hitting with OT and DT rates. Can you look into this or you may already know the answer? I think we are going to have to audit every site that has a TAPFIN presence" (Attachment G-25).

141.    August 3, 2017 Plaintiff met with Marillia Vidal-Clarisey for a follow-up from the meeting on July 28, 2017 and to update Vidal-Clarisey on any new information that I could give her. Plaintiff advised Vidal-Clarisey that she wanted to reach out to Nick Choi so that he was aware that she had now involved Human Resources.

142.    August 3, 2017 Plaintiff sent a detailed email to Nick Choi to bring up issues that were not being addressed and wanted to address the issues related to the gaps within the process including the unethical processes being directed by Misty Sanderson and how it is causing the Plaintiff to not be able to complete or meet her deadlines (Attachment G-26).

143.    August 4, 2017 Misty Sanderson email to the Installation team advises that "under the IRS guidelines Per Diem can be taxed under certain circumstances. When those circumstances are met the IRS considers Per Diem an income rather than an expense recovery. All Full Time Installers must complete the form no later than August 11, 2017. Use physical addresses, no PO boxes. Submit all forms to Misty Sanderson. Make sure you get them completed ASAP" (Attachment G-27).

144.    August 7, 2017 Plaintiff had meeting with Nick Choi. Plaintiff advised Choi of all open issues and Nick Choi advised to "give him a week to look into" Plaintiff provided Nick Choi with a list of current TAFPIN issues and the solutions to clear them up specifically advising "before a timesheet is approved we must: verify PO is correct, if not correct, get it updated BEFORE we approve the timesheet in Fieldglass. Plaintiff later followed up with an email to

35

Nick Choi so that he further understood the importance of verifying timesheets in Fieldglass BEFORE approving the vendor timesheets, in which Sanderson was directing Plaintiff to do. (Attachment G-28).

145. August 7, 2017 Tonya Seiwert resigned in less than 6 months of working under the direction of Misty Sanderson and advised Plaintiff if any happens to have Honeywell ask for her exit review. All duties contract vendor related duties transferred back to the Plaintiff, as no one handled contract vendor labor besides the Plaintiff prior to Siewert's joining of the Install Admin team (Attachment G-29).

146. August 10, 2017 Melissa Maynard, Supervisor Electrical Installation reached out to Plaintiff to see how she was doing. Plaintiff updated Maynard on the meeting between her and Nick, as Maynard was already aware of the issues between Plaintiff and Sanderson. Plaintiff advise that Nick Choi said to give him a week to come up with a plan and that he didn't know if Plaintiff was going to report Maynard or another Manager but he wanted to get things resolved Maynard responds "I hope they will utilize you to your full capabilities" (Attachment G-30).

147. August 11, 2017 Plaintiff received her mid-term review rated "Outstanding Performer". Sanderson advised that Management was looking at Plaintiff for promotion and to "keep up the good work" (Attachment G-31).

148. August 11, 2017 Melissa Maynard, Installation Electrical Supervisor and Andrew Geyer, Director Installation Mechanical advised Plaintiff to no longer approve any vendor labor timesheets that were not correct. Misty Sanderson was also copied on that email thread (Attachment G-32).

149.    August 15, 2017 Misty Sanderson stopped Plaintiff for making corrections on vendor labor timesheets. Sanderson was so furious that she stopped Plaintiff from approving timesheets and advised that she was going to approve them.

150.    August 15, 2017 Plaintiff emailed Vidal-Clarisey to reschedule their meeting but she wanted to have the meeting that was scheduled with Nick Choi, Ryan Balzer, Misty Sanderson, Andrew Geyer, Melissa Maynard and Brett Sanderson first before providing Vidal-Clarisey with an update because the meeting was going to be about open issues within Installation (Attachment G-33).

151.    August 15, 2017 Meeting to discuss open issues regarding Tapfin. In attendance was Plaintiff, Nick Choi, Andrew Geyer, Ryan Balzer, Misty Sanderson and Melissa Maynard (by conference call), later joined by Jen Saphir, Honeywell Purchasing Manager. During this meeting Nick Choi stepped out of the meeting and Ryan Balzer told the Plaintiff "I'm going to take this opportunity now to tell you to stop going to Nick Choi and telling him anything". By the end of the meeting Nick Choi advised Plaintiff to continue reject any vendor related timesheet that was being submitted in Fieldglass that caused questions or was incorrect. At the end of the meeting Plaintiff emailed Maynard to see if she heard what Ryan Balzer said to Plaintiff. Maynard advised yes and stated that it was weird.

152.    Plaintiff had to stay in the office until 9:15pm that night to complete the process of vendor timesheet approval in order for the workers to be paid on time. Sanderson never did work on approving any timesheets that she took from Plaintiff earlier that day.

153.    August 16, 2017 Plaintiff sent Nick Choi an email to advise of new issues that she was starting to uncover with regards to TAPFIN purchase order terms. Plaintiff provided solutions and options for Management to discuss in order to clear up invoicing and billing issues.

Plaintiff also explained how it is taking her 3x's as much time to clear Brett Sanderson's projects and that Brett nor Misty Sanderson wanted her to involve Nick Choi (Attachment G-34).

154.     August 16, 2017 Plaintiff sent Vidal-Clarisey an email that detailed the meeting between Nick Choi, Andrew Geyer, Ryan Balzer, Misty Sanderson and Melissa Maynard. Brett Sanderson did not attend the meeting. Plaintiff also advised Vidal-Clarisey that Sanderson had just sent her a meeting invite titled "Discussion" 30 mins prior to her email (Attachment G-35).

155.     August 16, 2017 11:53am Sonja Sales, TAFPIN Sr. Program Professional emailed Sanderson to advise that her manager wanted her to schedule a conference all to go over the current PO, timekeeping and mapping and to work on ideas to improve process. Plaintiff was copied on the email, however Sanderson advised to set up a meeting with her first. If they needed anyone further, they can set up another call. Plaintiff complained Sanderson was eliminating her out of her role as the contract vendor labor coordinator for the department (Attachment G-36).

156.     August 16, 2017 Plaintiff emailed Melissa Maynard to update her on a discussion the Plaintiff had with Sonja Sales, TAPFIN Coordinator and proposed solutions on how to eliminate the open issues with TAPFIN timesheets (Attachment G-37).

157.     August 18, 2017 Misty Sanderson scheduled a meeting with Plaintiff titled "Discussion" at 3:30pm to 4:00pm, meeting was later cancelled.

158.     August 18, 2017 Nick Choi scheduled a follow up meeting with the Plaintiff. He advised the Plaintiff to provide him with the issues and solutions. Plaintiff supplied Nick Choi with backup.

159.     August 21, 2017 Blazer and Sanderson tried to put Plaintiff on a Performance Improvement Plan ("PIP"). At the beginning of the meeting, Balzer let Sanderson aggressively criticize Plaintiff. When Plaintiff tried to correct her, Balzer repeatedly told Plaintiff to "shut

up." Because Balzer and Sanderson were ganging up on her, Plaintiff requested a third party - Nick Choi - attend the meeting. In response, Balzer abruptly said "no" claiming "you are wasting too many people's time." Plaintiff immediately emailed Nick Choi after the meeting to advise him that Balzer and Sanderson were both attacking her and that she asked Balzer for a mediator like Choi or HR. Choi never responded to the email (Attachment G-38).

160.    August 21, 2017 Immediately after the meeting Plaintiff had with Balzer and Sanderson she emailed Nick Choi to advise him that Balzer and Sanderson were both attacking Plaintiff in a meeting. Balzer advised Sanderson to email the Vendor Labor Process to Plaintiff after the meeting. Plaintiff was already familiar with process as Plaintiff is the originator of the written process besides the changes that Sanderson has made since she started taking over Plaintiff's responsibilities away. Choi never responded to Plaintiff's email (Attachment G-39).

161.    On August 23, 2017, Plaintiff attended a meeting in the HR Department with Director of Human Resources Bernie Hess. Also, in attendance were Choi and Balzer, but curiously not Sanderson. When Plaintiff asked why Sanderson was not there, no one responded.

162.    In response to Hess' question about what her complaint was about, Plaintiff explained that her complaint was about the unresolved accounting practices that are being directed of her to do and the harassment of Sanderson but now she wanted to file a workplace racial harassment complaint against both Sanderson and Balzer.

163.    In response, Hess spend approximately thirty minutes trying to explain what harassment was. Plaintiff felt that Hess was trying to convince her to drop her complaint.

164.    After his lengthy explanation, Hess then asked Plaintiff "Well what do you want me to do".

165. Plaintiff told Hess that she wanted to file racial harassment complaints against both Sanderson and Balzer and she wanted the Company to investigate both of her complaints.

166. Later that day Misty Sanderson emailed Plaintiff and removed the responsibility of approving vendor labor timesheets. Plaintiff emailed Nick Choi immediately to advise, since on August 15, 2017 that was Nick Choi's last direction to Plaintiff. Plaintiff also advised that she wanted to talk to him regarding what exactly are her responsibilities going to be. Nick Choi never responded and the responsibility was never given back.

167. August 25, 2017 Plaintiff reached out to Jennifer Saphir to request for an independent review of all the open issues that are going on because she didn't feel safe and that no one within the department is talking to her and feels that she is dealing with an organized group which included Intelligrated Human Resources, she feels like an outcast and complained that it was just a matter of time before the department completely removes Plaintiff out of her role. Plaintiff requested that no one from Intelligrated is involved because the Plaintiff was fearful of further retaliation. Saphir advised "My HR has NO association with Intelligrated and is aligned to support our Honeywell Corporate Procurement team, I would like to share your note with my HR in order to find the best person engage from the Honeywell side. Plaintiff advised that she didn't mind Saphir sharing her complaints with Honeywell HR but Plaintiff advised that she did not want the information shared with Intelligrated at least at this time (Attachment G-40).

168. August 28, 2017 Plaintiff is coordinating with Garland Floyd, Mechanical Installation Coordinator advising that she needed to get the information he needed from the "Headcount" report a report that Sanderson required Plaintiff to use. Plaintiff advised that the spreadsheet that Sanderson wanted Plaintiff to use did not have real time information the Plaintiff required in order to verify contract vendor timesheets properly (Attachment G-41).

169.     Later that day Jennifer Saphir reached out to Plaintiff and schedule a confidential meeting for 4:00pm to discuss in detail Plaintiffs complaints (Attachment G-42).

170.     August 29, 2017 Jennifer Saphir emailed Plaintiff to request the Honeywell Integrity report #258870809401, a complaint that was filed by the Plaintiff earlier in the year which concluded "not enough information was given to investigate". Plaintiff later emailed Jennifer Saphir to advise that she just received her first official Intelligrated HR meeting regarding Sanderson and Balzer (Attachment G-43).

171.     August 29, 2017 Plaintiff sent an email to Justin Best to advise of her workload since returning from the Accounting department. Plaintiff noticed that Sanderson was not processing Plaintiff's responsibilities as Balzer and Sanderson advised would happen. Plaintiff was complaining of the backload and how she will try to get cleared (Attachment G-43a).

172.     August 31, 2017 Sanderson sent an update meeting invite to all Install Admins to change the bi-weekly meetings to weekly, the attendees include Maria Floyd, Plaintiff and all other Install Admins that take direction from Sanderson (Attachment G-44).

173.     September 7, 2017 Vidal-Clarisey met with and asked Plaintiff to sign a "confidentiality agreement" stating that the Company was starting its investigation of her complaints. Vidal-Clarisey told Plaintiff that she could not talk with anyone about her complaints as of that date and that if she did, she could be terminated (Attachment G-45).

174.     September 8, 2017 Marillia Vidal-Clarisey, HR requested Plaintiff to email her additional supporting documentation regarding her discrimination and work harassment complaints. Plaintiff sent requested emails at 3:48pm (Attachment G-46).

175.     September 8, 2017 4:30pm Plaintiff emailed Jennifer Saphir, Honeywell Sr. Procurement Manager to advise that she received her official notice that Intelligrated HR started

41

their investigation. Plaintiff stated that Vidal-Clarisey said it will take a month to complete the full investigation she also expressed how she feels like an outcast. Saphir advised Plaintiff that "I do know Honeywell HR reached out to me. I think they are requesting Intelligrated HR to own the investigation with their oversight" (Attachment G-47).

176.    September 11, 2017 9:18am Marillia Vidal-Clarisey reached out to Plaintiff on clarification of the backup sent on September 8, 2017 and also wanted Plaintiff to provide her with the "invoicing issues" related to TAPFIN and supporting backup (see Attachment G-46 email thread).

177.    September 11, 2017 4:52pm Sanderson sent an email to Plaintiff to question her when did she stop working on TAPFIN. Plaintiff advised that she stopped working on TAPFIN August 23, 2017 when Sanderson directed her to stop working on TAPFIN including no longer approving TAPFIN timesheets. Plaintiff also question Sanderson on why her responsibilities are being taken away. Sanderson response "This TAPFIN process has been confusing to all so I'm working on getting the process completed. Sanderson further stated "Once all of that is complete and the process finalized than I will re-assign the TAPFIN workload (Attachment G-48).

178.    September 13, 2017 7:17 am Tricia Hayworth, responded to Plaintiff's email from September 5, 2017 regarding Elite Force Staffing and that she received all invoices in house except those that were awaiting purchase order revisions. Hayworth responded advising "We will wait to hear from you on the other PO revisions" (Attachment G-49).

179.    September 13, 2017, Upon Plaintiff's arrival to her desk she was stopped by Balzer and told her that he needed her for an important mission, he stated that Nick Choi had just got his butt chewed out for being overbudget by 3 million dollars and he needed me to go to accounting and help them get caught up. Plaintiff asked why couldn't one of "temporary

contractors" or another Install Admin be volunteered since no one else besides me handled the contract vendor labor and the department already was behind. Balzer responded he thought she was the most qualified person since I worked closely with accounting clearing Install invoices. Plaintiff had never been down to accounting to work this was the first time ever being asked to work in that department.

180.    September 13, 2017 8:29 am Balzer emailed Nick Choi that he spoke with Misty Sanderson on where they are with invoices and Sanderson advised that the Plaintiff is behind on subcontractor invoices as well as TAPFIN invoices (Attachment G-50).

181.    September 13, 2017 8:54 am Blazer sent an email to Nick Choi, Misty Sanderson and Tricia Hayworth copying Andrew Geyer, Chris Forte and the Plaintiff on an email advising the Plaintiff would be relocated to AP for the next 8 days or however long it takes to help get caught up. Plaintiff's HR investigation on hostile workplace harassment against Balzer and Sanderson had officially started on September 7, 2017 (Attachment G-G50).

182.    September 13, 2017 9:04 am Tricia Hayworth requested Payables User access for Plaintiff (Attachment G-51).

183.    September 14, 2017 8:34am Per Balzer's direction Plaintiff forwarded all open work that she was responsible for to Sanderson. Balzer advised Sanderson would make sure Plaintiff's workload is processed while Plaintiff is working with Accounting. Plaintiff was advised not to work on anything for Installation and forward all emails that come to Plaintiff to Sanderson. Although Plaintiff questioned this work transfer, Balzer insisted on the transfer and stated "she was the most qualified" (Attachment G-50).

184.    September 14, 2017 Later Marillia Vidal-Clarisey scheduled a meeting with Plaintiff to remind her that the investigation is now official that that she is not able to speak with anyone about any of the events pertaining to the investigation

185.    September 18, 2017 11:05am Steve Worrell, Elite Force Staffing, emailed Plaintiff regarding past due invoices. Plaintiff advised Worrell she is unavailable and included Sanderson on the email and asked Sanderson to assist Worrell (Attachment G-52).

186.    September 20, 2017 9:54 am Steve Worrell emailed Plaintiff again requesting for assistant and stated that Sanderson still has not contracted him. Plaintiff involved Tricia Hayworth and to updated her on Worrell's situation and reminded her about the revisions Plaintiff processed that they both were waiting on prior to Plaintiff relocating to accounting. Hayworth explained what was needed to get his invoices released and ok'd Plaintiff to receive in order to get past due invoices paid to help satisfy the customer. At 10:24am Plaintiff emailed Worrell under the direction of Hayworth to provide Worrell with an update and to advise him of the accounting holds that required lien waivers (Attachment G-52).

187.    Plaintiff has a flurry of emails of her forwarding all Installation related invoices, requests etc. to Sanderson. Plaintiff also advises senders and requesters that she is unavailable and that Sanderson will respond.

188.    September 20, 2017 12:09pm Plaintiff also advised Sanderson to email the Installation team to let them know she is not available as Plaintiff continued to receive daily Installation emails and Plaintiff felt Sanderson and Balzer were shifting blame of the backup in Installation on Plaintiff. Sanderson emailed the Installation team but failed to state that Plaintiff is unavailable. Plaintiff continued to receive Installation requests and continued to forward to Sanderson (Attachment G-53).

189.    September 20, 2017 3:52 pm Misty Sanderson emailed Plaintiff "While you are helping out with accounting, we will be handling your installation responsibilities" and copied Ryan Balzer and Tricia Haworth on the email. She then questioned why she received on a purchase order for Elite Force Staffing. Plaintiff advised that she only helped because the customer escalated the issue of his past due invoices and advised that Worrell complained that Sanderson was not contacting him so he reached back out to her. Plaintiff also explained some of the invoices were holding due to a revision request the Plaintiff processed prior to her move to the accounting department. Misty Sanderson advised Plaintiff to "please do not complete anymore Installation transactions until you are finished with accounting" (Attachment G-54).

190.    September 20, 2017 5:02pm Judy McClure forwarded an email to Plaintiff advising "Please see below". On September 19, 2017 at 8:44am Sanderson sent an email to all Install Admin team except Plaintiff to advise that she had a personal appoint and that she would be working from home today. When Plaintiff requested to work from home due to personal appts Sanderson would force Plaintiff to exhaust her personal paid time and not allow Plaintiff to work from home (Attachment G-55).

191.    September 21, 2017 Plaintiff was accidently copied on an email thread that included Vidal-Clarisey, Bernie Hess, Tom Luers, Electrical Install Management and Mechanical Install Management the email is in regards to the IRS forms that were due to have been completed by Full time Install personnel. The email details Installation Management conversation in which Nick Choi, VP Installation Services states "I recommend that we speak with them again, and coach them in filling out the form". Andrew Geyer, Director Mechanical Installation states "The idea is to get an address of some type so they do not have to possibly pay taxes" (Attachment G-56).

192.     September 26, 2017 4:22pm Sanderson sent Plaintiff to provide her with what she wants Plaintiff to do when she returns back to the office tomorrow which included getting with Amanda Hale so see where she is with purchasing cards and pick back up where she left off; prepare to train new hire Beth Ackley (Caucasian) on coding; get with Jessica Holland so that she can retrain Plaintiff so that she can back up Holland on orders; and that Sanderson and Plaintiff would get together to work on past due subcontractor invoices. Sanderson stated that Tricia Hayworth requested her to work on accounting items for the next 2 days but it could be from Plaintiff's own desk in Installation. Sanderson stated she volunteered the Plaintiff to continue to work for the accounting department (Attachment G-57).

193.     September 27, 2017 When Plaintiff returned to work the next day, she asked Sanderson and Balzer when would she be receiving her normal duties back. Sanderson never responded but Balzer responded "changing up duties every so often provides for workload stability and cross-trained team members". Plaintiff's responsibilities for the department had never been cross-trained until she started to complain about suspected fraudulent activity and the hostile environment in which she was subjected to (Attachment G-58).

194.     Balzer later pulled Plaintiff into a meeting with Vidal-Clarisey and accused her of telling someone that the Company would not hire her because she was black. Plaintiff denied the accusation. Plaintiff questioned who told him that? Balzer just replied "don't worry about that I have my sources and refused to give a name. Balzer stated "just consider this your warning". Plaintiff advised Marillia Vidal-Clarisey that this meeting was a form of retaliation and requested that the meeting be added to the investigation as support of the hostile environment that the Plaintiff is continuing to deal with. Vidal-Clarisey told Plaintiff she's not sure that this meeting could be combined but that she would look into (Attachment G-59).

195. After the meeting the Plaintiff immediately searched online for the Ohio Civil Rights Commission (OCRC) website and electronically filed a discrimination complaint against Honeywell/Intelligrated.

196. On September 28, 2017 1:39pm Sanderson sent an emailed to the entire Install admin team, including Maria Floyd advising that Honeywell has suspended and removed all purchasing rights for all admins that reported to Misty Sanderson with exception to the admins that were trained to process requisitions. Plaintiff was not listed as a person to go to for processing even though Plaintiff the most qualified of the Admin team for processing of requisitions (Attachment G-60).

197. September 28, 2019 Misty Sanderson notice for recurring Install Meeting for all Install Admins that handle duties Supervised by Sanderson attendees include: Maria Floyd, Install Admin, office Install Admins and Site Admins all that take direction from Sanderson on a daily basis (Attachment G-61).

198. September 28, 2017 Because Plaintiff had access to Install Admin's calendars, she was able to see that Vidal-Clarisey scheduled a meeting with Jessica Holland at 3:15pm. Plaintiff knew that it was related to the reverse racism that Balzer subjected her to the day before Supporting document sent to OCRC shows Jessica Holland's interview was taken by Marillia Vidal-Clarisey on September 29, 2017 (see **Exhibit O** Attachment O-4).

199. On September 29, 2017 9:10 am Sanderson advised Plaintiff that she was able to start back working on clearing "subcontractor invoices' only. Plaintiff later found out that Sanderson failed to work on any of the invoices that the Plaintiff sent to her during the time she was volunteered to work in the accounting department (Attachment G-63).

200.    September 29, 2017 9:13 am Plaintiff emailed Tricia Hayworth, Manager Accounts Payable that Sanderson has allowed her to work on subcontractor invoices only and not TAPFIN. Plaintiff also advised Hayworth that Sanderson had only processed 2 invoices out of all the invoices sent to Sanderson between September 14, 2017 until September 27, 2017 (Attachment G-64).

201.    On September 29, 2017 1:30 pm, Balzer invited Plaintiff to participate in a "Performance Discussion" with Vidal-Clarisey and himself. During this discussion Balzer had a list of various other performance issues he accused the Plaintiff of, Balzer stated "This is not the first time I have had to ask you to refrain from challenging or complaining about our process, and to listen to and follow your supervisor's instructions. Further stating this is your problem to fix. If you do not fix this immediately, I will have to implement further corrective action" (Attachment G-65).

202.    Balzer also presented the Plaintiff with a falsified PIP dated August 29, 2017. During this meeting Balzer argued in the presence of Vidal-Clarisey that he had already meet with the Plaintiff regarding that PIP, the Plaintiff rejected that the meeting ever happened and that it was the 1st time that she had ever seen such notice (Attachment G-66).

203.    Plaintiff asked Vidal-Clarisey why she could not see that Balzer and Sanderson were retaliating against her and why is she allowing it to happen in her presence. In response, Vidal-Clarisey said that this discussion was about Plaintiff's job performance, not retaliation. Vidal Clarisey also stated that Balzer and Sanderson has the right to file investigations as well just as the Plaintiff did.

204.    After the meeting at 1:49pm Balzer emailed her a list of her performance issues and restated what he said in the meeting that included HR. Plaintiff responded by requested

48

Vidal-Clarisey to add the meeting to her open hostile environment investigation as more supporting back up to support continued harassment. In response Vidal-Clarisey replied "As discussed in the meeting earlier, this was a performance issues discussion not related to the ongoing investigation but I'll certainly look into your request to include this into the investigation and I'll follow up with you (Attachment G-67).

205.    September 29, 2017 Justin Best, Manager, Electrical Installation emailed Plaintiff to research on a requisition Plaintiff processed on September 12, 2017. Plaintiff was relocated to Accounting September 14, 2017. Plaintiff felt that Sanderson and Balzer were work together causing her backload and her to miss deadlines. Plaintiff advised Justin Best and Melissa Maynard that Sanderson and Balzer were the cause of the invoicing issues contributing to the department because none of her responsibilities were handled while she was in Accounting. Maynard responded "What a nightmare" (Attachment G-68).

206.    Sometime during the Annual Installation Supervisor's meeting one of the Install Admins gave the Plaintiff a copy of an email that Lucy Gomez, former Installation Admin Specialist wanted the Plaintiff to have because she knew that Sanderson was harassing Plaintiff as well. Plaintiff provided copies of the emails to the OCRC (Exhibit H).

207.    Lucy Gomez, Hispanic, former Installation Admin Specialist was experiencing hostile situations between herself and Misty Sanderson. Marillia Vidal-Clarisey accidently copied Gomez on an email to Bernie Hess, Director HR and David Schweitzer, Honeywell's Legal counsel regarding "Resignation – Lucy Gomez dated June 6, 2017. The emailed stated that Gomez was resigning due to Management (Attachment H-1).

208.    On June 9, 2017 Lucy Gomez responded and added Nick Choi, VP Installation Services to the email detailing her reasons for resigning due to her constant intimidation by

Misty Sanderson. The email detailed the hostile work environment that Gomez was subjected to and because no prompt fair investigation was provided to her Gomez resigned. The email detailed how Balzer and Sanderson was also working together to place her on a performance improvement plan (PIP). The email detailed that Gomez witnessed Sanderson verbally abuse her co-workers and that Balzer never did a thorough investigation into Sanderson's alleged abuse towards her employees. Gomez requested to know what was documented about her conclusion with Sanderson (Attachment H-2).

      209.    June 13, 2017 Lucy Gomez sent a email directly to Marillia Vidal-Clarisey to address her concerns about Sanderson and the reprimand that was given to Gomez. Gomez advised that she was going to file a grievance about the reprimand directly with Honeywell HR. Gomez complained about the way Vidal-Clarisey handled her complaints about Sanderson with not responding properly or timely and stated because of Vidal-Clairsey's unfair tactics she would be filing a complaint directly with Honeywell HR. Gomez stated she had been working for Honeywell/Intelligrated for over 11 years and has never had any performance issues. Plaintiff complained that she felt Intelligrated HR and the Installation department worked together to harbor unlawful discriminatory practices. Plaintiff also advised Honeywell of her believe that a mutiny was happening within the Company as Intelligrated employees did not want to confirm to Honeywell's regulations. Because Honeywell failed to lead the investigation, they failed to protect Plaintiff from being subjected to harassment and retaliation by both Intelligrated Human Resources and Installation for reporting suspected activity outside of Intelligrated HR (Attachment H-3).

**Plaintiff complained that the hostile environment got worst once she involved Honeywell Officials outside Intelligrated Officials. Plaintiff complained that a mutiny existed within her**

50

department as many individuals of Management would intentionally direct Plaintiff to approve questionable invoices and/or contact vendor labor invoices without proper checks and balances.

### Exhibit I

210.     On October 2, 2017 Misty Sanderson emailed the Installation Admin team to advise that Amanda Hale, Installation Administration Specialist called out sick. Hale was allowed to work from home and did not have to exhausted her sick personal paid time as Sanderson made Plaintiff do. Plaintiff was denied the opportunity to work from home after making complaints of fraudulent activity within the department (Attachment I-1).

211.     October 2, 2017 8:46am Misty Sanderson allowed Amanda Hale to work from home when she was sick (Attachment I-2).

212.     On October 3, 2017, Plaintiff sent a high priority email to Jen Saphir, Honeywell's Procurement Manager, for help in getting Honeywell Human Resources involved immediately. Plaintiff advised that she is constantly being retaliated against and that she believed that Intelligrated HR was harboring this abuse. Plaintiff explained how all of her duties have been removed from her since she complained about fraudulent activity within the Install department and felt that she is being outcasted. Plaintiff asked why is Sanderson and Balzer able to get away with the things they are doing and no one is helping her (Attachment I-3).

213.     October 4, 2017 11:26am Plaintiff emailed both Brett Sanderson and Misty Sanderson of a mix up on Tradesman account and advised accounts affected. Plaintiff advised that Mark with Tradesmen advised that they were not going through TAPFIN (Attachment I-4).

214.     October 4, 2017 4:52pm Jeanette Guerra sent a meeting invite to both Plaintiff and Vidal-Clarisey scheduled for October 6, 2017 at 4:15pm to discuss complaints.

215.    October 4, 2017 5:01pm Vidal-Clarisey left Plaintiff a voicemail saying she was following up on her request to add Honeywell HR to her investigation on Balzer and Sanderson.

216.    October 5, 2017 Plaintiff emailed Justin Best an update on his request submitted from the day before. Best advised Plaintiff that the request included an invoice schedule and that his request needed to be processed timely. At this time because Sanderson instructs Plaintiff to send all requests to Sanderson first before processing, Plaintiff emailed request to Sanderson to receive her approval. Plaintiff advised Best that Sanderson still had not responded giving Plaintiff approval to process his requests. Plaintiff suggested that Best reach out to Sanderson so he could get a quicker response (Attachment I-5).

217.    October 5, 2017 8:41am Melissa Maynard emailed Plaintiff to ask "Does she now require approval for you to submit a req. That doesn't make sense". Plaintiff advised that while she was working in accounting Sanderson failed to process $5,768,824.15 worth of invoices for month-end. Plaintiff advised that some Install Admins noticed what was happening and advised Plaintiff that Sanderson and Balzer was working together blaming the departments failures on Plaintiff (Attachment I-5).

218.    October 6, 2017 1:00pm Sanderson scheduled a "one on one" meeting with Plaintiff. Sanderson gave Plaintiff a high-level review of the changes she made while she was in the accounting department. Plaintiff asked when would her normal duties be returned. Sanderson advised that Maria Floyd, now handles the Tapfin responsibilities. During this meeting Sanderson stated that management was looking at me for a promotion but wanted to know what I wanted to do"? Plaintiff took it as a suspected bribe from Sanderson to have Plaintiff drop the harassment claims against her and Balzer.

219.    On October 6, 2017 at 4:15pm a telephone interview took place regarding Plaintiff's suspensions of fraudulent accounting practices and harassment claims with Guerra and Vidal-Clarisey, however Vidal-Clarisey was not present in the same conference room as Plaintiff during this interview but was present on the interview call. Plaintiff has reason to believe that Choi, Balzer and Sanderson may have listened in on this call in another area along with Marillia Vidal-Clarisey and Berne Hess.

220.    October 8, 2017 3:59pm, Jeanette Guerra, an investigator from Honeywell's Global Security Group, sent Plaintiff an email to sign an attached Interview Admonishment form and to have Marillia sign as a witness (Attachment I-6).

221.    October 9, 2017 6:36 am Plaintiff responded explained to Guerra that she had already signed a "Interview Admonishment" with Vidal-Clarisey back on September 7, 2017. Jeannette Guerra admitted that she did not know anything about the previous form but mentioned she was updated on all other meetings. Plaintiff advised most importantly at this time is that someone expedites the issues regarding Sanderson and Balzer because the constant taunting has become unbearable and that she had not had a meeting that included Nick Choi, Balzer or Sanderson yet. Plaintiff emailed Vidal-Clarisey to ask for a copy of the form because Guerra had requested the form (Attachment I-6).

222.    October 9, 2017 9:13am Plaintiff sent an email to both Guerra and Vidal-Clarisey to advise that she was just advised by Misty Sanderson that she will be going back down to AP to help on invoices and expenses and was advised to wait until she heard from AP to go down. Plaintiff advised that she would be more productive doing her own responsibilities. Plaintiff provided them with the invoices that were currently holding (Attachment I-7).

223.     October 9, 2019 10:16am, Plaintiff emailed Guerra additional supporting backup regarding Installation payroll and questionable practices directed by Sanderson to pay benefit days for Installers that did not have any paid days available (Attachment I-7).

224.     October 9, 2017 5:25pm Guerra responded to Plaintiff's email regarding going back to AP and just advised "At this time it's best to follow the direction you receive from your Supervisor. In terms of the duties for the Install Department, that will be up to your Supervisor to manage. We are currently reviewing all the information but it should not deter you from performing your work duties as instructed by your Supervisor (Attachment I-7).

225.     October 9, 2017 5:52pm Guerra replied to Plaintiff's email regarding the Interview Admonishment form stating "There is no separate HR for Honeywell. Both Vidal-Clarisey and Guerra will be working together. Regarding your further concern of Sanderson and Balzer taunting you, we are looking into the matter" (see Attachment I-6).

226.     Plaintiff continued to receive Installation requests for updates on requests that had been sent to Sanderson from Installation Managers. Plaintiff advised that all requests must go through Misty Sanderson. Plaintiff also advised that she cannot process any items for Installation until Sanderson or Balzer advises.

227.     October 10, 2017 3:43pm Justin Best emails Plaintiff and Sanderson regarding an update on requisitions he submitted to Plaintiff on October 5, 2017 prior to her relocating to the Accounting department again. Plaintiff responded at 3:44pm advising "I am no longer involved in Installation while I am down in accounting per Misty. Please contact Misty" (Attachment I-8).

228.     October 10, 2017 3:46pm Plaintiff emailed Melissa Maynard and asked if she could please talk to Justin Best and explain why requisitions were being delayed and that Balzer and Sanderson insisted that she cannot help on anything Installation related (Attachment I-8).

229.    October 11, 2017 9:52am Sanderson responded to Best's request by adding Jessica Holland to the email thread asking her to research on the requisition processed by Plaintiff back on October 5, 2017, however Plaintiff still had to advise Jessica Holland because she was researching on the wrong request (Attachment I-8).

230.    October 11, 2017 4:55pm Melissa Maynard responded to Plaintiff to asking "Are you permanently moving down there?". Plaintiff advised that she was just told to go back down to accounting by Sanderson with no further updates. Plaintiff advised that we are struggling in our own department and with her being down in accounting it is having a negative impact on the books. Plaintiff said Sanderson has taken her out of the loop on everything and it's like she just fell off the map and said "I need my job" (Attachment I-9).

231.    Sometime in Mid-October 2017 Honeywell received complaint from OCRC.

232.    On October 16, 2017, Plaintiff called off work because of a family matter and advised Tricia Hayworth. Hayworth forwarded the email to Balzer (Attachment I-10).

233.    October 16, 2017 Although Plaintiff was out of the office, she was copied on an email thread regarding a requisition that was submitted but was linked to the incorrect project.

234.    October 17, 2017 8:47am Upon return to the office, Plaintiff responded to the email and advised that the original request was submitted to her incorrectly. Plaintiff under the direction of Warren Pierce, Category Manager advised Plaintiff to cancel her requisition. Plaintiff then advised Andrew Geyer to reach out to Sanderson in order to help him coordinate a new requisition request (Attachment I-11).

235.    October 17, 2017 1:14pm Balzer sent Plaintiff an email message advising her of how much sick and vacation time she had left for the year and told her that she had only 4 hours available to cover her October 16t absence. Balzer also told Plaintiff if she plans on using any

55

more vacation time in the future that it needs to be requested/approved in advance by your supervisor. Although Plaintiff replied to Balzer asking why she was not allowed to use her vacation hours like other employees had done in the past and currently uses vacation to cover personal time off, Balzer never responded. Because Balzer had never previously sent Plaintiff an email message like this before, Plaintiff felt that the real reason Balzer sent his message was to harass her and let her know that he was watching her (Attachment I-10).

236.    October 18, 2017 11:25am Because Plaintiff kept receiving emails from outside departments including from the Installation team, Plaintiff again asked Sanderson to submit an email to the Install Team so that everyone was aware not to email the Plaintiff on Installation items and involve Sanderson. As Plaintiff complained that Sanderson kept sending Plaintiff harassing emails accusing her of not forwarding emails to her and blaming the invoice backlog on the Plaintiff. Plaintiff responded to Sanderson stating that she has not missed any emails (Attachment I-11).

237.    On October 18, 2017 11:30am, Sanderson responded to Plaintiff's email stating that she will send an email to the group but advised that this was the 2nd email that she received that week that she was not copied on and was forwarded to her from an Installation Manager (Attachment I-11).

238.    October 18, 2107 12:07pm Plaintiff responded adding Vidal-Clarisey and Guerra because she was exhausted of Sanderson and Balzer working together to create a paper trail of "performance issues' that Sanderson and Balzer orchestrated in retaliation of the Plaintiff complaining about the suspected fraudulent activity including the aiding and abiding by the Installation Management team. Plaintiff responded that Sanderson's statements are not true and

that she has not missed forwarding any emails to Sanderson. Plaintiff again advised that she has been telling individuals to get with Sanderson or email Sanderson for help (Attachment I-11).

239. October 18, 2017 12:29pm Sanderson sent an email to the Install team stating "Malissa is helping out accounting this week and will not be able to process these requests until she gets back to Installation (Attachment I-12).

240. October 18, 2017 12:57pm Plaintiff emailed Vidal-Clarisey and Guerra once again complain of the harassment of Sanderson and Balzer. Plaintiff added both investigators to the email thread so they were aware of the constant emails and attacks that she is being subjected to. Plaintiff stated that she wanted the email thread documented to prove that Sanderson and Balzer are not handling her duties and that she didn't want to later be blamed for not completing her workload. Plaintiff wanted it documented that she is following Balzer and Sanderson's direction and not going outside their direction (Attachment I-12).

241. October 18, 2017 1:08pm Plaintiff emails Sanderson for clarification because prior she was advised to forward all emails to Sanderson and that Sanderson will make sure Plaintiff's workload is processed while she was in accounting. The email that Sanderson sent was stating Plaintiff will clear Installation items upon return. Sanderson never responded (Attachment I-13).

242. October 18, 2017 2:21pm Garland Floyd, Coordinator, Mechanical Installation Services emailed Plaintiff copying Sanderson and asked Plaintiff to research his request on a change order he originally submitted on September 19, 2017. Plaintiff advised "No, she did not process. Plaintiff advised that she was directed to forward all Installation items to Sanderson for processing. Plaintiff advised to get with Sanderson (Attachment I-14).

243. October 18, 2017 4:19pm Sanderson sends an email to the Installation team advising to submit all subcontractor requests to Plaintiff and Jessica Holland. Jessica will handle all these until Malissa gets back to Installation (Attachment I-15).

244. On October 19, 2017 3:59pm, Plaintiff sent an email message to Balzer asking him once "Can you please advise if I have approval to use her vacation hours to cover her hours missed from October 16 day off. This time, Plaintiff copied Vidal-Clarisey and Guerra on her message. Once again, Balzer nor Vidal-Clarisey or Guerra ever responded (Attachment I-16).

245. October 19, 2017 11:03am Vidal-Clarisey responded to Plaintiff's email from the day before and just stated that she looked through the emails and Sanderson was not copied as Balzer and Sanderson advised the Plaintiff to do. Plaintiff was upset that Vidal-Clarisey was being bias and not mentioning anything of the harassing emails that Sanderson and Balzer has started to send Plaintiff daily (Attachment I-12).

246. October 19, 2017 12:03pm Plaintiff responded to Vidal-Clarisey defending herself as she didn't think that Vidal-Clarisey was fairly looking at all allegations and complaints that the Plaintiff had against Sanderson and Balzer. Plaintiff explained that she was not in on the original email thread either and advised Geyer to get with Sanderson to get the requisition processed. The Plaintiff advised that she cannot be held responsible for the way others are ending emails and that Sanderson and Balzer are the reason the invoices and backload are being created. Plaintiff again advised that no one is helping her or reprimanding Sanderson nor Balzer (Attachment I-12).

247. October 24, 2017 12:52pm Sanderson sent Plaintiff an email titled Installation Duties Update. The email provided the Plaintiff with an outline on training and transitioning of her final duties to Beth Ackley (Caucasian) and Dariana Gregory (Caucasian), and to create a

workflow for processing contract vendor requisitions as no one on the team was trained to handle Plaintiff's contract vendor related duties as these duties were always the Plaintiffs main functions for the Installation department to provide checks and balances. Plaintiff made several complaints to Company officials that removing her from her role would cause great havoc on Installation, Accounting and Finance, but no one cared to listen, to this day the Plaintiff has never met with a Honeywell official outside of Intelligrated's original team only by a conference call (Attachment I-17).

248.    October 24, 2017 2:11pm Plaintiff emailed Sanderson to provide her with an update on where Sanderson left off on clearing vendor invoices so that she can pick up where Sanderson left off. Sanderson responded to Plaintiff that she "only cleared Elite Force, RPM and worked on an ECA PO" and provided Plaintiff with a link to her new Subcontractor Labor Log created by Sanderson and didn't advise on where she left off with invoicing (Attachment I-17).

249.    October 24, 2017 2:57 Plaintiff responded that she needed training on Sanderson's new log as her old log was not operable when she last tried to train the Plaintiff and Tonya Seiwert back in May 2017. Plaintiff advised that Sanderson only trained Maria Floyd in the background to transfer contract vendor labor invoices to Sanderson's new log. When Sanderson replied she added Balzer to her email and responded and told the Plaintiff to "Please continue to use your form" referring to the log created by Plaintiff for 2017 (Attachment I-18).

250.    October 24, 2017 3:10pm Plaintiff added Vidal-Clarisey and Guerra to the email thread and responded that Sanderson may have misunderstood what Plaintiff was asking in her original email. Plaintiff was asking where did Sanderson house all the emails that the Plaintiff had been forwarding to Sanderson since October 10, 2017. Balzer then replied in Sanderson's defense stating he wasn't sure where the disconnect is and restated what Sanderson direction was

in the email. Plaintiff felt that Balzer didn't try to understand what was going on. Plaintiff responded to Balzer and updated him on the process of how invoices are cleared she also advised him she didn't need the invoices that Sanderson cleared, the Plaintiff needed to know where Sanderson housed the invoices she did NOT clear (Attachment I-18).

251.     Guerra, Honeywell Global Investigator replied at 4:01pm stating "I am not sure why I am being copied on these emails" and requested to be removed from the email thread. The Plaintiff then removed Sanderson and Balzer but kept Vidal-Clarisey on the email. The Plaintiff responded that she added Guerra because she is one of the leading investigators on her complaints and that the email was to updated Guerra and Vidal-Clarisey on the daily constant attacks. Plaintiff advised that she has been waiting patiently for an update on her complaints since August 23, 2017 and that because of the constant attacks on her work ethics she has been pulled into multiple meetings that were in retaliatory nature. Plaintiff advised that she was told that Honeywell doesn't tolerate retaliation per Vidal-Clarisey. Discrimination and harassment is also prohibited per Honeywell's Workplace Harassment policy (Attachment I-18).

252.     October 24, 2017 4:34pm Vidal-Clarisey replied to the email thread told Plaintiff that she wanted it to be clear the previous meeting held on September 27 and 29, 2017 were not "HR meetings. However, Plaintiff replied and pointed out that since Vidal-Clarisey was her HR representative and she participated in the meetings, these meetings should be included as part of her discrimination complaints against Balzer and Sanderson as she requested on two different occasions. Plaintiff also stated that she had come down to Vidal-Clarisey office multiple times in an emotional wreck due to the constant attacks and only asked that someone promptly helps her. Plaintiff stated that she had been in over 11 meetings regarding her "performance issues' and only 2 meetings regarding her complains. Plaintiff also addressed that she specifically told Vidal-

Clarisey that she was going to be retaliated against once Sanderson and Balzer found out they have been reported (Attachment I-19).

253.    October 30, 2017, Donna Arway, Sr. Payroll Specialist emailed Plaintiff to forward her any other information regarding spouses working together within the Installation department. Arway stated that Honeywell was asking for more information. Because the request was from Honeywell the Plaintiff looked for the spreadsheets that housed all information on each Electrical and Mechanical Installation employee, the Plaintiff advise that the spreadsheet was no longer in the folders and must have been moved by Sanderson (Attachment I-20).

254.    November 1, 2019 Beth Ackley emails Plaintiff "You're a terrific teacher". After Sanderson directed Plaintiff to train Ackley to take over contract vendor labor responsibilities. Sanderson and Balzer told Human Resources that Plaintiff was not a team player and refused to help train other team members. Plaintiff complained to HR that they were being bias and allowing the harassment and bulling to continue (Attachment I-21).

255.    On November 3, 2017, Sanderson told Plaintiff that the Accounting Department was getting behind and that she was going to send her to work there once again for about a week.

256.    November 8, 2017 12:37pm Melissa Maynard sent an email to the Installation Admin team to get suggestions on how to we can standardize the different scenarios regarding install pay, mileage and travel. Sanderson replied to Maynard that she needed to direct any questions to Sanderson not the Install Admin team. Maynard argued and replied to Sanderson stating "Why are we not allowed to discuss anything with the admin? Especially, if they are the ones we are working with on a daily basis. Maynard further stated "They are competent individuals that have shared experiences with us. Then directed a statement to Sanderson stating

"You were included on the email to ask for your input as well. If you do not want to proactively address issues than we will have another TAPFIN situation on our hands" (Attachment I-22)

257.    November 8, 2017 12:42pm Sanderson sent an email to the Plaintiff to advise her not to tell the group of any changes that she has not been aware of. Sanderson was upset that Gretchen Buckner told Plaintiff of new changes coming from Honeywell. Plaintiff advised the training in question was sent my Honeywell and was required for ALL employees that deals with requisitions. Plaintiff advised she only told Beth Ackley of the new policy because Ackley was selected to process Installation requisitions and needed to updated on the new process that took place immediately (Attachment I-23)

258.    November 8, 2017 12:50pm Plaintiff sent an email to Maynard thanking her for speaking up for the Install Admins. The Plaintiff advised that the Install Admins are afraid to speak up because of all the retaliation they are witnessing happening to the Plaintiff. Maynard responds "That stays between us" (Attachment I-24).

259.    On November 8, 2017, Plaintiff's phone was locked out and all data from her phone was deleted included the meetings that Plaintiff recorded to prove that Balzer, Sanderson, Choi, Vidal Clarisey and Hess were working together to remove Plaintiff out of her position to hide and to stop Plaintiff from complaining about unethical process, harassment, discrimination and retaliation. Plaintiff was advised that her phone was not backed up by the Honeywell's IT team. All text messages between Sanderson and Plaintiff were deleted included other relevant text messages that proved Sanderson would not allow Plaintiff to work from home as Plaintiff always texted Sanderson any time sheet needed to be off work. Plaintiff believes that Honeywell Intelligrated had something to do with the Plaintiff's phone being erased. Honeywell IT stated that Plaintiff's phone was not backed up but Plaintiff advised that she's never did anything

different to her company phone. Only Honeywell Intelligrated IT had access including Installation's own IT personnel outside Honeywell IT. Honeywell IT did not want Intelligrated IT to process IT requests all requests must go through Honeywell IT.

260. November 9, 2017 Plaintiff emailed Sanderson as directed and advised her that Beth Ackley is now officially trained to handle vendor requisition on her own. Ackley once again replies to Plaintiff "Thanks for being such a great teacher!" (Attachment I-25).

261. Plaintiff completed transferring all subcontractor PO's to Sanderson's new log and sent a confirming email to Sanderson to advise her. The only purchase orders not transferred were the one's directed per Sanderson. Plaintiff advised that she would send out an email to Install Management to let them know to start using the current form so that the log stays up to date. Sanderson responded "Do not sent out the email yet. I will send these emails to the group going forward. I need to verify all updates are made". Plaintiff did not send any notice. The log did not stay updated (Attachment I-26).

262. November 15, 2017 Plaintiff forwarded a vendor set up request submitted by Chris Daily. Per Sanderson, Plaintiff is not able to process anything without her approval first (Attachment I-27).

263. November 15, 2017 Sanderson scheduled a meeting to update Plaintiff and advise that Maria Floyd is no longer handling Tapfin and that Andrea Houston (African American contractor brought in by Sanderson). Sanderson shifted TAPFIN to Andrea Houston because Maria Floyd was not able to approve vendor timesheets in Fieldglass because her husband Garland Floyd already had rights and it would cause a conflict of interest.

264.    November 16, 2017 Although there was an Administrative site meeting scheduled, Sanderson told Plaintiff that she did not need to attend this meeting, all other Install Admins were invited including Maria Floyd, Installation Install Specialist (Attachment I-28)

265.    As of November 28, 2017, HR had still not gotten back to Plaintiff on the results of the investigation of her racial harassment and retaliation complaints against Balzer and Sanderson. Also, Sanderson still had not trained Plaintiff on the reports she said that she needed Plaintiff to run for Andrea Houston.

266.    November 29, 2017 Ann Dittenhofer, Voelker-controls, emailed Sanderson regarding Installation material orders not being received in the system. Sanderson included Maria Floyd on the email and directed Maria Floyd to help Dittenhofer with receiving the material orders so that the invoices can be paid, these are duties that fall under Sanderson's direction (Attachment I-29)

267.    November 30, 2017 Maria Floyd, Install Admin Specialist coordinating with other Install Admins to help receive purchase orders that belong to other Install Admin's projects under the direction of Sanderson (Attachment I-30).

268.    Shortly thereafter, Plaintiff notified management that she was once again pregnant and was planning on working up until the baby is born.

269.    December 6, 2017 10:52am Balzer sent an email to the Installation Admin Team and that effective immediately Jim Hueker is now over the Installation Admin Team and he has now been assigned to John Moore's new team (Attachment I-31).

270.    December 6, 2017 Chris Dailey called Plaintiff asking for an update on his vendor setup request he submitted on November 15, 2017. Plaintiff didn't have an update to provide to him as the request was forwarded to Sanderson for processing by Plaintiff.

271.    December 6, 2017 1:50pm Plaintiff emailed Dailey to let him know that she tried

to reach out to Sanderson and was not getting any replies. Plaintiff suggested that Dailey may

want to directly contact Sanderson for a quicker response. Plaintiff specially asked Chris Dailey

if Sanderson was already researching or working on his request already. Dailey responded stating

"I haven't heard anything" and started trying to come up with solutions on how he may have to

charge his Company purchasing card for the training classes he needed. Because of the urgency

of Dailey's request the Plaintiff offered to look into his request (Attachment I-32).

272.    December 6, 2017 3:38pm Gretchen Buckner, Indirect Buyer Strategic Sourcing

sent an email to Sanderson and Plaintiff. Plaintiff responded to get clarification on the email sent.

Sanderson interjected and replied to Plaintiff only, by taking Buckner off the email thread and

advised "Any further information you need from Gretchen please contact me directly so not to

cause confusion" (Attachment I-33).

273.    At 3:53pm Plaintiff responded stating that she was just trying to get a solution for

the customer and stated that she emailed Sanderson several times and didn't get a reply and

didn't want the customer to assume the Plaintiff was not handling as the customer requested the

Plaintiff to research on what the holdup was (Attachment I-33).

274.    Sanderson replied to Plaintiff at 11:23pm in a confrontational tone and stated that

Plaintiff only started emailing her on December 4, 2017 and continued to attack the Plaintiff's

actions for trying to help the customer. Sanderson then stated "We have had issues in the past

with you following my directions". The Plaintiff immediately remembered that Balzer used

similar text in a different email dated September 29, 2017 that was also directed to the Plaintiff

stating "This is not the first time I have had to ask you to refrain from challenging or

complaining about our process, and to listen to and follow your supervisor's instructions (Attachment I-33).

275.    December 7, 2017 8:38am Plaintiff immediately added Nick Choi, VP Installation Services to the email thread and responded to Sanderson email from the night before stating her statements are untrue. Plaintiff advised of the different times she reached out to Sanderson for an update for Chris Dailey adding attachments so that Choi would be able to view and read. Plaintiff stated that she was "being attacked for NO reason and was being blamed for Sanderson's failure to read her emails in a timely manner. Plaintiff also stated that Sanderson is choosing purposely NOT to communicate with or ask the Plaintiff questions (Attachment I-33).

276.    Plaintiff then directed a statement to Nick Choi stating "Can you please schedule some kind of meeting so that we can discuss. I have not been talking to anyone or saying anything over the past few months in hopes that this would be resolved but it is not. Can you please help? Nick Choi never responded (Attachment I-33).

277.    December 7, 2017 11:16am Brenda Uselton, CFO, BCU Electric Inc. emailed Plaintiff to research on an invoice submitted on October 10, 2017 to AP Clerk, Justin Best, Melissa Maynard and Bob Mummaw. Plaintiff was not on original email. Plaintiff coordinated to get the proper approval in order for the invoice to be paid out the following Monday. Uselston responds "I know I can always count on you" (Attachment I-34).

278.    Later that afternoon Sanderson pulled Plaintiff into a conference room and reprimanded the Plaintiff for adding Nick Choi to the email. Sanderson ranted that she was tired of the Plaintiff "trying to make her look bad". After the meeting with Sanderson the Plaintiff immediately emailed Jim Heuker the new Install Admin Manager at 11:34am to request an

immediate meeting to resolve issues with Sanderson. Heuker never responded to Plaintiff's email (Attachment I-33).

279.    There was never a meeting regarding the mistreatment that the Plaintiff continually complained about and was being subjected to under the supervision of Sanderson and Balzer.

280.    The next morning shortly after the Plaintiff arrived to work, she was called into Jim Hueker's office, in attendance was Marillia Vidal-Clarisey. Without any mention of the incident that happened the day before the Plaintiff was advised that the accounting department was behind and he selected the Plaintiff to go back down to help them out. Hueker advised that he didn't know how long the Plaintiff would be down there but directed her to transfer all open items on her desk to Sanderson. Vidal-Clarisey didn't comment on anything and Plaintiff was excused and again relocated to Accounting.

281.    On December 12, 2017 Plaintiff received feedback on claims from Marillia Vidal-Clarisey and Berne Hess. Plaintiff was advised that she could not receive a copy of the report because it was confidential and was never given any documentation of the findings. Marillia advised "they were not able to verify her allegations" and "there was no evidence to support Plaintiff was retaliated against for reporting her allegations". Marillia Vidal-Clarisey advised Plaintiff to continue to follow Sanderson's directions. Hess just advised that he saw the Plaintiff just had a difficult time taking directions from Sanderson and suggested that the Plaintiff work on communication skills because Honeywell will not tolerate any further disruptions in business.

282.    On December 13, 2017 Plaintiff responded to follow-up meeting provided by Marillia Vidal-Clarisey and Bernie Hess. Plaintiff advised how she disagreed with the findings and felt that she was not given a proper investigation. Plaintiff also stated she will always try to

do her best to be a team player even during difficult times; she will continue to follow the direction of her supervisor and manger and said she will provide the best support for our team and company (Attachment I-35).

283.    Vidal-Clarisey never responded nor met with Plaintiff regarding the incident that recently happened days prior on December 7, 2017 between Sanderson and Plaintiff.

284.    December 19, 2017 Honeywell emailed new Finance Purchase Order Policy "As a publicly traded company, we must adhere to specific financial controls". The new policy states: No invoice will be accepted for payment unless authorized by a purchase order, unless exempted from the PO requirement by Corporate policy (see Exhibit A Attachment A-4).

285.    Eventually all Installation Administrative Specialist responsibilities were removed from Plaintiff. The Plaintiff's last responsibilities before going on a medical leave was filing and getting the mail for the Accounting department (Attachment I-36).

286.    December 19, 2017 Sanderson sent an email to Beth Ackley copying Plaintiff although she had been in accounting since December 8, 2017. Sanderson admitted that the Install Department need to get the revisions competed BEFORE we get the invoice. Sanderson also states that these requests should be coming from Installation Managers and not from a contract vendor. These are the same solutions the Plaintiff had been advising Sanderson, Balzer and Installation Management in order to alleviate the vendor invoicing issues caused by Sanderson and Balzer. However, Plaintiff was told that she was directly responsible for the departments failure to meet deadlines and forecast (Attachment I-37).

287.    December 21, 2017 Sanderson stated after talking to Bernie Hess, VP Human Resources, regarding Holiday pay she need information forwarded to her. Sanderson sent an email to the Install Admin team to request all admins to send her a list of all Install Employees

who will be receiving Holiday pay and no hours; that includes no work, vacation or sick pay. This email was forwarded to the Plaintiff by Judy McClure, Install Admin Specialist because by this time Sanderson was intentionally leaving Plaintiff off emails directed to the Installation Admin members that reported to her. Plaintiff complained that Sanderson and Balzer were segregating her from the team and spreading false statements about the Plaintiff. McClure had filed an age discrimination complaint against Sanderson with the EEOC (Attachment I-38).

288.    December 22, 2017 Brett Sanderson directs the Install Admins that report to Misty Sanderson (Brett's wife) "We need to make sure we spread their hours out so they don't get denied Holiday pay. The 1-7 week has to have some kind of vacation for them to get paid the Holiday from what I have heard". Marillia Vidal-Clarisey was on Brett Sanderson's email reply and said nothing and proves that Human Resources allowed unethical processes to continue against Honeywell's polices since the acquisition of Intelligrated. Plaintiff complained many members of the original Intelligrated team did not want to adhere to Honeywell's new regulation and policies (Attachment I-39).

289.    Approximately 30 mins later 12:58pm, the Plaintiff forwarded the email regarding Holiday pay to Gretchen Buckner as she had advised the Plaintiff on another occasion that Brett Sanderson and Misty Sanderson was being investigated. Buckner further directed Plaintiff to forward her any emails that go outside of Honeywell policies and regulations as she stated the information provided from the Plaintiff would help Honeywell's investigation on Brett Sanderson and Misty Sanderson. Plaintiff stated "I wished we had a secret Honeywell person in our group so they can see what I have been saying all the time" (Attachment I-40).

290.    Plaintiff also had a recorded voice conversation that included Gretchen Buckner advising the Plaintiff that Sanderson and Hess are working together by moving Plaintiff to the accounting department during the OCRC investigation.

291.    Plaintiff has made numerous complaints to Intelligrated and Honeywell officials dating back to mid-2015, including providing documentation that proved unethical behavior by the Installation Management team and members. Plaintiff documented the suspected fraudulent payroll, expenses and other activity happening in the Installation department and tried to separately involve Honeywell due to the special circumstances of being a Whistleblower. Honeywell did nothing to protect the Plaintiffs safety.

292.    January 8, 2018 Plaintiff still in accounting with no update on her returning to installation. Plaintiff still receiving emails and complaints from contract vendors requesting payment on past due invoices. Plaintiff continued to forward emails to Sanderson (Attachment I-41).

293.    January 11, 2018 Honeywell sent out an Employee email titled "Respecting Others and Promoting A Positive Workplace". The email thread details Plaintiff's and another Install Admin, Judy McClure's reaction to the email (Attachment I-42).

294.    On January 12, 2018 All Plaintiff's rights were taken away to access any Installation information in Oracle. Plaintiff was advised it was because she is working in the accounting department. Plaintiff only sign in was with the accounting department she was also able to clock in and out for payroll (Attachment I-43).

295.    Plaintiff continued to receive Installation emails and she continued to forward to Sanderson for processing at the same time advising the Requesters she is unavailable to process Installation items (Attachment I-44).

296.    January 15, 2018 Sanderson forwarding contract vendor labor responsibilities to Beth Ackley as she now is the contact for contract vendor labor as the Plaintiff remained in Accounting with no update on ever returning to the Installation department (Attachment I-45).

297.    January 15, 2018 3:24 Sanderson advises Plaintiff that she no longer needs to forward invoices to Sanderson as she now receives copies of Installation invoices on the invoice distribution (Attachment I-46).

298.    January 16, 2018 Garland Floyd emails Plaintiff to research on invoices that needed to be paid. Plaintiff advised Floyd she is unable to assist and added Sanderson to the email (Attachment I-47).

299.    January 18, 2018 Honeywell send out an Employee email regarding "Financial Reporting". The email stated "maintaining the highest standard of integrity and ethics is a fundamental element of Honeywell's performance culture, particularly in the accuracy of our books and records". In detail further states "Each of us makes daily choices that can affect the accuracy of our financial reporting, so we must be sure to record all transactions according to Honeywell's policies. Mistakes can affect our financial reporting and, ultimately, the integrity of our brand" (Exhibit A Attachment A-6).

300.    January 24, 2018 Melissa Maynard emailed Plaintiff to ask "They have you back in AP?" Plaintiff advised yes and that all of her Installation rights have now been taken away. Plaintiff is only able to clock in and out. All Installation access has been removed from Plaintiff. Maynard responds "I hate to hear that; I hope everything works out well for you. I have you in my thoughts" but still did nothing to help Plaintiff (Attachment I-48 and I-48a).

301.    On January 26, 2018 Plaintiff requested a personal day off. Plaintiff had to send Misty Sanderson several emails to have her approve her time off as she was purposely not speaking or communicating with Plaintiff (Attachment I-49).

302.    As of February 1, 2018 Sanderson, was sending out emails to the Install Admin team intentionally excluding the Plaintiff out of emails (Attachment I-50).

303.    February 2, 2018 Plaintiff requested time off for doctors appoints and sends the request to Tricia Hayworth as no one provided Plaintiff with any updates on her turn to Installation as of February (Attachment I-51).

304.    February 14, 2018 Plaintiff was advised that she was suffering a miscarriage and went on a medical leave.

**While Plaintiff has been on medical leave, Honeywell Intelligrated, through its Employees, and Healthcare Representatives has continued to interfere, discriminate, harass, and retaliate against Plaintiff**.

### Exhibit J

305.    Company employees have repeatedly tried to contact Plaintiff even though they do not have a legitimate reason for doing so.

306.    Jessica Holland, after being a hostile witness during the Honeywell Investigation she tried to contact Plaintiff on multiple occasions, July 31, 2018, February 9, 2019 through messenger,

307.    Company representatives have sent Plaintiff's conflicting messages about her medical benefits and premiums.

308.     Plaintiff STD leave was approved February 14, 2018 through March 27, 2018. Plaintiff was advised to request for an extension if needed under the pregnancy leave (Attachment J-1).

309.     Plaintiff requested for an extension under the pregnancy leave and was denied on April 19, 2018. Plaintiff remained under the care of Dr. Andrews although she was denied STD benefits income for pregnancy (Attachment J-2).

310.     On April 30, 2018 Plaintiff went under the care of MD Percy Mitchell diagnosed with mental illness. Plaintiff was put on a medical leave for mental illness. Plaintiff requested FLMA paperwork to be sent to Dr. Mitchell.

311.     On May 17, 2018 Cigna letter stated they would start obtaining backup from Dr. Mitchell to evaluate Plaintiff's claim on mental illness (Attachment J-3).

312.     On May 21, 2018 Cigna letter stating that the Plaintiff's "leave of absence has been closed due to "cancellation of leave request" (Attachment J-4).

313.     On May 30, 2018 Cigna, Adam Robinson, Claim's Manager confirmed he received Plaintiff's requested appeal back up. **Plaintiff had to request an appeal because her STD claim was mysteriously closed**

314.     On July 12, 2018 Cigna letter stating claim closed due to no paperwork received from Dr. Percy Michell (Attachment J-5).

315.     On July 13, 2018 Cigna letter stating, they received updated paperwork from Dr Mitchell. The information was reviewed and sufficient to revers our prior decision. Your claim has been reopened and benefits reinstated (Attachment J-6).

316.     On July 26, 2018 OCRC found probable cause on discrimination against Honeywell/Intelligrated (see Exhibit K Attachment K-2).

317.    On August 3, 2018 Plaintiff received benefit payment for only 24 hours for wk. ending July 16, 2018 – July 29, 2018. Plaintiff tried to contact Cigna, Claim's Manager and was unsuccessful (see Exhibit M Attachment M-37).

318.    On August 7, 2018 Plaintiff finally was able to communicate with Adam, Cigna Claim's Manager. Plaintiff question the cancellation of benefits. Adam stated "they were waiting for the Plaintiff to call for the explanation". Claim Manager only advised that the claim "was expedited for another review". He would not release any further information. Plaintiff immediately requested for an appeal and a copy of letter the letter of explanation to advise reasons for the cancellation of STD benefits.

319.    Approximately a week later Plaintiff received a letter from Cigna dated August 6, 2018 stating "after completing a review, we are unable to approve benefits beyond July 18, 2018" (Attachment J-7).

320.    On August 17, 2018 Plaintiff confirmed with her doctor's office that they still had not received requested appeal's paperwork requested on August 7, 2018. Plaintiff requested for Cigna representative to refax appeal paperwork to Dr. Percy Mitchell's office. Cigna Representative advised that no one but my claim Manager can refax the paperwork. Plaintiff was directed to her claims Manager's voicemail. Claims Manager never returned phone call.

321.    On September 7, 2018 Dr. Michell's office contacted Plaintiff and advised that they had received appeal paperwork.

322.    On September 13, 218 Dr. Michell's office faxed appeal paperwork to Plaintiff's claim manager over her STD claim.

323.    On September 17, 2018 Plaintiff confirmed with Cigna Representative that that her Claims Manager received her appeal paperwork on September 14, 2018 (recording).

74

324.     September 18, 2017 Plaintiff emailed Marillia Vidal-Clarisey, her HR Generalist, a medical disability form from one of her creditors and asked if Vidal-Clarisey should assist with having the employer's section completed in order for her creditors insurance to cover her monthly car payments while she was on her medical leave. Vidal-Clarisey responded the next day stating that she would forward the form to the Benefits department since she does not the information to complete (Attachment J-8).

325.     On September 20, 2018 Marillia Vidal Clarisey sent a "Return to work follow up" email stating that the Plaintiff has been off work since February 14, 2018 and that her FLMA has been exhausted since May 8, 2018. The email also stated that that the Plaintiff's STD claim has been denied as of July 18, 2018 and no longer being approved. The letter advised that Plaintiff has been on an "unexcused" absence since July 28, 2019. The notice advised the Plaintiff she had until September 27, 2018 to advise if she would be returning to work or the Plaintiff will be "voluntarily terminated" (Attachment J-9 and J-9a).

326.     Plaintiff replied to Vidal-Clarisey and requested for as reasonable accommodation and help with assisting Plaintiff with staying in compliance with Honeywell's policy in order for her to receive long term disability benefits. Plaintiff also complained about her having to contend with conduct that has been intentional in preventing her in receiving services timely. Plaintiff question Vidal-Clarisey's update on Plaintiff being on an unexcused absence since July 28, 2018 and stated that Honeywell advised that they would be responsible for letting Honeywell know Plaintiff was still on a medical related leave. Plaintiff also complained about her disability claim being flagged and that no one is allowed to help her but Adam, and complained that Adam is not communicating with her and that her disability paperwork is not being processed properly or in a timely manner. Plaintiff advised of the extra scrutiny that she felt she was going through in order

75

to receive approval of her disability benefits in which she paid into and was eligible to receive (Attachment J-10).

327.    September 21, 2017 Vidal-Clarisey replied and advised that she is reviewing the status of Plaintiff's claims with Cigna and will have an update next week. Vidal-Clarisey also advised that she faxed the requested disability paper to Plaintiff's creditor, although the requested deadline was on September 19, 2018 (Attachment J-11).

328.    September 23, 2018 Plaintiff emailed Vidal-Clarisey again to request information on Honeywell's LTD policy as Vidal-Clarisey gave Plaintiff a deadline of September 27, 2017 to advise if she was returning to work or she would be involuntarily terminated. Vidal-Clarisey still had not sent ADA or LTD information to Plaintiff yet (Attachment J-12).

329.    September 24, 2018 3:42pm Vidal-Clarisey responded to Plaintiff that the ADA accommodation process and LTD process is separate. Vidal-Clarisey attached the ADA accommodation paperwork and provided the Plaintiff with a new deadline of October 3, 2018. Vidal-Clarisey provided the LTD benefits number so that Plaintiff could apply for LTD benefits simultaneously (Attachment J-13).

330.    Plaintiff received a letter dated September 24, 2018, from Cigna stating that the updated backup paperwork was received from Dr Mitchel but it was not enough to reverse their prior's decision. Claim still closed (Attachment J-14).

331.    On September 27, 2018 OCRC denied Honeywell/Intelligrated's reconsideration and upheld the probable cause against Honeywell/Intelligrated for race, age and retaliation (see Exhibit K Attachment K-6).

332.    September 28, 2018 Plaintiff applied for LTD benefits and emailed Vidal-Clarisey to advised she would forward the ADA accommodation paperwork her doctor as

76

requested. Plaintiff also complained about her frustration with her STD Claim's manager and about how her claims have not been processed in a timely manner. Jennifer LTD Claim's manager stated that she didn't see anything noted in the system that Plaintiff ever filed an appeal from the August 6, 2019 denial. Plaintiff denied that claim and stated that she applied for an appeal and that she received the letter dated September 24, 2019 stating the received information did not change their prior's decision (Attachment J-15) (recording).

333.    October 2, 2018 Vidal-Clarisey acknowledged that she received Plaintiff's email regarding ADA accommodation paperwork for Plaintiff's doctor (Attachment J-16).

334.    On October 5, 2018 Plaintiff suffered a second miscarriage. Plaintiff was advised that fetus complications happened a week 8 (same week of Reconsideration hearing).

335.    On October 8, 2018 Plaintiff advised LTD Claims Manager of miscarriage. LTD Claims Manager advised that there were no notes in their system regarding my request for an appeal from August 7, 2017. Claims Manager advised she was unable to view STD claim information and advised that the Plaintiff may want to speak with her Claims Manager's Supervisor at that point.

336.    On October 9, 2018 Plaintiff spoke to Cigna Company official, Marissa, Adams's Supervisor regarding Adam and her appeal request from August 7, 2018. Marissa also stated that she didn't show anything noted in the system regarding my request for an appeal. (recorded call)

337.    October 11, 2018 Plaintiff sent an email to Vidal-Clarisey notifying her effective immediately she wanted all information regarding her employment to be sent through her attorney as Plaintiff's mental illness health was deteriorating due to the continued FLMA interference and FLMA retaliation that she was being subjected to. Plaintiff's disability benefits

were being interfered with and was causing tremendously financial hardship on the Plaintiff and family (Attachment J-17).

338.    Vidal-Clarisey responded by removing Plaintiff's attorney from the email and stated "as I explained prior email, it is Honeywell's understanding that your STD benefits have been terminated and you have been on an unapproved leave of absence since July 18, 2018." Vidal-Clarisey further stated that she would not include Plaintiff's attorney on information intended to be confidential as the accommodation and Plaintiff's medical leave of absence. However, Plaintiff knew that Vidal-Clarisey understood what information the Plaintiff wanted her attorney to be copied on, as Vidal-Clarisey submitted multiple emails which seem to threaten the employment of the Plaintiff with an involuntary termination (Attachment J-18).

339.    Plaintiff states that it was only when she forwarded her a disability form to Vidal-Clarisey on September 18, 2017 that Vidal-Clarisey took the opportunity to start harassing the Plaintiff with multiple emails with conflicting deadlines in order to further interfere with the Plaintiff's medial disability leave.

340.    On October 15, 2018 Plaintiff received a letter dated October 4, 2018 of medical cancellation effective August 1, 2018 due to non-payment of premium (see **Exhibit M** Attachment M-6).

341.    On October 16, 2018 Plaintiff contacted Honeywell Benefits in order to discuss cancellation. Plaintiff last received an invoice in the amount of $5,711.95. Plaintiff prior requested Honeywell Benefits to research the open invoice balance because STD payments were always automatically taken out of her payroll and Plaintiff stated she did not own that amount and her healthcare insurance was wrongly cancelled (see **Exhibit M** Attachment M-5).

342.    During this call Honeywell Benefits advised the Plaintiff's medical benefits were cancelled because of a past due amount of $499.82 was not paid. Plaintiff questioned the amount and requested a copy of the current bill due. Honeywell benefits agent advised they could not advise on what happened but can confirm the amount past due was $499.82 (recording)

343.    On October 16, 2018 Plaintiff contacted Marillia Vidal-Clarisey to advise of medical insurance being cancelled. Marillia advised she would contact them and get back with me.

344.    On October 19, 2018 Honeywell Benefits sent a 2nd letter of cancellation of medical benefits due to none payment of premiums (see **Exhibit M** Attachment M-7).

345.    October 22, 2018 Vidal-Clarisey emailed Plaintiff again and advised in order to evaluate your accommodation they need additional information from your physician. Vidal-Clarisey forwarded attached documents and provided Plaintiff with a new deadline of October 31, 2018 (Attachment J-19).

346.    October 22, 2018 Plaintiff contacted Honeywell Benefits center for an update. Honeywell advised that benefits were reinstated but refused to release any information regarding the old balance. Plaintiff again requested for a copy of the current bill for $499.98.

347.    Oct 23, 2018 Plaintiff received notice from Benefits Reinstatement notice that benefits were reviewed and reinstated. The bill is being updated and will be sent out in November, but that the balance will need to be paid or my benefits will be cancelled.

348.    October 29, 2018 Plaintiff received notice from Cigna they are still waiting on backup of on LTD medical records from doctor (Attachment J-20).

349.    November 9, 2018 Vidal-Clarisey emailed Plaintiff to advise she has not received requested letter dated October 22, 2017. Vidal-Clarisey advised if she didn't received paperwork

by November 14, 2018 that Honeywell would have to evaluate my request based on the information available. Never heard anything else from Vidal-Clarisey (Attachment J-21).

350.    November 11, 2018 Medical Benefits invoice received showed balance due of $911.36 and a past due balance of $499.98. Honeywell still has not sent requested priors bill that showed balance due of $499.98 (see **Exhibit M** Attachment M-8).

351.    On November 12, 2018 Cigna sent a letter stating LTD benefits have been approved. Back payment was approved back to August 15, 2018 – November 14, 2018 for LTD coverage (Attachment J-22).

352.    On November 13, 2018 Cigna sent a letter stating they received sufficient information to reverse their prior decision and the Plaintiffs STD benefits were reinstated (Attachment J-23).

353.    November 20, 2018 Plaintiff contacted Honeywell Benefits Center to discuss what her current balance was. Plaintiff complained that Honeywell Benefits Center was double billing her for healthcare benefits that were already paid in full from her previous STD benefits payroll. Call was disconnected (recorded)

354.    December 12, 2018 Medical Benefits invoice received showed an adjusted balance due of $4,158.98. Plaintiff contacted Honeywell Benefits department and advised that she did not have the funds to pay off the entire balance due as requested by Honeywell. Plaintiff also complained that invoice dated November 11, 2018 was still incorrect and wanted someone to research. Plaintiff made a payment of $700.00 (see **Exhibit M** Attachment M-10).

355.    From January through April 2019 Plaintiff continued to make full monthly premium payments of $548.37 including "additional amounts" that she believed was going toward rearrange.

356.    Plaintiff was late on May's 2019 premium, although it was confirmed received and posted on May 12, 2019.

357.    May 8, 2019 Honeywell Benefits issued a letter of cancellation for Medical Benefits. Plaintiff's healthcare benefits were never reinstated (see **Exhibit M** Attachment M-15).

358.    On May 20, 2019 Plaintiff contacted Honeywell Benefits officer and was advised that benefits would be reinstated since the payment was showing received, he just needed to confirm reinstatement and would contact the Plaintiff back. (recording)

359.    On May 29, 2019 Plaintiff contacted Honeywell Benefits and was advised that her medical benefits would not be reinstated until the balance of $3,212.58 is paid (recording).

360     On June 22, 2019 Honeywell Intelligrated issues Plaintiff a refund in the amount of $677.64 noting that "This refund is offered to you for the following reasons: Overpayment of H&W Deductions" (Attachment J-24).

361.    On June 25, 2019 Plaintiff along with Scott Campbell of the Department of Labor 859.578.4680 contacted Honeywell Benefits Center to advise on the status of Plaintiff's healthcare coverage. Honeywell advised they would research and contact Plaintiff back.

362.    On July 15, 2019 Plaintiff along with Scott Campbell again contacted Honeywell Benefits center to discuss the status of Plaintiff's healthcare coverage. Honeywell advised that Plaintiff was not eligible for Cobra healthcare due to "active employee" status and that they would not be able to reinstate Plaintiff's medical healthcare coverage until the balance of $3,212.58 is paid in full.

363.    Plaintiff currently does not have any family medical coverage after making many unsuccessful attempts at getting Honeywell Intelligrated to research on the billing and help resolve issues. Plaintiff has STD payroll stubs that show healthcare deductions were taken out

however paystubs also show signs of Honeywell manipulating Plaintiff's payroll deductions only in the healthcare deduction section. Plaintiff states her healthcare coverage was unlawfully terminated. Honeywell Benefits invoices between May 11, 2018 – September 2018 were falsely being adjusted and manipulated to intentionally cause a financial stress on the Plaintiff, while simultaneously terminating Plaintiff's STD income benefits on multiple occasions. In October 2018 when Plaintiff's healthcare coverage was terminated for an unpaid balance of $5,711.95, Plaintiff did not owe anything and to this day Honeywell has failed to explain the multiple adjustments on Plaintiff's healthcare benefits invoices between May 11, 2018 – May 8, 2019 when her healthcare coverage was terminated permanently (see **Exhibit M** Attachment M-1 through M-15).

364.    On July 22, 2019 Plaintiff received a letter from Cigna dated July 11, 2019 stating that Cigna has been trying to contact Plaintiff unsuccessfully. It continued to state on March 27, 2019 Cigna received proof of Plaintiff's application for filing for Social Security. The letter advised that Cigna last spoke with Plaintiff March 4, 2019. The letter further stated effective August 15, 2019 Cigna will began taking an estimated monthly reduction from Plaintiff's LTD benefits in the amount of $2,895; Effective August 15, 2019 Plaintiff's benefits would be $100. The notice stated "This estimate reduction will continue until Cigna receives either confirmation of your pending application, notice of award, or notice of denial for social security benefits" (Attachment J-25).

365.    July 22, 2019 Plaintiff immediately faxed her denial letter from Social Security dated April 11, 2019. Plaintiff was unaware that Social Security didn't notify Honeywell nor that Honeywell didn't have any means of finding out the information it needed. Plaintiff advised of the continued miscommunication and that Cigna should have sent a written notice before July

11, 2019 since Cigna specifically stated they were unable to reach Plaintiff by phone. Plaintiff requested in her fax that all requested information required by Cigna be sent to her in writing due to the miscommunication and issues Plaintiff had already been dealing with (Attachment J-26).

366. On July 29, 2019 Plaintiff received another notice from Cigna dated July 18, 2019. This time the letter stated that Cigna had tried to contact her on June 17, 2019, June 18, 2109 and June 20, 2019. The letter stated that Cigna needed to talk to the Plaintiff in order to determine if the Plaintiff will be returning to work. Plaintiff called to speak with Sharaya, Cigna Claim Manager but was only directed to her voice mail. The Plaintiff left a message stating that she is still under the care of her doctor and if any review information is needed to please reach out to the doctor to obtain an update on the Plaintiff's condition for LTD benefits (Attachment J-27).

367. Because the Plaintiff didn't receive a follow up call from Sharaya, Cigna Claims Manager, Plaintiff sent another fax dated July 31, 2019 regarding Cigna's letter dated July 18, 2019, advising Sharaya of the voice message left. Plaintiff also advised Cigna to send her written notice that her LTD benefits would not be affected since she responded with required documentation stated on Cigna letter dated July 11, 2019 "This estimate reduction will continue until Cigna receives either confirmation of your pending application, notice of award, or notice of denial for social security benefits" (Attachment J-28).

368. August 1, 2019 Plaintiff responded to a msg left from Sharaya, this time the msg left stated that Plaintiff needed to contact Cigna because the estimate cannot be removed now until Cigna receives notice that the Plaintiff appealed the Social Security decision from April 2019. Plaintiff immediately contacted Cigna to speak with Sharaya because she felt that Cigna was interfering with her LTD benefits and not properly providing the Plaintiff with reasonable

notifications so that the Plaintiff can remain compliant so that her benefits are not hindered. Plaintiff requested to speak with a supervisor but the supervisor maintained they provided enough time. Plaintiff advised that at no time did Cigna or Honeywell advise verbally or written that she had to apply for an appeal when she was denied Social Security benefits. Cigna representative stated that Plaintiff had until before August 15, 2019 to provide backup to Cigna.

369.  August 2, 2019 Plaintiff received a letter from Cigna dated July 23, 2019 stating in order for the Plaintiff's LTD benefits to not be affected the Plaintiff needed to provide Cigna with backup that an appeal of was filed or her benefits effective August 15, 2019 will be $100 (Attachment J-29).

370.  August 10, 2019 Plaintiff received a letter dated August 1, 2019 from Cigna. The letter is dated the same date that Plaintiff last spoke with Cigna, Claim Manager Supervisor. Plaintiff advised Cigna to send her something in writing that shows that Cigna stated Plaintiff had to apply for an appeal when she was denied Social Security. Instead Cigna just sent another letter to try to re-state that they sent Plaintiff a letter dated July 23, 2019, regarding the need of supporting backup that Plaintiff is appealing the Social Security decision of April 11, 2019. Plaintiff complained that Cigna would be putting her in financial hardship if it decreased Plaintiff's benefits from $2657.00 per month to $100.00. Plaintiff further advised that she believe Cigna was purposely trying to cancel her LTD income benefits in which she is eligible to receive per Cigna's July 11, 2019 letter stating "This estimate reduction will continue until Cigna receives either confirmation of your pending application, notice of award, or notice of denial for social security benefits". Plaintiff faxed Cigna denial on July 22, 2019. Cigna's notice dated July 11, 2019 did NOT state an appeal was a requirement. Plaintiff advise she will be making a complaint against Cigna for FLMA interference and FLMA retaliation (Attachment J-30).

371.    Plaintiff faxed letter to Cigna dated August 12, 2019 regarding her frustrations on the number of letters she has received from Cigna over the past few weeks. Plaintiff advised Cigna that a complaint would be filed for FLMA interference and FLMA retaliation due to the extra scrutiny that the Plaintiff has been put through in order to receive benefits that she was entitled to per Honeywell's Family Plan with Cigna (Attachment J-31).

372.    Plaintiff's denial of Disability benefits with Social Security dated April 11, 2019 in which Plaintiff faxed to Cigna on July 22, 2019 to satisfy the requirements stated on July 11, 2019 letter (Attachment J-32).

.    373.    Plaintiff believes Honeywell/Intelligrated Benefits Center and Cigna are working together to prevent Plaintiff to be further approved for LTD benefits in which she is entitled to and in which she paid into. Plaintiff believes that it is Honeywell's motive to cripple the financial state of the Plaintiff in order to prevent the Plaintiff for further filing her Federal complaint against Honeywell/Intelligrated.


**Plaintiff's OCRC discrimination charge and the OCRC's probable cause determination**

**Exhibit K**

374.    On September 27, 2017, Plaintiff filed her OCRC discrimination charge alleging that Honeywell Intelligrated, through its employees, had created a hostile work environment and unlawfully discriminated against her based on her race and age. She also alleged that the Company had retaliated against her for complaining about the discrimination (Attachment K-1).

375.    Pursuant to its procedures the OCRC issued a July 26, 2018 Letter of Determination finding that it is probable that Honeywell Intelligrated had engaged in unlawful

discriminatory practices in violation of Ohio revised Code Chapter 4112. The Commission ordered that Plaintiff's case be scheduled for conciliation (Attachment K-2).

376.  By letter dated August 9, 2018, Honeywell Intelligrated filed its request for reconsideration of the Commission's probable cause determination and requested the opportunity to present oral argument in support of its request (Attachment K-3).

377.  By letter dated August 17, 2018, Ohio Civil Rights Commission efforts at voluntary compliance with Chapter 4112 were unsuccessful and the matter is now at IMPASSE (Attachment K-4).

378.  After conciliation failed, the Commission issued an administrative complaint against Honeywell Intelligrated and scheduled a public hearing for Plaintiff's case (Attachment K-5).

379.  During the Ohio Civil Rights Commission's September 27, 2018 meeting, the Commission held a hearing on Honeywell Intelligrated's request for reconsideration. After the hearing, the Commissioners voted to Deny the Company's request (Attachment K-6).

380.  Shortly after the Commission's hearing, Plaintiff learned that she had suffered a second miscarriage.

381.  Plaintiff then elected to request a right to sue letter so that she could file this federal employment discrimination lawsuit against Honeywell Intelligrated and the individual Defendants (Attachment K-7).

## Plaintiff's performance reviews for 2015, 2016 and Mid-year Performance Reviews
## Exhibit L

382.  Plaintiff's 2017 Mid-Year Performance Review (Attachment L-1).

383.    Plaintiff's 2016 Performance Review (Attachment L-2).

384.    Plaintiff's 2015 Performance Review (Attachment L-3).

**Plaintiff states that Honeywell interfered and unlawfully cancelled her Healthcare Benefits resulting from manipulated invoices and payroll stubs to create a financial hardship on the Plaintiff in retaliation for filing a complaint with the OCRC.**

### Exhibit M

385.    Honeywell Benefit Service Center invoices and communication dated

May 11, 2018 – May 8, 2019 and Plaintiff's STD paystubs and LTD paystubs

386.    Honeywell Benefits Service Center invoices and Cancellation notices

(Attachments M-1 though M-15)

387.    Plaintiff's regular payroll stub from weeks October 9, 2017 through December 17,

2017 (Attachments M-16 though M-24)

388.    Plaintiff's STD paystubs from December 18, 2017 through August 14, 2018 that

shows Honeywell manipulating Plaintiff's healthcare deductions only (Attachments M-25

though M-40).

389.    Plaintiff's LTD paystubs from November 15, 2018 through LTD payment stubs

(Attachments M-41 through M-47)

390.    February 16, 2019 Honeywell Intelligrated failed to pay Plaintiff unused available

benefit hours. Honeywell failed to pay Plaintiff paid time when it was requested. Honeywell

Intelligrated paid Plaintiff for 40 hours of unused benefit hours from 2018 in February 2019

(Attachment M-48).

391.    Original deposit was sent to Plaintiff's checking account but due to financial

hardship that was created by Honeywell Intelligrated from continuously terminate Plaintiff's

disability income, Plaintiff's checking account was closed by the Bank. Honeywell Intelligrated had to reverse and mail a paper check to Plaintiff on February 21, 2019 (Attachment M-49).

### Honeywell Paid Sick Time Policy and Vacation for Exempt Employees Policy

### Exhibit N

392.     Paid Sick Time Policy (Attachment N-1).

393.     Vacation for Exempt Employees Policy (Attachment N-2).

**Honeywell's position statements to OCRC in regards to their non-discriminatory reasons for moving Plaintiff to the accounting department, reasons for removing Plaintiff's duties, and the shift of blame Honeywell places on Plaintiff.**

### Exhibit O

394.     Plaintiff advises that Honeywell statements were misleading and Plaintiff can prove that their non-discriminatory reasons are pretext.

395.     Plaintiff advises that Honeywell defamed her name and character. Honeywell caused the Plaintiff to be humiliated

396.     Honeywell Intelligrated's representatives did not provide the Plaintiff with a timely and fair investigation. Honeywell Intelligrated's representations were falsely made, with either knowledge of their falsity, or with disregard as to whether they were true or false.

397.     Honeywell Intelligrated, through the individual Defendants, has committed the tort of intentional misrepresentation under Ohio law.

398.     Honeywell Intelligrated, though the individual Defendants, has also committed the tort of fraud under Ohio law.

399.    Vidal-Clarisey contact the access Integrity Helpline not till September 5, 2017 although Plaintiff has written documentation showing that she reached out to Vidal-Clarisey as early as July 28, 2017 (Attachment O-1)

400.    All investigation reports and documents that were written by Vidal-Clarisey or Bernie Hess should be rejected. As there were many misrepresentations and misstatement of facts that were purposely left out of certain reports that would prove evidence of retaliation for the Plaintiff. See Exhibits H Honeywell Intelligrated officials knew of escalated issues surrounding Misty Sanderson prior to Plaintiff's complaints but advises in the Plaintiff's reports there was no evidence of a hostile workplace environment and that Sanderson had a great working relationship with her Installation Admins.

401.    Honeywell Intelligrated failed to advise the OCRC of the emails dated June 6, 2017, June 9, 2017 and June 13, 2017 regarding Lucy Gomez resignation due to management (see Exhibits H Attachments H-1 through H-3).

402.    Honeywell's Business Conduct Incident Report from Plaintiff's complaints opened September 6, 2017 and closed November 5, 2017 by Vidal-Clarisey under the direction of Bernie Hess (Attachment O-2)

403.    September 7, 2017 Interview Summary for Plaintiff by Marillia Vidal-Clarisey (Attachment O-3)

404.    September 29, 2017 Interview Summary for Jessica Holland by Marillia Vidal-Clarisey (Attachment O-4)

405.    October 6, 2017 Interview Summary for Plaintiff by Guerra and Vidal-Clarisey (Attachment O-5)

406.     October 6, 2017 Interview Summary for Misty Sanderson by Jeanette Guerra (Attachment O-6)

407.     October 6, 2017 Interview Summary for Ryan Balzer by Jeanette Guerra (Attachment O-7)

408.     October 9, 2017 Interview Summary for Nehkeya Clifton by Marillia Vidal-Clarisey (Attachment O-8)

409.     December 12, 2017 Feedback meeting with Plaintiff attended by Vidal Clarisey and Bernie Hess. Plaintiff never received any copy of any report until Plaintiff was copied on Honeywell Intelligrated's position statements to the Ohio Civil Rights Commission (Attachment O-9).

410.     Honeywell Intelligrated's position statement on December 21, 2017 sent to OCRC (Attachment O-10).

411.     Honeywell Intelligrated's position statement on August 9, 2018 sent to OCRC in support of their reconsideration hearing which was Denied. (Attachment O-11).

**Honeywell/Intelligrated without posting the positions allowed younger and less qualified similarly situated employees outside the protected class that reported to Misty Sanderson to receive promotions and transfers. Honeywell/Intelligrated passed Plaintiff over on a promotion and/or transfers that would have allowed her the same opportunity.  Plaintiff trained and directed the Installation Field Admins prior to her taking maternity leave in August 2015.**

### Exhibit P

412.     Titles for all Install "Field" Admin while under the supervision of Cindy Levitz, former supervisor prior to Sanderson's promotion. Install Admins included: Misty Sanderson, Administrative Assistant; Lucy Gomez, Office Administrator, Installations; Judy McClure,

Administrative Assistant; Toni Milne, Administrative Installation Assistant; Connie Brooks, Administrative Assistant Installation Services; (Attachment P-1).

413.    Titles changes for Installation Field Admins after Sanderson was appointed supervisor of Installation Admins. Install Admins included: Judy McClure (Caucasian), Installation Administration Specialist; Lucy Gomez (Hispanic), Installation Administration Specialist; Toni Milne (Caucasian), Installation Administration Specialist. Connie Brooks (Caucasian), Administrative Assistant Installation Services was terminated by Sanderson because of "performance" (Attachment P-2).

414.    Jessica Holland (African American), Installation Administration Specialist was hired by Sanderson in early 2016. Jessica Holland transferred from the Accounting Department formerly reporting to Tricia Hayworth, Manager, Accounts Payables. Holland's prior title was "Accounts Payable Specialist". (Attachment P-3).

415.    In less than 9 months Holland wanted to transfer out from the Installation department, but remains in same position (Attachment P-4).

416.    Amanda Hale (Caucasian) 25 years of age, Installation Administration Specialist was hired by Sanderson also in early 2016. Hale's previous title prior to reporting to Sanderson was Mechanical Installer, her former supervisor was her father, Nathan Hale, Supervisor, Mechanical Installation (Attachment P-5).

417.    Amanda Hale's first title after reporting to Sanderson was "Administrative Installation Assistant" see document dated February 15, 2016 within 3 months Sanderson promoted Amanda Hale to "Installation Administration Specialist" see document dated May 16, 2016, same title as Plaintiff (Attachment P-6).

418.    Melissa Maynard (Caucasian), Supervisor, Electrical Installation originally joined the Installation Administration team. Because of issues with Sanderson, Maynard requested not to have to report to Sanderson. Maynard was allowed to report to Bob Mummaw because she could not report directly to her husband, Ken Maynard, Manager, Electrical Installation. Melissa Maynard's title was "Administrative Assistant", by the following year Melissa Maynard was promoted to Electrical Installation Coordinator and by October 2017 of the same year, Melissa Maynard went from "Electrical Installation Coordinator" (Attachment P-7).

419.    Plaintiff's title has remained the same since she started with the Installation department. Although Plaintiff trained and directed each Installation Admin, including Misty Sanderson she was passed over on a promotion that she was most qualified for. Plaintiff was also denied a transfer to another roll that would allow her to utilize her managing abilities.

420.    Toni Milne, (Caucasian), Installation Administration Specialist at the end of 2016 was allowed to transfer from Sanderson's supervision to report to Melissa Maynard. Both Sanderson and Balzer approved Milne's transfer however Plaintiff was denied this same transfer (see **Exhibit E** Attachment E-30).

421.    After the acquisition all Installation Administration Specialist titles changed to "Assistant Administration Customer Product Support". The following associates support Installation duties for the Installation department related to projects and services. Installation Admins include: Maria Floyd (31 years of age), Assist Admin Cust Prod Supp; Judy McClure (67 years of age), Sr. Assist Admin Cust Prod Supp; Lucy Gomez, Assist Admin Cust Prod Supp; Nehkeya Clifton, Assist Admin Cust Prod Supp; Toni Milne, Sr. Assist Admin Cust Prod Supp (although she doesn't report to Sanderson per Honeywell her title changed to Assist Admin Cust Prod Supp); Amanda Hale, Assist Admin Cust Prod Supp; Beth Ackley (37 years of age),

Assist Admin Cust Prod Supp; Jessica Holland, Assist Admin Cust Prod Supp and Plaintiff, Sr. Assist Admin Cust Prod Supp (Attachment P-8).

422.    Lucy Gomez (Hispanic), Assist Admin Cust Prod Supp resigned effective June 16, 2017 according to the email Vidal-Clarisey accidently copied Gomez on dated June 6, 2017 (see Exhibit H Attachments H-1 through H-3)

423.    All "Assist Admin Cust Prod Supp" employees report to the same department 250 and to the Human Resources Generalist Marillia-Vidal-Clarisey. All Assist Admin Cust Prod Supp employees attend or conference in on weekly admin meetings organized by Misty Sanderson. Maria Floyd has a differ reporting Manager Andrew Geyer, Director Installation Services, however Floyd has been trained by Sanderson and takes direction from Sanderson on Installation Admin related items. Both Maria Floyd and Plaintiff take direction from Andrew Geyer, Floyd's direct manager in order to support the Installation Management team (Attachment P-8).

424.    Judy McClure (67 years of age) filed an Age discrimination complaint against Sanderson in 2017 with the EEOC. Plaintiff spoke with Patrick Hunt (918)-497-9159 who called and asked Plaintiff questions regarding the work conditions as witness for McClure. McClure complained that Sanderson took her tasks and assigned them to younger Installation Admin Specialist.

425.    1481 Installation Administration Specialist or 1842 Sr. Installation Administration Specialist according to Honeywell's job description dated November 15, 2014 (Attachment P-9).

**FIRST CAUSE OF ACTION**
**Race Discrimination and Racial Harassment - Title VII and Ohio R.C. §4112.02**
**(Against Defendant Honeywell Intelligrated)**

426.    Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

427.    Plaintiff, an African American female, was fully qualified for her positions at all times.

428.    As described above, Defendants treated Plaintiff less favorably than similarly situated white employees by subjecting her to heightened scrutiny, criticism, and investigation which created a racially hostile work environment for her.

429.    Defendants' conduct was intentional, willful, wanton, malicious, and in reckless disregard for Plaintiff's rights.

430.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injury and damage for which she is entitled to judgement.

### SECOND CAUSE OF ACTION
### Age Discrimination - Title VII and Ohio § 4112.02 (A); § 4112.14 (A); § 4112.99
### (Against Defendant Honeywell Intelligrated)

431.    Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

432.    Plaintiff, a female 43 years of age at time of incident, was fully qualified for her positions at all times.

433.    As described above, Defendants treated Plaintiff less favorably than similarly situated white employees by subjecting Plaintiff to different terms and conditions of employment, not allowed to transfer out from under Misty Sanderson's supervision, was stripped of her Installation Administer Specialist duties which reduced her opportunity for advancement; failure to promotion; and she was transferred to a less desirable job.

434.    Defendants' conduct was intentional, willful, wanton, malicious, and in reckless disregard for Plaintiff's rights.

435.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injury and damage for which she is entitled to judgement.

### THIRD CAUSE OF ACTION
**Pregnancy Discrimination Title VII and Ohio R.C. §4112.5.05 (G)(5); § 4112.02 (A)**
**(Against Defendant Honeywell Intelligrated)**

436.    Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

437.    The Pregnancy Discrimination Act (PDA) is an amendment to Title VII of the Civil Rights Act of 1964.  The Pregnancy Discrimination Act (PDA) makes it illegal for Employers to discriminate on the basis of "Pregnancy", Childbirth, or a "related medical condition" (including those related to miscarriage or termination of a pregnancy).

438.    All employers covered by Title VII are covered by the PDA.

439.    The PDA prohibits employers from discriminating against pregnant employees, forcing them to take leave when they are still able to perform their jobs, and making assumptions about their ability or willingness to work after they have children.

440.    Women affected by pregnancy or related conditions must be treated in the same manner as other applicants or employees who are similar in their ability or inability to work.

441.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered the loss of income which created financial hardship, injury and damage for which she is entitled to judgement.

### FOURTH CAUSE OF ACTION
**Wage Discrimination O.R.C. § 4111.17**
**(Against Defendant Honeywell Intelligrated)**

442.    Plaintiff realleges the foregoing paragraphs as if fully rewritten herein. Defendant violated the Equal Pay Act when it promoted Misty Sanderson, former Installation Field Administration to the position of Supervisor, Installation Administration Team.

95

443.    At the time of Sanderson's promotion, the Plaintiff was most qualified and experienced for the Supervisor, Installation Administration position.

444.    Plaintiff had already been in training 6 months prior to Plaintiff going on maternity leave.

445.    Plaintiff's position and responsibility was already mirroring Cindy Levitz, former Supervisor, Installation Administration Team and was her backup.

446.    As described above, Defendants treated Plaintiff less favorably than similarly situated white employees by unfairly compensating the Plaintiff for her employment based on her skill, effort, and level of responsibility she provided to the Installation department.

447.    Defendants failed to allow Plaintiff to use paid vacation days as similarly situated white employees by subjecting Plaintiff to different terms and conditions of employment benefit days.

448.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injury and damage for which she is entitled to judgement.

## FIFTH CAUSE OF ACTION
### Pattern or Practice of Retaliatory Harassment O.R.C. § 4112.02
### (Against Defendant Honeywell Intelligrated)

449.    Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

450.    Discriminatory acts that are part of a pattern or practice of discrimination can be challenged as a single act. If the discriminatory pattern or practice continues into the filing period, all of the component acts of the pattern or practice will be timely, and relief can be recovered for any of those acts. EEOC COMPLIANCE MANUAL, Section 2-IV TIMELINESS,

C. When Can a Discriminatory Act Be Challenged ?, Pattern-or-Practice Claims.

https://www.eeoc.gov/policy/docs/threshold.html#2-IV-C.

451.    The EEOC's position is that a pattern or practice of discrimination should be considered a single unlawful employment practice, and not a series of discrete acts, each of which must be challenged within the charge filing period. Akin, Gump, Strauss, Hauer & Feld, LLP, EEOC Pattern or Practice Litigation, ABA National Conference on EEO Law, March 23-27, 2010 at 4.

452.    As explained in the EEOC's Enforcement Guidelines on Retaliation and Related Issues (https://www.eeoc.gov/laws/uidance/retaliation-guidance.cfm#3_Harassing), at Section II, B, 3, Harassing Conduct as Retaliation, sometimes retaliatory conduct is characterized as 'retaliatory harassment." The threshold for establishing retaliatory harassment is different than for discriminatory hostile work environment. Retaliatory harassing conduct can be challenged under the standard announced in *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006) ("the *Burlington Northern* standard"), even if it is not severe or pervasive enough to alter the terms and conditions of employment. If the conduct would be sufficiently material to deter protected activity in the given context, even if it were insufficiently sever or persuasive to create a hostile work environment, there would be actionable retaliation.

453.    A covered entity is as liable for the actions of its agents as it would be for actions taken by itself. An agent is an individual or entity having the authority to act on behalf of, or at the direction of, the covered entity. EEOC COMPLIANCE MANUAL, SECTION 2: THRESHOLD ISSUES, 2-III COVERED PARTIES, 2. Agents.

454.    An entity that is an agent of a covered entity is liable for the discriminatory actions it takes on behalf of the covered entity.

455.    Applying the above guidelines to the facts of this case, Plaintiff can prove a pattern-or-practice claim for retaliatory harassment against Honeywell Intelligrated and the individual Defendants.

456.    As discussed in the above Statement of Facts, Honeywell Intelligrated, through its employees and agents, engaged in a pattern or practice of retaliatory harassment against Plaintiff.

457.    As a proximate result of Defendants' retaliation, Plaintiff has suffered damages for which she is entitled to all of the appropriate remedies available to her.

## SIXTH CAUSE OF ACTION
### Disparate-Treatment Discrimination O.R.C. § 4112.02
### (Against Defendant Honeywell Intelligrated)

458.    Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

459.    Disparate treatment discrimination occurs when an employer intentionally discriminates against an individual because they possess one of the protected characteristics. The employer's motive for taking the adverse employment action against the employee or prospective employee is central to a determination of fault.

460.    Sanderson and Balzer allowed other similar situated employees that reported to them outside of the protected class to transfer from under the supervisor of Sanderson when they complained of issues with Sanderson.

461.    Sanderson allowed other similar situated employees that reported to her outside of the protected class to work from home and not have to exhaust their paid days but denied the same opportunity when Plaintiff had to take care of a family matter. Sanderson told Plaintiff she had to use per personal time and could not work from home.

462.    Balzer allowed other similar situated employees that reported to him outside of the protected to use vacation hours to cover missed hours, Balzer denied Plaintiff this same

request. Balzer refused to answer 3 separate requests from Plaintiff asking if she had his permission to use her available vacation days.

463.    Plaintiff took a loss in pay due to Balzer not approving Plaintiff's payroll.

## SEVENTH CAUSE OF ACTION
### Aiding and Abetting Discrimination in Violation of the
### Ohio Civil Rights Act O.R.C. § 4112.02(J)
### (Against Defendant Honeywell Intelligrated)

464.    Plaintiff realleges the preceding paragraphs as if fully rewritten herein.

465.    All of the individual Defendants aided and abetted Honeywell/Intelligrated in engaging in a pattern-or-practice of racial and retaliatory harassment against Plaintiff.

466.    As a proximate result of the individual Defendants aiding and abetting retaliation, discrimination, and the denial of public accommodations, Plaintiff has suffered damages for which she is entitled to all of the appropriate remedies available to him.

## EIGHTH CAUSE OF ACTION
### Breach of an Implied Contract O.R.C. § 2305.07; § 2305.06
### (Against Defendant Honeywell Intelligrated)

467.    Plaintiff realleges the preceding paragraphs as if fully rewritten herein.

468.    The attached copies of Honeywell Intelligrated's policies on Equal Employment Opportunity Workplace Harassment, Vacation for Non-Exempt employees, and Paid Sick Leave constitute an implied contract.

469.    Plaintiff can establish all the elements for a breach of an implied contract of employment claim because: (1) she had an implied contract of employment; (2) she performed her obligations under this contract; (3) Honeywell Intelligrated materially breached the contract; and (4) Plaintiff has suffered damages.

470. As a result of Honeywell Intelligrated's breach of Plaintiff's implied contract of employment, Plaintiff has suffered and continues to suffer damages for which she is entitled to all of the appropriate remedies available to her.

### NINETH CAUSE OF ACTION
### Promissory Estoppel
### (Against Defendant Honeywell Intelligrated)

471. Plaintiff realleges the preceding paragraphs as if fully rewritten herein

472. Doctrine of Promissory Estoppel states that an injured party can recover damages if those Damages were the result of a promise made by a promisor and the promise was significant enough to move the promisee to act on it.

473. Plaintiff's was promised a role that would allow her opportunity for advancement into a supervisory role prior to Plaintiff's maternity leave and again when the department expanded. Plaintiff remained in the accounting department as of February 13, 2017 never returning to Installation department.

473. Plaintiff role in the Installation Department was to create a balancing sheet for contract vendor labor, track requisitions, coordination of requisitions, tracking of vendor payroll and invoicing.

474. Because Honeywell HR failed to properly investigate the hostile workplace and retaliation claims properly, Honeywell/Intelligrated allowed Sanderson and Balzer to remove Plaintiff's duties which removed the opportunity for advancement to the Plaintiff,

475. Removed the checks and balances from the department in which Plaintiff's role supplied

476. Allowed the Plaintiff to be transferred to a different department

477. Allowed the removal of all Installation access to internal systems without cause.

100

478.    Plaintiff was fully qualified for her positions at all times and did not have any history of failure to meet expectations or deadlines relevant to her job duties and responsibilities as an Installation Administration Specialist.

479.    Plaintiff received a rating of "Outstanding Performer" in 2015, 2016 including her mid-year 2017 performance review of "Outstanding Performer".

480.    Performance issues escalated only after Plaintiff involved Honeywell officials outside of Intelligrated officials.

481.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injury and damage for which she is entitled to judgement.

## TENTH CAUSE OF ACTION
### Wrongful Discharge in Violation of Public Policy § 4112.99
### (Against Defendant Honeywell Intelligrated)

482.    Plaintiff realleges the preceding paragraphs as if fully rewritten herein.

483.    As evidenced by the Ohio Civil Rights Act and federal employment laws prohibiting discrimination and retaliation, this nation and the State of Ohio has a clear public policy prohibiting discrimination and retaliation in the workplace.

484.    Plaintiff complained about suspected fraudulent activity to Company officials.

485.    Plaintiff complained of being forced to approve questionable invoices, payroll and expenses.

486.    Plaintiff complained multiple times prior to complaints about Misty Sanderson and Ryan Balzer discriminating and harassing her, including other Company officials in order to eliminate Plaintiff's role out of the department.

487.    In response to Plaintiff's complaint, Honeywell Intelligrated, through the individual Defendants, engaged in a pattern and practice of retaliation that ultimately resulted in forcing Plaintiff to take a mental health medical leave.

488.    Defendants' actions were willful, malicious, and/or in reckless disregard of Plaintiff's rights.

489.    As a result of Defendants' retaliatory and discriminatory misconduct, Plaintiff has been damaged and is entitled to compensation.

## ELEVENTH CAUSE OF ACTION
### Misrepresentation and Fraud
### (Against Defendant Honeywell Intelligrated)

490.    Plaintiff realleges the preceding paragraphs as if fully rewritten herein.

491.    In its policies on Equal Opportunity and Workplace Harassment, Honeywell Intelligrated made representation to all employees, including Plaintiff that the Company would protect them against discrimination, harassment, and retaliation.

492.    Honeywell Intelligrated's representations were falsely made, with either knowledge of their falsity, or with disregard as to whether they were true or false.

493.    Honeywell Intelligrated, through the individual Defendants, has committed the tort of intentional misrepresentation under Ohio law.

494.    Honeywell Intelligrated, though the individual Defendants, has also committed the tort of fraud under Ohio law.

495.    As a result of Honeywell Intelligrated's misrepresentation and fraud, Plaintiff has and continues to suffer damages for which she is entitled to all of the appropriate remedies available to her.

102

## TWELETH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against Defendant Honeywell Intelligrated)

496.  Plaintiff realleges the preceding paragraphs as if fully rewritten herein.

497.  "To establish a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that the defendant, through extreme and outrageous conduct, intentionally or recklessly caused the plaintiff severe emotional distress." Mowery v. Columbus, 10th Dist. No. 05AP-266, 2006-Ohio-1153, Paragraph 48.

498.  As discussed in the above Statement of Facts, all of the Defendants engaged in extreme and outrageous conduct towards her and that their conduct caused her to suffer severe emotional distress which caused her to suffer two miscarriages.

499.  As a result of the Defendants' intentional infliction of emotional distress, Plaintiff has and continues to suffer damages for which she is entitled to all of the appropriate remedies available to her.

## THIRTEENTH CAUSE OF ACTION
### FLMA Interference and FMLA Retaliation 29 U.S.C. § 2615(a)(1); 29 U.S.C. § 2615(a)(2)
### (Against Defendant Honeywell Intelligrated)

500.  Plaintiff realleges the preceding paragraphs as if fully rewritten herin.

501.  Pursuant to 29 U.S.C. § 2615(a)(1), it is unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided by the FMLA.

502.  Pursuant to 29 U.S.C. § 2615(a)(2), an employer may not discriminate or retaliate against an employee for taking FMLA leave. Thus, employers are prohibited from "us[ing] the taking of FMLA leave as a negative factor in employment actions." Hunter v. Valley View Local Schools, 579 F.3d 688, 690 (6th Cir. 2009)(citing 29 C.F.R. § 825.220).

503.  In the instant case, Plaintiff asserts FLMA interference and FMLA retaliation under both single-motive and mixed motive theories.

103

504.     Regarding Plaintiff's single-motive theory, Plaintiff contends that she can establish a *prima facie* case for FLMA interference and FMLA retaliation and that Honeywell Intelligrated's proffered reasons for the adverse employment actions it took against her are pretextual. The heightened scrutiny which Plaintiff's supervisors put her under, her reduced performance evaluation ratings, the attempt to put her on an unjustified performance improvement plan, and her frequent transfers to the Accounting Department raise a genuine issue of material fact regarding causation. A reasonable jury could find that Honeywell Intelligrated non-discriminatory explanation for these adverse employment actions is pretextual.

505.     Regarding Plaintiff's mixed-motive theory, the "burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim. *Merendo v. Ohio Gastroenterology Grp., Inc.,* 2019 U.S. Dist. LEXIS 31507, * 46-47 (citing *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 400 (6th Cir. 2008) (Title VII gender discrimination claim). As discussed in the Statement of Facts above, Plaintiff has produced some evidence in support of her mixed-motive claim for FLMA interference and FMLA retaliation.

506.     As a proximate result of the Honeywell Intelligrated's FLMA interference and FMLA retaliation against Plaintiff, she has suffered damages for which she is entitled to all of the appropriate remedies available to her.

### FOURTEENTH CAUSE OF ACTION
### Defamation: Slander and Libel O.R.C § 2739.01
### (Against Defendant Honeywell Intelligrated)

507.     Plaintiff realleges the preceding paragraphs as if fully rewritten herin.

508.     The statements contained in the investigation reports provided by Honeywell HR were false.

509.    Plaintiff did not have any performance issues and Plaintiff did not cause the backload of invoices that caused the department to miss forecast as Honeywell advised OCRC at administrative/reconsideration hearings.

510.    Honeywell Officials allowed Sanderson and Balzer to spread false accusations surrounding Plaintiff's performance and work ethics to internal department employees segregating the team in believe that Plaintiff was at fault.

511.    Honeywell knowing knew they were sending misleading and false statements to the OCRC investigator in order to hide unlawful discriminatory practices harbored by the Company officials.

512.    Statements made by Honeywell officials/representative contained false and misleading information about the Plaintiff and was presented to OCRC Commissions in both administrative hearing and reconsideration hearing in which OCRC found probable cause of race, age and retaliation.

513.    Honeywell/Intelligrated defamed, slandered and ruined the "Outstanding" reputation that the Plaintiff had earned and diluted her tasks to filing and delivering mail because she complained of a protected activity.

514.    Defendants' actions were willful, malicious, and/or in reckless disregard of Plaintiff's rights.

515.    As a result of Honeywell Intelligrated's defamation through libel and slander, Plaintiff has and continues to suffer damages for which she is entitled to all of the appropriate remedies available to her.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants Honeywell Intelligrated, Misty Sanderson, Ryan Balzer, Marilla Vidal-Clarisey, and Nick Choi as follows:

(a)     That Honeywell Intelligrated be ordered to immediately accept the resignation of Plaintiff.

(b)     That Honeywell Intelligrated be ordered to issues a Letter of Recommendation for the Plaintiff.

(c)     That Honeywell Intelligrated pay Plaintiff any and all back pay, front pay and lost benefits she has suffered.

(d)     That Honeywell be required to pay all medical bills and related expenses resulting from Plaintiff's mental health illness from this complaint.

(e)     That Plaintiff be awarded compensatory damages from Defendants in an amount to be determined at trial but in no event less than $350,000.

(f)     That Plaintiff be awarded punitive damages in an amount sufficient to deter the Defendants from engaging in similar retaliatory, discriminatory, and harassing conduct in the future but in no event less than $700,000.

(g)     That Honeywell Intelligrated be ordered to expunge Plaintiff's official personnel file and any and all other files kept on Plaintiff related to the discriminatory, harassing, and retaliatory actions the individual Defendants took against him.

(h)     That all of the individual Defendants who participated in the pattern-or-practice of retaliatory harassment against Plaintiff be ordered to attend remedial training on what constitutes unlawful retaliation, discrimination, and harassment under federal and Ohio

106

law and what preventive measures they need to take to avoid engaging in such illegal activity in the future, including Mason and West Chester facilities

(i)     That all of the employees including management at the Mason and West Chester facilities participate to attend remedial training on what constitutes unlawful retaliation, discrimination, and harassment under federal and Ohio law and what preventive measures they need to take to avoid engaging in such illegal activity in the future.

(j)     That Plaintiff be awarded both pre-judgment interest and post-judgment interest.

(k)     That Plaintiff be awarded reasonable attorney's fees and costs from the Defendants.

(l)     That Honeywell Intelligrated be ordered to pay all court fees and costs for Plaintiff.

(m)     That Plaintiff be awarded all other legal and equitable relief to which Plaintiff may be entitled from the Defendants.

Dated: August 15, 2019

**JURY DEMAND**

Plaintiff demands a trial by jury

Malissa R Harmon
1512 N Breiel Blvd.
Middletown Ohio 45042
(513) 499.7093

107