UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MALISSA R. HARMON,　　　　　　　　　　　Case No. 1:19-cv-670
　　　Plaintiff,　　　　　　　　　　　　　　　Cole, J.
　　　　　　　　　　　　　　　　　　　　　　Litkovitz, M.J.

　　　vs.

HONEYWELL INTELLIGRATED,　　　　　　　**REPORT AND**
　　　Defendant.　　　　　　　　　　　　　**RECOMMENDATION**

Plaintiff Malissa Harmon ("Harmon") brings this employment discrimination action

against Honeywell Intelligrated ("Honeywell") alleging claims under Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C § 623 et seq., the Pregnancy Discrimination Act

("PDA"), 42 U.S.C. § 2000e(k), the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et

seq., the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, and state law.  (Doc. 48; *see* Docs. 29, 35).

This matter is before the Court on Honeywell's motion for summary judgment (Doc. 84),

Harmon's response in opposition (Doc. 89), Honeywell's reply memorandum (Doc. 98),

Harmon's motion for leave to file a fourth amended complaint (Doc. 99), Honeywell's response

in opposition (Doc. 100), and Harmon's reply memorandum (Doc. 101).

## I.  Factual Background[1]

Harmon was hired as a full-time employee at Intelligrated[2] in June 2011 as a Data Entry

Associate.  (Doc. 80-1, Pltf. Depo., at PAGEID 1857).  Harmon represented herself as

"Black/Hispanic" on the enrollment application.  (*Id.*; *see also Id.*, Ex. A, at PAGEID 1941).[3]

---

[1] The factual background is undisputed unless otherwise noted.

[2] As explained *infra*, Honeywell acquired Intelligrated on August 29, 2016.  (Doc. 80-1, Pltf. Depo., at PAGEID 1858; Doc. 84 at PAGEID 2277 n.3).  As a result of this acquisition, Harmon became an employee of Honeywell.

[3] Harmon represented herself as "Black" when she filed an OCRC charge in this matter.  (Doc. 80-1, Pltf. Depo., at PAGEID 1857; *see also* Doc. 80-1, Ex. BB, at PAGEID 2011).

Harmon was born in 1974 and was 45 years old when she left Honeywell's employment.  (*Id*. at PAGEID 1859; *see Id*., Ex. QQ, at PAGEID 2044).  Harmon was promoted to a Proposal Coordinator in the Sales Department, and after being in that department for several years, Harmon applied for, and was promoted to, an Installation Administrative Specialist in March 2015.  (*Id*. at PAGEID 1857-58).  In fall 2015, Harmon took FMLA leave for the birth of her son.  (*Id*. at PAGEID 1858).  When Harmon returned, Misty Sanderson ("Sanderson") had become the interim director of the Installation Department.  (*Id*.).  Thereafter, Sanderson was promoted from interim director to Supervisor of the Installation Department.  Harmon did not apply for the Supervisor position with Intelligrated because the position was not posted.  (*Id*.).

On August 29, 2016, Honeywell acquired Intelligrated.  (*Id*. at PAGEID 1858; *see* Doc. 84 at PAGEID 2277 n.3).  As a result of this acquisition, Harmon became an employee of Honeywell where she continued to be supervised by Sanderson.  (Doc. 80-1, Pltf. Depo., at PAGEID 1858).  Harmon's new title with Honeywell was Assistant Administrative Senior in the Customer Production Support Department.  (*Id*.).  Despite this title, Harmon's job duties and responsibilities remained the same.  (*Id*. at PAGEID 1858-59).  Harmon was known as the Vendor Labor Coordinator at Honeywell, and in that position, she coordinated all of the purchasing and training.  (*Id*. at PAGEID 1859).  Harmon was paid hourly and was not in a supervisory position at Honeywell.  (*Id*.).  As of January 1, 2017, other employees in the department where Harmon worked included: Amanda Hale (White, age 24), Jessica Holland (Black, age 36), Judy McClure (White, age 66), Lucy Gomez (Hispanic, age 36), Toni Milne (White, age 44), Nehkeya Clifton (White, age 37), and Melissa Maynard (White, age 30), among others.  (Doc. 84-2, Hamilton Decl., at PAGEID 2382; *see also Id*. at PAGEID 1859-62).  From

what Harmon could recall, Sanderson never talked about her age and Harmon did not talk about her age or tell Sanderson how old she was. (Doc. 80-1, Pltf. Depo., at PAGEID 1860).

In January 2017, Harmon received an appraisal review by Honeywell where Sanderson, as Harmon's supervisor, rated Harmon an "Outstanding Performer." (*Id.*, Ex. C, at PAGEID 1947-52). Sanderson stated:

> [Harmon] has developed her technical skills and knowledge on policies and procedures exceptionally well over the past year. She has handled the changes and growing pains of the company with professionalism and maintained her ability to complete tasks and make deadlines. [Harmon] continues to grow with the team and is an important part of our team growth as well. Each team member has their own special abilities and she understands how to utilize the team and how to insert her abilities into the team to be utilized as well. Our team has been through a lot of changes over the past year and [Harmon] has handle[d] the stress and changes very well considering the high levels of stress going around.

(*Id.* at PAGEID 1947). In response, Harmon stated she is "very proud to be a part of the Installation Admin Team and look forward to many more productive years. Thank you!" (*Id.*; *see also Id.*, at PAGEID 1863-64). Harmon has an auditing and accounting background, and she indicated in her appraisal review that she "utilize[s] [her] accounting and auditing background in order to be successful at [her] position." (*Id.* at PAGEID 1864; *see also Id.*, Ex. C, at PAGEID 1950). Harmon considered herself to be the "most skilled at that time" in her job duties given her auditing and accounting background. (*Id.*).

Beginning in 2017, Harmon reported incidents of allegedly hostile behavior by Sanderson. The first such reported incident occurred on January 25, 2017, where a new requisition form was introduced, and Harmon knew about the form before Sanderson did. (*Id.*, Ex. D, at PAGEID 1952-53). Sanderson raised her voice and talked over Harmon for communicating with upper management about installation processes rather than going through Sanderson. Harmon stated in the Incident Report that Sanderson did "not want me to talk to

3

anyone outside of her regarding any process issues [and she] has already directed me to always go through her first and that I am not to reach out to our own installation Mgmt or anyone outside our dept for help." (*Id*. at PAGEID 1953). Harmon further stated she did "not feel comfortable with this" and believed that she "should never have to feel intimidated by anyone I work for because of new changes happening within our department." (*Id*.). The Incident Report did not mention or suggest race or age discrimination. (*See Id*.; *see also Id*. at PAGEID 1864). At no point did Sanderson direct any racial slurs at Harmon. (*Id*.; *see also Id*. at PAGEID 1865). Instead, Sanderson "yelled and raised her voice and in the office where everybody looked at" Harmon. (*Id*. at PAGEID 1864). Harmon continued to seek intervention regarding Sanderson's alleged mismanagement of the department, observing that Sanderson refused to conform to the "Honeywell way" after the acquisition of Intelligrated:

> [W]hen we went from Intelligrated to Honeywell and we had to transition to the Honeywell way, [Sanderson] did not want to transition in the Honeywell way. She wanted – she was still trying to force us to still do the Intelligrated way and didn't want us to conform to the Honeywell way, and what I was trying to explain to Ryan [Balzer][4] is that the way that she's managing us and the way that she's forcing us to do things that are against the rule is – is not right, and he needed to be involved. He needed to step in and help us, because we were – you know, at that time I was not the only admin that was complaining at that time. . . .
> * * *
> If you didn't do what she told you to do, then that was not acceptable to her. You had to do what she told you. You – especially if you were under her, she was your supervisor and you were a director or something and you came to one of her people and said something, she would even tell us do not talk to them, you send them to me, don't do nothing for them; so she would – you know, that's where pretty much she kind of got upset at me, because I was a Purchase Coordinator for our department, and she would always say, "Why do you know things before I know them?" And I used to tell her that it's not my fault. . . .

(*Id*. at PAGEID 1866, 1870).

---

[4] Ryan Balzer ("Balzer") was Sanderson's direct supervisor while she was employed at Honeywell.

4

Harmon continued to raise issues concerning Sanderson's allegedly hostile treatment of her and the other employees in Harmon's department, Sanderson's poor management of the department, and transactions that Harmon viewed as unethical. On May 25, 2017, Harmon emailed Balzer and described struggles in her department. (Doc. 80-1, Ex. J, at PAGEID 1965-66). Harmon told Balzer that she and other employees in her department were "struggling" due to a "flood of orders coming in." (*Id*. at PAGEID 1966). Harmon also told Balzer that she and other employees in the department gave "suggestions" to Sanderson, but Sanderson did not listen. (*Id*.). Harmon stated, "I just wanted to make sure you were aware of the stress level. At least I know for me and I hear it from the girls but I'm not sure if they are scared to speak up at times. When we say we have an opinion Misty quickly answers, 'I already have an idea on what I want to do' so that kills the opinion." (*Id*.). Harmon asked Balzer to redistribute work among the employees within the department to address the workload issues and stress levels. (*Id*.; *see also Id*. at PAGEID 1872). Balzer told Harmon he talked to Sanderson about this already but would address it again next week and to hang in there until more help arrives. (*Id*. at PAGEID 1965).

Thereafter, Harmon reached out to other management personnel at Honeywell regarding Sanderson's treatment of her and the other Honeywell employees in Harmon's department. For example, on August 3, 2017, plaintiff emailed Nick Choi ("Choi"), Director of Field Operations at Honeywell, informing him that issues in her department were not being addressed. (*Id*. at PAGEID 1873; *Id*., Ex. K, at PAGEID 1967).[5] In this email, Harmon explained that Sanderson told Harmon not to reach out to anyone else in management concerning issues in her department. Harmon stated Sanderson would "NOT let me talk at all. . . . I am doing my diligence to bring

---

[5] Harmon testified in her deposition that she had reached out to Choi before she sent this August 3, 2017, and this was "just one of the e-mails that I sent . . . from 2017." (Doc. 80-1, Pltf. Depo., at PAGEID 1873).

these issues to management by [following] the chain of command but I also feel that I am being halted from not talking to upper Mgmt. This is affecting my duties within our dept. I am only speaking now because I have been told directly I am no longer able to come to you." (*Id.*, Ex. K, at PAGEID 1967) (emphasis in original).

On July 28, 2017, Harmon met with Marilia Vidal-Clarisey ("Vidal-Clarisey"), Human Resources Generalist at Honeywell, asking her to conduct an "HR investigation" on "unethical things" going on in the department and stating that she wanted "Honeywell corporate" to be involved. (*Id.* at PAGEID 1875, 1879). Harmon told Vidal-Clarisey she wanted to file a hostile harassment charge against Balzer and Sanderson. (*Id.* at PAGEID 1875). Harmon testified that Sanderson created a "hostile work environment that she was subjecting to me – subjecting me, and no one was doing anything about it." (*Id.* at PAGEID 1876). Harmon explained, "I hadn't been transferred, but my job was – my duties were being stripped. I was being yelled at in front of everybody, with her finger all on my computer, telling her (sic), open it, show me now, show me now." (*Id.* at PAGEID 1875). Harmon stated this conduct "was uncalled for." (*Id.*).

On August 10, 2017, Harmon emailed Melissa Maynard[6] and advised her that Harmon was overworked and that numerous deficiencies existed in Harmon's department at Honeywell. (*Id.*, Ex. M, at PAGEID 1970-72). Harmon recommended that more employees should be trained on order entry because it would benefit the entire department. (*Id.*). Harmon explained that duties were being bounced around, and there was a lack of consistency in the department because the employees were handling too many tasks and responsibilities. (*Id.*). Harmon stated Sanderson had "been forgetting things a lot and I think it's because [she] is overwhelmed . . . [and] [t]rying to do too much without help or advi[c]e from others." (*Id.*). Harmon explained

---

[6] Melissa Maynard is identified as the Electrical Installation Departmental Supervisor at Honeywell.

that Sanderson "just takes work from one and lays it on the other.  I feel like I am always behind. [I]t's been like this since April for me with my backload, but I hear it from others as well. Other's may be afraid to speak out.  Nick [Choi] said he will talk to the admins so it will be fair, as they may and may not agree with me (that's fair).  I think he's definitely going in the right direction."  (*Id*.).

On August 21, 2017, Harmon met with Balzer and Sanderson.  (*Id*. at PAGEID 1875).  In this meeting, Balzer and Sanderson attempted to place Harmon on a Performance Improvement Plan ("PIP") to address the following performance issues: "Follow processes requested by your Supervisor and utilize the tools given to complete tasks.  Ask questions if you do not understand the direction you are given or have issues.  Utilize vendor labor log and tools given for invoicing and PO tracking to help correct current issues."  (*Id*.; *see also Id*., Ex. N, at PAGEID 1973). Harmon did not know whether the PIP was put into effect because she never signed the PIP documentation.  (*Id*. at PAGEID 1877).  Harmon testified, "I don't know if Honeywell had me in their documents on a PIP.  I just know I didn't sign it, and I said that I needed to have a third-party person in the meeting between me and Ryan and Misty."  (*Id*.).  Jeanette Guerra, Senior Investigator with Honeywell, stated the proposed PIP "was not put into effect pending the investigation of [Harmon's] complaint" and "was never put into effect."  (Doc. 84-1, Guerra Decl., at PAGEID 2317).

After this meeting, Sanderson emailed Harmon detailing the proper procedures on how to process Vendor Labor Process going forward.  (Doc. 80-1, Ex. O, at PAGEID 1974).  Harmon thereafter met with Vidal-Clarisey and told Vidal-Clarisey that she wanted to file complaints against Balzer and Sanderson.  (*Id*. at PAGEID 1879-80).  Harmon "demanded a meeting with somebody other than just" Balzer and Sanderson.  (*Id*. at PAGEID 1880).  Subsequently,

7

Harmon met with Balzer, Vidal-Clarisey, Bernie Hess ("Hess")[7], and Choi on August 23, 2017. (*Id*.).  Harmon stated that in this meeting Hess told her that "this is just a case where you don't really want to transition to the new process and you don't want to listen to [Sanderson], you know, and maybe it's hard for you to take direction."  (*Id*.).  Harmon disagreed and told Hess that she wanted "hostile environment charges" against Balzer and Sanderson.  (*Id*.).  Hess told Harmon that it would be two weeks before they could start the investigation into Harmon's complaints.  (*Id*.).  Pursuant to Honeywell policy, Harmon's complaint triggered a Business Conduct Incident Report ("BCIR") and the resulting investigation into Harmon's allegations. (*See Id*.).  The investigation "took place from September through December 2017."  (Doc. 84-1, Guerra Decl., at PAGEID 2316).

On August 25, 2017, Harmon emailed Jennifer Saphir ("Saphir"), Honeywell Senior Procurement Manager, stating she "really need[ed] to talk to someone outside the Intelligrated Team" concerning "unethical processes and directions that have been directed at me."  (Doc. 80-1, Ex. Q, at PAGEID 1979; *see also* Doc. 80-1, Pltf. Depo., at PAGEID 1882).  Harmon told Saphir she had been retaliated against after reaching out to upper management against the wishes of her managers and supervisors.  (*Id*.).  Harmon reported she was "pulled into a room and my manager tried to pursued (sic) me to sign a PIP."  (*Id*.).  Harmon stated, "I feel like I am possibly dealing with an organized group which things have been going on from what I hear but to[o] many people have been either to[o] scared to say something or have been terminated.  I know at this point I feel this group is trying to get rid of me."  (*Id*.).  She added, "I believe my work is being taken away from me because I know too much or I am finding out something which I don't know. . . ."  (*Id*.).

---

[7] Harmon identifies Hess as the Vice President of Human Resources at Honeywell.  (*See* Doc. 89 at PAGEID 3822).

On September 7, 2017, Vidal-Clarisey interviewed Harmon as part of an official Honeywell investigation into Harmon's allegation of a "hostile work environment." (*Id*. at PAGEID 1981-83). During this interview, Harmon recounted the January 20, 2017 incident, reiterating that Sanderson yelled at Harmon that day, and that as Harmon had previously explained to Balzer, every time Harmon offered an idea, Sanderson declined to listen and said, "I already know what you're going to say." (*Id*. at PAGEID 1981-82). Harmon explained to Vidal-Clarisey that Sanderson screamed at her when Harmon attempted to have someone intervene because Sanderson was so upset. (*Id*. at PAGEID 1981). Harmon also told Vidal-Clarisey that Sanderson said, "Do what I tell you to do" when Harmon was having issues with processing Tapfin[8] invoices. (*Id*. at PAGEID 1982). Harmon said she sent an email to Tapfin on May 21, 2017, informing them that Tapfin was billing overtime and double time because it was not set up properly. Harmon said that Sanderson told her, "Why did you send this email, we don't have time to correct these errors" and "You're wasting too much time when things are correct[ed] immediately." (*Id*.). Harmon explained that she sent an email on July 27, 2017 to management telling them that they needed a dedicated person to handle Tapfin. Following this email, Harmon said that Sanderson pulled Harmon into her office and told her she needs "to stop sending these emails to management, no one is going to respond to you." Harmon told Vidal-Clarisey that Sanderson "used a snappy tone." (*Id*.).

Harmon stated Sanderson never said anything offensive to her, and that "the main issue is that Sanderson raises her voice. Harmon stated Sanderson never called her bad names." (*Id*. at PAGEID 1983). Harmon was asked how her job had been affected by the incident, and Harmon stated she missed deadlines and past due invoices, she felt like an outcast on the team, and she

---

[8] As best the Court can discern, Tapfin is one of Honeywell's vendors. (*See* Doc. 80-1, Ex. S, at PAGEID 1984; *see also* Doc. 80-1, Pltf. Depo., at PAGEID 1878).

felt Sanderson was taking her out of everything such as the time card, payroll, and invoice processes.  (*Id*.).

Harmon's complaint that she was subjected to a "hostile work environment," as presented to Human Resources, "did not technically fall under the umbrella of Honeywell's Equal Employment Opportunity policy, which prohibits and provides a robust process to investigate and address complaints of any discrimination or harassment on the basis of any protected category, or retaliation for reporting the same" because Harmon "did not state or even suggest that the hostility was based on her race or any other protected category."  (Doc. 84-1, Guerra Decl., at PAGEID 2317).  Guerra, Senior Investigator with Honeywell, averred that even though Harmon's complaints did not fall under Honeywell's Equal Employment Opportunity Policy, Harmon's "complaints of 'hostile work environment' were fully and extensively investigated." (*Id*.).

Beginning in mid-September 2017, Harmon was temporarily assigned to assist in the Accounting Department.  (*See* Doc. 80-1, Pltf. Depo., at PAGEID 1888-90; *see also* Doc. 80-1, Exhs. T and U, at PAGEID 1988-89).  Harmon believed she was sent to the Accounting Department because she had filed complaints against Balzer and Sanderson and they were "trying to get me out of the office" and to "segregate me from talking to anyone."  (*Id*. at PAGEID 1888).  Pointing to an email between Harmon and Balzer, Honeywell asserts that Harmon was temporarily sent to Accounting Department to assist with a backlog of invoicing given Harmon's stated accounting background.  (*Id*., Exhs. T and U, at PAGEID 1988-89). Harmon worked in the Accounting Department for roughly two-weeks in September 2017, intermittently in October 2017, and from late December until February 13, 2018.  (*Id*. at

PAGEID 1889-91).[9]  During the periods of time when Harmon was assisting in the Accounting Department, Harmon did not experience any change in her employment status, job title, compensation, or benefits.  (*See* Doc. 84-2, Hamilton Decl., at PAGEID 2381).

In the meantime, on October 6, 2017, Guerra interviewed Harmon as part of the ongoing investigation into Harmon's complaints.  (Doc. 80-1, Ex. S, at PAGEID 1984-87).  During this interview, Harmon described the details surrounding the Tapfin invoice processing.  Specifically, Harmon discussed delays in vendor invoice processing for the past year and stated she received phone calls from vendors regarding past due invoices.  Harmon said she would bring issues to Balzer, but Balzer told her multiple times to go to Sanderson.  Harmon stated Sanderson "was so frustrated and she would not listen to Harmon."  (*Id*. at PAGEID 1984).  Harmon expressed to management that vendor relationships were becoming a problem.  Harmon explained to Balzer and Sanderson she had to dedicate 100 percent of her time to fix the invoices because Tapfin threatened to take workers off projects because of the past due invoices.  Harmon stated Balzer and Sanderson refused Harmon's repeated requests to talk to Choi about the Tapfin issues.  Harmon eventually spoke to Choi, and he told Harmon to finish approving the timesheets.  Choi inquired about Harmon's relationship with Sanderson.  Harmon detailed the events that occurred on August 21, 2017, concerning Sanderson and Balzer's attempt to place Harmon on a PIP.  Harmon also told Guerra about a possible conflict of interest between Sanderson and her husband, Brett Sanderson, who was also a Honeywell employee.  During this interview, Harmon described her transition to the Accounting Department and how Balzer told her to forward her invoices to Sanderson and not to worry about any of her responsibilities in the Installation

---

[9] The exact dates when Harmon worked in the Accounting Department are unclear from the record before the Court. It is undisputed, however, that Harmon worked in the Accounting Department for approximately two weeks in September 2017, two weeks in October 2017, and sometime in December to February 13, 2018.  (*See* Doc. 80-1, Pltf. Depo., at PAGEID 1889-92).

Department.  Harmon said aside from thanking Harmon for helping the Accounting Department, Sanderson and Balzer refused to talk to Harmon when she returned to the Installation Department.  Harmon told Guerra that Sanderson had not cleared out any of Harmon's invoices while she was helping the Accounting Department.  Harmon also described difficulties with the new vendor labor log created by Sanderson.  (*Id*. at PAGEID 1986-87).

Following interviews with Sanderson, Balzer, and Honeywell employees Jessica Holland, Amanda Hale, Tina Cundiff, and Nehkeya Clifton, the Honeywell investigation into Harmon's complaints concluded in December 2017.  (*See* Doc. 84-1, Guerra Decl., Ex. A; *see also* Doc. 84-1, Ex. A).  On December 12, 2017, Vidal-Clarisey and Hess met with Harmon regarding the outcome of the investigation, advising Harmon that Honeywell found no evidence of a hostile work environment.  (Doc. 80-1, Pltf. Depo., at PAGEID 1894; *see also* Doc. 80-1, Ex. X, at PAGEID 1996-97).  The investigation did, however, result in a requirement that Sanderson undergo "training and coaching" on "managerial skills, interpersonal skills, and effective communication skills."  (Doc. 80-1, Ex. X, at PAGEID 1996).  Although Harmon acknowledged she was told the outcome of the investigation, Harmon disputed the accuracy of the results.  (*Id*. at PAGEID 1894-95).  Harmon testified she "was trying to expose the unethical activity that was going on within the Installation Department," and Honeywell "misrepresented" this fact by stating Harmon "never complained about any unethical invoicing or anything."  (*Id*.).

On December 13, 2017, the day following the conclusion of the Honeywell investigation, Harmon sent an email to Vidal-Clarisey telling her she did "not feel like anything had been resolved" and the "complaints about Misty Sanderson and Ryan Balzer with regards to working in an (sic) hostile work environment or being mistreated is well alive in our department."  (*Id*., Ex. Y, at PAGEID 1998; *see also Id*. at PAGEID 1895).

12

From February 13, 2018 to May 18, 2018, Harmon was approved for twelve weeks of FMLA due to a "pregnancy-related condition."  (*Id*. at PAGEID 1906-07).  In addition to leave under FMLA, Harmon also sought short term disability ("STD") for the same pregnancy-related condition.  (*Id*. at PAGEID 1907-08).  Cigna, Honeywell's third-party plan administrator, approved Harmon's STD through March 27, 2018.  (*Id*. at PAGEID 1908).  Documentation provided by Cigna showed that Cigna was "unable to continue paying [STD] benefits beyond March 27, 2018" because "the medical information provided to [Cigna did] not demonstrate an impairment of such severity that it would have prevented you from performing the duties of your own job as an (sic) Sr Assistant Admin Product Support" at Honeywell.  (Doc. 80-1, Ex. DD, at PAGEID 2013-15).  In making this finding, Cigna relied on documentation from Harmon's physician, Dr. William Andrew, who opined, in relevant part, that Harmon "may return to work on 4-30-2018 with no restrictions."  (*Id*., Ex. EE, at PAGEID 2017; *see also Id*. at PAGEID 1909-11).  Cigna also relied on Dr Andrew's office visit notes from April 2, 2018, April 7, 2018, and April 10, 2018.  (*Id*. at PAGEID 2014).  In reviewing the medical documentation, Cigna determined there were no objective quantifiable clinical exam findings or diagnostic testing to demonstrate a total functional impairment.  Cigna also determined that Harmon turned down available treatment, and there was no evidence that Harmon was seeing any specialist for her alleged symptoms.

On July 13, 2018, Cigna reversed its decision on Harmon's STD claim following review of updated medical documentation and retroactively reinstated Harmon's STD benefits from March 27, 2018 through July 18, 2018.  (*Id*., Ex. II, at PAGEID 2026-28).  Harmon testified that following this letter from Cigna, she "received all that backpay, and they also paid all my

medical benefits, the deductions of my medical benefits from that money as well[.]" (*Id*. at PAGEID 1914).

On August 6, 2018, Cigna reviewed Harmon's STD claim and concluded it was "unable to continue paying benefits beyond July 18, 2018" based on medical documentation it received from Harmon's physicians. (*Id*., Ex. KK, at PAGEID 2029-30). Harmon testified she believed that Cigna stopped paying her benefits based on the July 26, 2018 probable cause finding by the Ohio Civil Rights Commission ("OCRC") stemming from her complaints against Honeywell. (*Id*. at PAGEID 1914-16).

On September 20, 2018, Vidal-Clarisey sent a letter to Harmon advising her she had been absent from work since February 14, 2018, and Harmon had been on unapproved leave since July 28, 2018. (*Id*., Ex. LL, at PAGEID 2031; *see also Id*., Ex. MM, at PAGEID 2035). Vidal-Clarisey instructed Harmon to respond to the letter by September 27, 2018, addressing her intentions on returning to work. Vidal-Clarisey stated if Harmon failed to respond by the September 27, 2018 deadline, Honeywell would "process a voluntary termination." (*Id*.). On September 20, 2018, Harmon responded to Vidal-Clarisey's letter. (*Id*., Ex. MM, at PAGEID 2034). Harmon advised Vidal-Clarisey of her dealings with Cigna and requested a reasonable accommodation for her to receive long term disability ("LTD") consistent with Honeywell policy. (*Id*.; *see also Id*. at PAGEID 2033).

On September 24, 2018, Vidal-Clarisey instructed Harmon she would need to submit a claim with Cigna to apply for LTD benefits. (*Id*. at PAGEID 2032). Vidal-Clarisey explained that the ADA accommodation process is separate from the process of applying for LTD benefits. Vidal-Clarisey sent Harmon an "Accommodation Request Form" to obtain information about her request for a reasonable accommodation. Vidal-Clarisey told Harmon that Honeywell would

14

engage in an interactive process to determine whether a reasonable accommodation was requested, and if so, what accommodation would be appropriate. Vidal-Clarisey stated that filling out the accommodation form would not guarantee that Honeywell would provide the requested accommodation. Vidal-Clarisey instructed Harmon to disregard the September 28, 2018 deadline and asked Harmon to submit the accommodation form to her on or before October 3, 2018. (*Id*.). On September 28, 2018, Harmon told Vidal-Clarisey that her application for LTD benefits had been filed, and she would have the accommodation form completed by the October 3, 2018 deadline. (*Id*.). Harmon timely submitted the accommodation form on October 3, 2018. (*Id*., Ex. NN, at PAGEID 2036-38).

Harmon's LTD was approved by Cigna in October 2018. (*Id*. at PAGEID 1917, 1920-21). Harmon stated that following the approval of her LTD benefits, Cigna reversed its prior decision on her STD benefits and reinstated her STD benefits in full from July 18, 2018 to August 13, 2018. (*Id*. at PAGEID 1921).

On March 24, 2019, the Equal Employment Opportunity Commission ("EEOC") issued Harmon a right-to-sue letter advising her she had 90 days in which to file a complaint. (Doc. 3 at PAGEID 121). Harmon testified that in July 2019, one month before the 90-day deadline to file suit, Cigna sent her a letter stating she had two weeks to provide a copy of a Social Security disability application or Cigna would lower her monthly payments from $2,700 to $100. (Doc. 80-1 at PAGEID 1921; *see also Id*., Ex. UU, at PAGEID 2057). Harmon sent Cigna a copy of her application. Cigna placed a "freeze" on Harmon's account and advised her it needed "proof" that Harmon "appealed the decision." (*Id*., Ex. UU, at PAGEID 2057). Cigna informed Harmon that if she did not respond by August 15, 2019, Cigna would reduce her monthly benefits. (*Id*.). Harmon told Cigna she was never advised of the appeal requirement and requested Cigna send

her a copy of the relevant policy language.  Harmon testified Cigna failed to provide her with this documentation.  (*Id*.).

Harmon then filed a complaint against Cigna with the Ohio Department of Insurance alleging that Honeywell, through Cigna, its healthcare administrator, was retaliating against her. (*Id*. at PAGEID 1921-22).  Harmon testified Cigna was "willing to remove the freeze off [her] account if [she] would agree to sign up with their third-party" agent concerning her Social Security benefits.  (*Id*. at PAGEID 1922).  Harmon, pursuant to the advice from the Ohio Department of Insurance investigator, did not use the recommended third-party agent.  (*Id*.). Instead, Harmon reapplied for Social Security and faxed Cigna a copy of the application.  (*Id*.). After waiting two weeks with no response from Cigna, Harmon re-sent the application after talking with Cigna.  (*Id*.).  Thereafter, Cigna removed the block on her account and paid Harmon back pay.  (*Id*.).

On August 15, 2019, Cigna sent a letter to Harmon regarding "how the length of your absence affects your job status according to Honeywell's Medical Leave of Absence Policy." (*Id*., Ex. OO, at PAGEID 2039).  The letter stated the following:

> Honeywell has asked us to make you aware that you have been absent from work for more than 18 months.  The maximum leave duration under Honeywell's Medical Leave of Absence Policy (the "Leave Policy") to maintain your active job status is 18 months or a reasonable time thereafter.  As a result, you need to choose one of the following options.
>
> If you are able to return to work in the foreseeable future, please contact Marilia Clarisey at 513-701-7281 as soon as possible to discuss your return.  If after you contact Honeywell, your prior position is not available, you will be provided 30 days (without pay) in which to seek another Honeywell position.  If, however, Honeywell does not hear from you within 2 weeks of the date of this letter, Honeywell will assume you are not able to return to work and Honeywell will terminate your employment.
>
> Upon termination from Honeywell, you are eligible to continue your health insurance coverage under COBRA and more information about this will be sent to

you by Aon Hewitt under separate cover. If you are approved for a Social Security Disability Award (SSDA), you may be eligible to receive COBRA coverage at the active employee rate for a period of up to 12 months and thereafter at the generally available rate of 102 percent of the applicable premium. You will need to send a copy of your SSDA to the address below or fax it to (973) 455-5695. Upon receipt, information regarding your subsidized COBRA period will be sent to you from Aon Hewitt, Honeywell's COBRA Administrator.

(*Id*. at PAGEID 2039-40).

On August 27, 2019, Harmon emailed Vidal-Clarisey and told her she was still under the care of her doctor, and she had received six letters from Cigna since July 11, 2019 advising her that her LTD benefits were being lowered. (*Id*., Ex. PP, at PAGEID 2042-43). Harmon referenced the difficulties she was having with Cigna and told Vidal-Clarisey to reach out to Cigna or her doctor on her condition because her doctor had not yet released her to return to work. (*Id*. at PAGEID 2043). Harmon stated:

I am not resigning nor have I advised Honeywell that I am not returning. I am unable to work due to my mental hea[l]th condition that has continued to get worse due to the constant FLMA interference and FLMA retaliation that I have been subjected to from both Cigna and Honeywell since I have been on medical leave. I have continuously been pressured on returning to work from Honeywell and Cigna including the multiple times that my STD benefits were cancelled causing me great financial distress. It has done nothing but contribute to my mass depression with all that I have been through and my losses. I am sending this notice in writing due to the continued harassing letters regarding the lowering of my LTD income benefits and the 2nd letter threating my termination that both Cigna and Honeywell continually and deliberately keep sending me.

(*Id*.).

On August 29, 2019, Vidal-Clarisey responded to Harmon's email and told her that it "is certainly not Honeywell's intent to place pressure on you to return to work if you are unable to do so, nor is it our intent to cause confusion regarding your benefits and/or leave options. It is Honeywell's (and Cigna's) standard process to regularly communicate with employees

concerning the status of their benefits and leaves of absence." (*Id.* at PAGEID 2041).  Vidal-Clarisey told Harmon:

> As set forth in Cigna's August 15, 2019 letter, the maximum leave duration under Honeywell's Medical Leave of Absence Policy (the "Leave Policy") is 18 months. You have now been absent from work for more than 18 months. Accordingly, pursuant to Honeywell's Leave Policy, to maintain your current job status, you must be able to return to work in the foreseeable future. According to your email, you are not currently able to return to work and you do not identify a foreseeable date upon which you will be able to return to work. Your request is thus for an indefinite leave of absence, which is not a reasonable accommodation under the ADA [Americans With Disabilities Act]. Accordingly, unless you are able to provide us with a reasonable return to work date your employment will be terminated. We need to hear from you by September 6th.

(*Id.*).  Later that day, Harmon emailed Vidal-Clarisey and informed her that Honeywell and

Cigna were placing pressure and continued stress on her.  (*Id.*).  Harmon again told Vidal-

Clarisey that she was still under the care of her doctor and to contact Cigna or her doctor for

more direct information.  (*Id.*).

By letter dated October 3, 2019, Honeywell terminated Harmon's employment because

she had "been absent from work under Honeywell's Medical Leave of Absence Policy for more

than 18 months." (*Id.*, Ex. QQ, at PAGEID 2044).

On September 9, 2019, Harmon filed a complaint under the Sarbanes-Oxley Act ("SOX")

with the Department of Labor ("DOL") alleging "discriminatory employment practices." (Doc.

89-15, Ex. O, at PAGEID 4558; *see also Id.*, Ex. TT, at PAGEID 2052; *Id.*, Ex. RR, at PAGEID

2045; *Id.* at PAGEID 1929).  Harmon updated her SOX complaint to include her termination

from Honeywell.  (Doc. 80-1, Ex. TT, at PAGEID 2053).  On December 11, 2020, the DOL

issued a dismissal of Harmon's SOX complaint.  (*Id.*, Ex. UU, at PAGEID 2056-58).  On

January 20, 2021, Harmon filed a request for reconsideration to vacate the dismissal her SOX

complaint.  (Doc. 89-15, Ex. O, at PAGEID 4608-32).  On January 25, 2021, Harmon's SOX

claim was assigned to Administrative Law Judge ("ALJ") Steven Bell. (*Id.* at PAGEID 4642-43). ALJ Bell issued an Order finding Honeywell to be in default following Honeywell's failure to enter an appearance in Harmon's SOX claim. (*Id.* at PAGEID 4645). On April 5, 2021, ALJ Bell conducted a damages hearing on Harmon's SOX claim. (*Id.* at PAGEID 4647-56). After the hearing, Honeywell filed, and the ALJ granted, a motion to set aside the ALJ's Order finding Honeywell to be in default. (*Id.* at PAGEID 4658). On June 28, 2021, the ALJ stayed Harmon's SOX proceedings "to take all necessary actions to place [Harmon's] Sarbanes-Oxley claims before the District Court." (*Id.* at PAGEID 4662).

On June 30, 2021, in the case currently before the Court, Harmon filed a motion for leave to file a third amended complaint to transfer jurisdiction of her SOX claim to this Court. (Doc. 39). On August 10, 2021, the Court granted Harmon's motion to add a cause of action for retaliation in violation of SOX. (Doc. 47). On August 19, 2021, ALJ Bell dismissed Harmon's SOX claim because Harmon's claim was "pending in the United States District Court for the Southern District of Ohio in the case captioned *Malissa R. Harmon v. Honeywell Intelligrated*, Case No. 1:19-cv-670." (Doc. 89-15, Ex. O, at PAGEID 4665).

## II. Standard of Review

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A grant of summary judgment is proper unless the nonmoving party "establish[es] genuinely disputed material facts by 'citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence . . . of a genuine dispute.'" *United Specialty Ins. Co.*

*v. Cole's Place, Inc.*, 936 F.3d 386, 403 (6th Cir. 2019) (quoting Fed. R. Civ. P. 56(c)(1)). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

A fact is "material" if its resolution will affect the outcome of the lawsuit. *Beans v. City of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *5 (N.D. Ohio Dec. 30, 2016), *aff'd*, No. 17-3088, 2017 WL 3726755 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 248). The party who seeks summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. To make its determination, the court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his

20

pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).

Because Harmon is a pro se litigant, her filings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005); *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) (pro se plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings). However, a party's status as a pro se litigant does not alter the party's duty on a summary judgment motion to support her factual assertions with admissible evidence. *Maston v. Montgomery Cty. Jail Med. Staff Pers.*, 832 F. Supp. 2d 846, 851-52 (S.D. Ohio 2011) (citing *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010)).

### III.  Honeywell's motion for summary judgment

Harmon alleges five counts against Honeywell in her third amended complaint ("TAC"): Count I for race discrimination and racial harassment under Title VII, 42 U.S.C. § 2000e, and Ohio Rev. Code § 4112.02; Count II for age discrimination under the ADEA; Count III for pregnancy discrimination under the PDA and Ohio Rev. Code §§ 4112.5.05 (G)(5), 4112.02 (A); Count IV for FMLA retaliation; and Count V for retaliation and wrongful termination in violation of SOX.  (Doc. 48).

#### A.  Count 1 of Harmon's TAC: Race discrimination and racial harassment in violation of Title VII and Ohio Rev. Code § 4112.02

Title VII of the Civil Rights Acts of 1964 makes it unlawful for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race. 42 U.S.C. § 2000e-2(a).  Title VII protects employees from discriminatory hostile or abusive work environments. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).  The Ohio Civil Rights Act, Ohio Rev. Code §

21

4112.02, similarly protects employees from racial harassment in the workplace. *Woods v. FacilitySource, LLC*, 640 F. App'x 478, 483 (6th Cir. 2016). Claims for race discrimination and hostile work environment brought under Ohio law are analyzed using the same standards as claims brought under Title VII. *Fletcher v. U.S. Renal Care*, 709 F. App'x 347, 351 n.1 (6th Cir. 2017) (citing *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 163 (6th Cir. 2004)) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131-32 (Ohio 1981)). *See also Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 n.4 (6th Cir. 2000).

A plaintiff can prove discrimination through either direct evidence or circumstantial evidence. Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 502 F. App'x 523, 534 (6th Cir. 2012) (citations omitted). "Direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus." *Id*. (citing *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006)).

Where a plaintiff seeks to prove her Title VII claim through circumstantial evidence, the claim is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Chattman v. Toho Tenax Am., Inc*., 686 F.3d 339, 347 (6th Cir. 2012) (citing *Chen v. Dow Chem. Co*., 580 F.3d 394, 400 (6th Cir. 2009)). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Once the plaintiff proves a prima facie case of discrimination, the burden shifts to the defendant to produce some legitimate, nondiscriminatory reason for the adverse employment action. If the defendant satisfies this burden, the burden shifts back to the plaintiff

22

to show that the reason offered by the defendant is a mere pretext for unlawful discrimination. *Id*. (citing *McDonnell Douglas*, 411 U.S. at 802, 804). Even with this burden-shifting framework, "[t]he ultimate burden of persuasion remains at all times with the plaintiff." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

### 1. Race Discrimination

To establish a prima facie case of race discrimination under Title VII, Harmon must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position in question; and (4) she was replaced by or treated less favorably than a similarly-situated individual outside the protected class. *Yazdian v. ConMed Endoscopic Techs., Inc*., 793 F.3d 634, 654-55 (6th Cir. 2015) (citing *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012)).

No one disputes that Harmon, an African American, is a member of a protected racial class. Further, Honeywell does not argue in its motion for summary judgment that Harmon failed to establish that she suffered an adverse employment action or was otherwise qualified for her position. Rather, Honeywell argues that Harmon failed to establish the fourth element of her prima facie claim of race discrimination, i.e., that she was replaced by or treated less favorably than a similarly-situated individual outside the protected class.

To be considered "similarly situated" for purposes of the fourth prong of the prima facie case, the employment situation of the comparator and plaintiff must be similar "in all relevant aspects." *Romans v. Michigan Dept. of Human Servs.*, 668 F.3d 826, 837-38 (6th Cir. 2012) (quoting *Highfill v. City of Memphis*, 425 F. App'x 470, 474 (6th Cir. 2011)). In the disciplinary context, Harmon must also show that the employees with whom she seeks to compare herself

"engaged in acts of comparable seriousness." *Martinez v. Cracker Barrel Old Country Store, Inc*., 703 F.3d 911, 917 (6th Cir. 2013). In making this assessment, the Court must consider factors such as whether plaintiff and the alleged comparators "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id*. (citation and internal quotations omitted).

Harmon has not established a prima facie case of race discrimination because she has not produced any evidence to satisfy the fourth element of her prima facie case. Harmon has not identified any non-African American employees who were allegedly treated more favorably than Harmon. Harmon argues she "provided comparative facts showing she and other non-white employees were treated differently than similarly situated white employees in that she was subjected to unwarranted performance plans, was denied promotions, and was denied the right to transfer departments and work from home." (Doc. 89 at PAGEID 3842-43, citing TAC, Doc. 48 at ¶¶ 11, 14, 18, 21, 27, 31-33). Harmon's Third Amended Complaint is not verified, and the allegations of the complaint cannot be considered in response to Honeywell's motion for summary judgment. *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017). Moreover, Harmon has failed to identify any of the employees by name nor has she attempted to explain how these employees were similarly-situated in all relevant aspects. Harmon's non-specific and unsupported assertions are insufficient to meet her burden of proof on summary judgment. *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment."). Harmon has failed to present evidence creating a genuine issue of fact on the fourth element of

24

her prima facie case of race discrimination. Therefore, Honeywell's motion for summary judgment should be granted on plaintiff's race discrimination claim.

### 2. Hostile Work Environment

Hostile-work-environment claims protect plaintiffs from a "workplace [] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . ." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted)). To establish a prima facie case of a racially hostile work environment under Title VII, Harmon must show that "(1) she was a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable." *Barrett*, 556 F.3d at 515 (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)). *See also Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (same).

Under the third element of the prima facie case, only harassment based on the plaintiff's race may be considered. *Bradley v. Arwood*, 705 F. App'x 411, 417 (6th Cir. 2017) (citing *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011)). "Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify." *CSX Transp. Co.*, 643 F.3d at 511 (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007)).

To satisfy the fourth prong, plaintiff must show that the conduct to which she was subjected was sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive, and that she subjectively regarded the conduct as abusive. *Smith*

*v. Leggett Wire Co*., 220 F.3d 752, 760 (6th Cir. 2000) (citing *Jackson v. Quanex Corp*., 191

F.3d 647, 658-59 (6th Cir. 1999)). In determining whether a reasonable person would consider

an environment hostile or abusive, the Court must consider all of the circumstances, including

the frequency and severity of the conduct and whether the conduct is threatening or humiliating

or a mere offensive utterance, and whether the conduct unreasonably interfered with the

employee's work performance. *Hafford*, 183 F.3d at 512. "[O]ccasional offensive utterances do

not rise to the level required to create a hostile work environment because, '[t]o hold otherwise

would risk changing Title VII into a code of workplace civility.'" *Khalaf*, 973 F.3d at 482-83

(quoting *Phillips*, 854 F.3d at 327) (in turn quoting *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir.

2008)). *See also Miller*, 2020 WL 4783553, at *3 ("[S]imple teasing, . . . offhand comments,

and isolated incidents (unless extremely serious) will not amount to discriminatory changes in

the terms and conditions of employment.") (quoting *Barrett*, 556 F.3d at 515) (in turn quoting

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

To establish the fifth prong of her prima facie case, Harmon must show that Honeywell

"'knew or should have known of the charged [racial] harassment and failed to implement prompt

and appropriate corrective action.'" *Barrett*, 556 F.3d at 516 (quoting *Hafford*, 183 F.3d at 513)

(in turn quoting *Pierce v. Commonwealth Life Ins. Co*., 40 F.3d 796, 804 n. 11 (6th Cir. 1994)).

Further, "employers are vicariously liable for harassment by supervisors, and the employee need

not show that the employer had knowledge of the harassment. However, an employer can raise

an affirmative defense to liability for supervisor harassment by establishing: (1) that it exercised

reasonable care to prevent and correct promptly any racially harassing behavior by its supervisor,

and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or

corrective opportunities provided by the employer or to otherwise avoid the harm." (*Id*.) (internal citations and quotations omitted).

In its motion for summary judgement, Honeywell argues that Harmon cannot establish the third element of her prima facie case of her hostile work environment claim based on race because there is no genuine issue of material fact that any "alleged behavior was based on Plaintiff's protected status." (Doc. 84 at PAGEID 2294). Pointing to the declarations of Jessica Holland, Jennifer Shelton and Nehkeya Clifton, which Honeywell attached as exhibits to its motion for summary judgment, Honeywell argues that "the undisputed evidence establishes that Sanderson's contentious behavior was indiscriminate, without regard to race, age or any other protected characteristic." (*Id*.). Honeywell contends that Sanderson "'bullied' nearly every member of the department, but that demographics played no role in her behavior." (*Id*.).

Honeywell further argues even if Harmon can prove that the harassment was based on race, Harmon cannot establish the fourth element of her prima facie case because there is "no evidence of 'severe' or 'pervasive' conduct upon which a hostile work environment claim can be based. (*Id*. at PAGEID 2294). Honeywell contends that Harmon "concedes Sanderson never made any racial slurs, jokes, gestures or racially-laced language." (*Id*. at PAGEID 2292, citing Doc. 80-1, Pltf. Depo., at PAGEID 1864-65). Honeywell argues that "[a]t best, Plaintiff points to evidence that Sanderson 'yelled' indiscriminately and once invaded her 'personal space.'" (*Id*. at PAGEID 2294).

The third element of Harmon's hostile work environment claim requires Harmon to prove that the harassing conduct was based on her race. *See Singleton v. PSA Airlines, Inc*., No. 3:19-cv-161, 2021 WL 1209592, at *6 (S.D. Ohio Mar. 31, 2021) ("The Sixth Circuit has held that the 'conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are

27

acting because of the victim's [race.]'") (quoting *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012)), *aff'd*, No. 21-3423, 2022 WL 875869 (6th Cir. Mar. 24, 2022). The Sixth Circuit has explained:

> When considering whether the third prima facie element has been met, this Court may only consider "harassment *based on the plaintiff's race*." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (emphasis in original) (citation omitted). "A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* Thus, a finding of race-based harassment does not require proof that racially derogatory comments were made, but rather [the plaintiff] must present evidence that the challenged actions "would not have occurred but for the fact that the plaintiff was African American." *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (citation omitted). "An example of the latter approach could include evidence that similarly situated individuals of a different race were not subject to harassment." *Pusey v. United Parcel Service, Inc.*, 393 F. App'x 366, 369 (6th Cir. 2010) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706-07 (6th Cir. 2007)).

*Bradley*, 705 F. App'x at 417-18.

It is undisputed that neither Sanderson nor any other Honeywell employee made racially derogatory comments toward Harmon. (*See* Doc. 80-1, Pltf. Depo., at PAGEID 1865; *see also* Doc. 80-1, Exhs. R and S, at PAGEID 1981-87). To meet her burden that any alleged harassment was based on her race, Harmon must therefore present evidence that the challenged actions would not have occurred but for Harmon's race. As noted above, Harmon could rely on evidence that similarly situated individuals of a different race were not subject to harassment. Harmon, however, fails to submit evidence creating a genuine issue of fact that non-African American individuals were not subject to the harassment she alleges.

Harmon's response in opposition to Honeywell's motion for summary judgment is 942 pages in length. (Doc. 89). In addition to her 64-page response, Harmon included 17 exhibits totaling 878 pages. (*Id.*). Despite the length of her brief, Harmon failed to cite admissible

evidence creating a genuine issue of fact on her prima facie case. Federal Rule of Civil

Procedure 56 requires a party asserting that a fact cannot be or is genuinely disputed support the

assertion by "citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other

materials." Fed. R. Civ. P. 56(c)(1). Harmon does not cite to any depositions, affidavits,

declarations, stipulations, admissions, or interrogatory answers in her response in opposition.

(*See* Doc. 89). Instead, Harmon cited to the allegations in her TAC (Doc. 48), the OCRC's

probable cause determination, and specific emails as evidence that a genuine issue of material

fact exists. Harmon's TAC is not signed under penalty of perjury, and therefore these allegations

cannot satisfy her burden in responding to Honeywell's motion for summary judgment. *See*

*King*, 852 F.3d at 578 (holding that "'a verified complaint . . . satisfies the burden of the

nonmovant to respond to a motion for summary judgment, unlike 'mere allegations or denials' in

unverified pleadings") (alteration in original) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 385

(6th Cir. 1999) (en banc)). Therefore, Harmon's argument that the allegations in her complaint

provide the proper support for proving her prima facie claims (Doc. 89 at PAGEID 3842-43) is

without merit. *See Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 565 (6th Cir. 2011)

("Plaintiffs, in response to a properly supported motion for summary judgment, cannot rely

merely on allegations and arguments, but must set out specific facts showing a genuine issue for

trial.").

　　　Citing only to eight paragraphs in her TAC, Harmon argues that she was treated

differently than similarly situated white employees. (Doc. 89 at PAGEID 3842-43, citing Doc.

48 at ¶¶ 11, 14, 18, 21, 27, 31-33). Not only does Harmon fail to provide proper evidentiary

support for these allegations, there is no evidence in the record to suggest any of Sanderson's allegedly abusive conduct was committed because of race.  The declarations of Jessica Holland, Jennifer Shelton, and Nehkeya Clifton support this finding.  Jessica Holland, an African American Honeywell employee who worked in the Installation Department with Harmon under the supervision of Sanderson, averred that Sanderson would "talk down" to employees in a "rude, blunt manner and would often raise her voice and yell at employees," including Nehkeya Clifton (White), Judy McClure (White) and Beth Ackley (White).  (Doc. 84-3, Holland Decl., at PAGEID 2383).  Holland declared she "personally got into heated exchanges with [Sanderson] in response to her rude behavior and frequent yelling."  (*Id.*).  Holland recalled a meeting with Sanderson and the entire Installation Department where Sanderson treated everyone like children, "screaming at the top of her lungs."  (*Id.*).  Holland never heard Sanderson make any racial comments or display any racially biased behavior.  (*Id*. at PAGEID 2383-84).  Holland declared she never experienced any racial discrimination by Sanderson or anyone else at Honeywell and she did not observe Sanderson treating Harmon differently than any other employee.  (*Id*. at PAGEID 2384).

Likewise, Jennifer Shelton, a mixed race (Filipino/Asian-American and Caucasian) Honeywell employee who worked in the Installation Department under Sanderson from June 2018 (shortly after Harmon went on leave) to June 2019 also experienced "rude, aggressive and condescending behavior" by Sanderson.  (Doc. 84-4, Shelton Decl., at PAGEID 2385-86).  Shelton described Sanderson's management style as "my way or the highway," and Sanderson "bullied and intimidated people for no reason."  (*Id*. at PAGEID 2385).  Shelton averred that Sanderson had "heated verbal confrontations with other employees," including Beth Ackley (White), and had "favorites," of various races – Hispanic, White, and mixed race.  (*Id*. at

30

PAGEID 2386). Shelton declared in her experience, "Sanderson was often rude, condescending and confrontational toward me and others, but her behavior did not correspond to anyone's race or age." (*Id*.).

Finally, Nehkeya Clifton a White Honeywell employee who worked in the Installation Department with Harmon under the supervision of Sanderson, described Sanderson as "rude, condescending and even hostile to several of the Installation Department employees." (Doc. 84-5, Clifton Decl., at PAGEID 2388). Clifton averred that Sanderson seemed to single out Harmon, Judy McClure (White), Tony Milne (White) and Lucy Gomez (Hispanic). (*Id*.). Clifton stated that "Sanderson never said or did anything to lead me to believe that her hostile behavior towards any of those employees was based on race. She never made any racist comments. Instead, I go[t] the impression that she wanted everyone to do things exactly as she said, and that she targeted any employee who questioned her method or directions. In my observation, Misty Sanderson was a bully, but her hostile nature was not based on demographics." (*Id*.).

Harmon also relies on the OCRC report and the probable cause determination to support her argument that she was subjected to a racially hostile work environment. (Doc. 89 at PAGEID 3842). Harmon argues that evidence "related to the extent of race discrimination and a racially hostile work environment has already been argued in the OCRC proceedings in which the OCRC's (sic) determined after an extensive investigation (which both Parties voluntarily participated) determined Harmon 'was' subjected to racial discrimination in a hostile working environment to the 'highest levels' ('emphasis added') through retaliation and for participating in protected activity." (*Id*.). Harmon attaches 80 pages of documentation pertaining to the OCRC proceedings as an exhibit in her response in opposition to Honeywell's motion for summary

31

judgment.  (*Id.*, Ex. M, at PAGEID 4438-4517).  Exhibit M contains Harmon's charges and amended charges of discrimination with the OCRC (*Id.* at PAGEID 4438-41, 4449, 4470-72), OCRC communications to Honeywell relating to Harmon's charges (*Id.* at PAGEID 4442-48, 4473-75), a "Timeline of Issues" (*Id.* at PAGEID 4450-61), Honeywell's communications to the OCRC (*Id.* at PAGEID 4462-68, 4494-4501), the OCRC's Letter of Determination (*Id.* at PAGEID 4476-82), the OCRC's Investigator Analysis (*Id.* at PAGEID 4487-93), and various OCRC documentation, orders, and letters (*Id.* at PAGEID 4483-86, 4502-03, 4507-17).[10]

Honeywell argues the Court should not consider this information in deciding the motion for summary judgment, citing *EEOC v. Ford Motor Co.*, 98 F.3d 1341, 1996 WL 557800 (6th Cir. 1996) (Table) and *Alexander v. CareSource*, 576 F.3d 551 (6th Cir. 2009).  (Doc. 96 at PAGEID 5649-50).  In *EEOC v. Ford Motor Co.*, the court noted that "an EEOC cause determination carries an evidentiary value of practically zero," and that "the only plausible value of an EEOC cause determination would be that it presents the evidence of discrimination that the EEOC considered."  *Ford Motor Co.*, 1996 WL 557800, at *10.  In *Alexander*, the Sixth Circuit, determined that an OCRC letter, which included a finding of probable cause that unlawful discrimination had occurred, could be considered as evidence to establish a material fact question on summary judgment.  *Alexander*, 576 F.3d at 561-63.  The Court of Appeals in *Alexander* noted that an OCRC Letter of Determination is self-authenticated under Fed. R. Evid. 901(1) and is "conceivably [] admissible under Federal Rule of Evidence 803(8)" as a record or statement of a public office.  *Id.* at 561.

---

[10] Exhibit M contains a document entitled "Reconsideration Investigator Analysis."  (Doc. 89, Ex. M, at PAGEID 4504-06).  This appears to be a document written by Harmon, and not the OCRC Investigator, as the content of the document includes "I" and "me" statements in reference to Harmon.  As such, it is hearsay and has not been considered.

As explained by the Court of Appeals in *Alexander*, the "[e]xclusion of an official report is warranted only if the court finds that 'the sources of information or other circumstances indicate lack of trustworthiness.'" *Id*. at 563 (quoting Fed. R. Evid. 803(8)) (and citing 2 McCormick on Evid. § 296 (6th ed.)). The Sixth Circuit stated:

> In this Circuit, "[t]o determine whether a report is trustworthy, courts consider the following four factors: (1) the timeliness of the investigation upon which the report is based, (2) the special skill or experience of the investigators, (3) whether the agency held a hearing, and (4) possible motivational problems." *Chavez v. Carranza*, 559 F.3d 486, 496 (6th Cir. 2009) (citing *Bank of Lexington* [*& Tr. Co. v. Vining-Sparks Sec., Inc.*], 959 F.2d [606], 616-17 [(6th Cir. 1992)]. "This list of factors is not exclusive; any circumstance which may affect the trustworthiness of the underlying information, and thus, the trustworthiness of the findings, must be considered when ruling upon the admissibility of factual findings under this rule." *In re Complaint of Paducah Towing Co., Inc*., 692 F.2d 412, 420 (6th Cir. 1982) (citations omitted).

*Id*. at 563. The Court of Appeals assessed the circumstances relating to the trustworthiness of the OCRC's probable cause determination and concluded that the report did not support the plaintiff's prima facie case of discrimination. *Id*. In examining the trustworthiness of the report, the Sixth Circuit stated, "there was no agency 'hearing,' the investigation lingered for over a year before the report was completed, [] there [was] no information in the record as to the evidence available to the agency," and the "lower court considered the same facts as the agency[.]" *Id*.

The Court has reviewed the OCRC documents in Exhibit M and finds several factors weigh against the trustworthiness of these documents. Similar to *Alexander*, the OCRC's Letter of Determination and the accompanying Investigator report are not tied to specific facts, and it is not clear to the Court what evidence the OCRC actually considered in reaching the probable cause conclusion. The OCRC investigator stated the "Commission conducted an investigation into [the] Charging Party's allegation against Respondent . . .[,] and [the] Commission considered relevant documents." (Doc. 89-13, Ex. M, at PAGEID 4476). The Investigator, however, failed to describe what the investigation entailed or identify the specific documents

33

relied upon. There was no agency hearing, the investigation covered a period of 10 months, and Harmon fails to point to any evidence in the record as to the evidence available to the agency. *See Alexander*, 576 F.3d at 563.

The Court notes other indicia of the OCRC documents' untrustworthiness. For example, the July 2018 OCRC Determination Letter states that in "October 2017," Harmon was "assigned to the Accounting Department *where she has been since filing her charge*[11] with the Commission." (Doc. 89-13 at PAGEID 4481) (emphasis added). The Letter states, "She was stripped of her original duties as an Installation Administration Specialist. She was assigned to filing paperwork and picking up and delivering the mail." (*Id.*). The OCRC statement that Harmon has been assigned to the Accounting Department since filing her charge is factually inaccurate. While the exact dates Harmon worked in the Accounting Department are unclear, it is undisputed that Harmon worked in the Accounting Department for approximately two weeks in September 2017, two weeks in October 2017, and sometime in December to February 13, 2018, when Harmon went out on medical leave. (*See* Doc. 80-1, Pltf. Depo., at PAGEID 1889-92). It appears the OCRC was not aware that Harmon worked in the Installation Department for the balance of September and October, all of November 2017, and part of December 2017, and instead concluded incorrectly that her re-assignment to the Accounting Department was permanent. In addition, the Investigator's Analysis suggests that Harmon and another African American employee were treated differently than a Caucasian employee who was "able to transfer out from under Ms. Sanderson" when the African American employees were not. However, the OCRC investigator states that the Caucasian employee actually "took a demotion" in connection with the transfer, but stated, "[The employee] is capable of per denim (sic), which

---

[11] Harmon actually filed her charge on September 27, 2017.

34

could result in higher pay." (Doc. 89-13 at PAGEID 4493). The Court is unable to discern how the Caucasian employee is a valid comparator when she was required to take a demotion in order to transfer out from Sanderson's supervision. These inaccuracies, along with the absence of any indication of the underlying evidence relied upon by the OCRC, call into question the trustworthiness of the OCRC Determination and report. Nor do the EEOC documents provide additional facts that would support Harmon's hostile work environment claim based on her race. Accordingly, while the Court has considered the OCRC report and the probable cause determination, the Court finds that these reports and determination fail to raise a fact question on summary judgment.

Harmon also argues the "racial discrimination and retaliation in a hostile work environment between June 2015 through February 2018" is demonstrated by "a flurry of internal emails to Management and Human Resources describing 'how' and 'why' she was being subjected" to the harassment. (Doc. 89 at PAGEID 3842). Harmon cites to two Honeywell emails that appear to have been produced during discovery. (*Id.*, at PAGEID 3843, citing Honeywell000123 and 000125).[12] These September 2017 emails are from Sanderson to Balzer and Balzer to Vidal-Clarisey and do not include any information that could reasonably be construed as supporting plaintiff's claim that she was subjected to harassment by Sanderson while non-African American employees were not. Rather, they suggest that Harmon was questioning Sanderson's authority and having difficulty understanding the work requirements. While Sanderson's email states that Harmon will be training "Andrea" on certain duties with "Andrea" eventually assuming those duties, there is no indication of the identity of this

---

[12] Such emails would not be hearsay under Fed. R. Evid. 801(d)(2)(A) as a statement by a party-opponent.

individual or her race. The Court is unable to conclude that either of these emails creates a genuine issue of fact on Harmon's prima facie case.

With the exception of these two Honeywell emails, Harmon fails to cite with particularity any other specific emails[13] or documents in support of her allegation that non-African American employees were not subject to Sanderson's abusive behavior. As stated by the Sixth Circuit, "Rule 56 places an affirmative duty on the nonmovant to cite to particular parts of materials in the record to establish that a particular fact cannot be supported or is genuinely disputed. District courts need not independently comb through the record and establish that it is bereft of a genuine issue of material fact before granting summary judgment." *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 734 (6th Cir. 2011) (internal quotations and citations omitted). Harmon has failed to produce evidence creating a genuine issue of fact that Sanderson singled Harmon out based on her race. Accordingly, the undisputed evidence shows the harassment experienced by Harmon was not based on her race and that employees of all races were subject to Sanderson's verbal abuse and hostility.

Moreover, even if Harmon could prove that the harassment was based on her race, Harmon has failed to establish the fourth element of her prima facie claim, i.e., that the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment. The Sixth Circuit has established a high bar in its line of decisions for determining what amounts to actionable discriminatory conduct under a hostile work environment theory. *Phillips*, 854 F.3d at 327 (citing *Williams*, 643 F.3d at 512; *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432 (6th Cir. 2014); *Clay v. United Parcel Serv.*,

---

[13] Harmon's references to her own emails (Doc. 89 at PAGEID 384344) appear to be offered for the truth of the matter, do not appear to meet a hearsay exception, and cannot be considered by the Court on summary judgment. In any event, these emails do not address whether the alleged verbal abuse and mistreatment by Sanderson were based on Harmon's race.

*Inc*., 501 F.3d 695, 707-08 (6th Cir. 2007)). The Sixth Circuit summarized this line of cases as follows:

> [T]his court has found even offensive and bigoted conduct insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements. *See, e.g., Williams*, 643 F.3d at 506, 513 (finding no hostile work environment where defendant "call[ed] Jesse Jackson and Al Sharpton 'monkeys' and [said] that black people should 'go back to where [they] came from'" among other racist comments); *Reed v. Procter & Gamble Mfg. Co*., 556 F. App'x 421, 432 (6th Cir. 2014) (no hostile work environment where plaintiff was subjected to race-based comments and his supervisor stood behind him and made a noose out of a telephone cord); *Clay*, 501 F.3d at 707-08 (fifteen racially-motivated comments and instances of disparate treatment over a two-year period were isolated, not pervasive, and therefore not actionable under Title VII).

*Phillips*, 854 F.3d at 328. Occasional offensive utterances do not rise to the level required to create a hostile work environment. *Id*. at 327. Although conduct must be extreme to amount to a hostile work environment, a "work environment viewed as a whole may satisfy the legal definition of an abusive work environment . . . even though no single episode crosses the Title VII threshold." *Bradley*, 705 F. App'x at 422 (internal quotations omitted).

Sanderson's rude behavior, blunt manner, yelling, and talking over Harmon are certainly unprofessional and offensive. However, consistent with the above-cited precedent, this conduct fails to demonstrate that Harmon's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21. *See also Phillips*, 854 F.3d at 327; *Williams*, 643 F.3d at 512; *Reed*, 556 F. App'x at 432; *Clay*, 501 F.3d at 707-08. Harmon has not introduced evidence on summary judgment to show that these incidents, taken together, constituted a hostile work environment.

Accordingly, Harmon has failed to establish a prima facie case on her hostile environment claims based on race. Honeywell is therefore entitled to summary judgment on Harmon's racially hostile work environment claim.

### B. Count 2 of Harmon's TAC: Age Discrimination in violation of the Age Discrimination and Employment Act

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's age [or] to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect h[er] status as an employee, because of such individual's age. . . ." 29 U.S.C. § 623(a)(1), (2). To establish a prima facie case of age discrimination under the ADEA, the plaintiff must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position in question; and (4) she was replaced by a "significantly younger" person or that similarly situated younger employees were treated more favorably. *Tschappatt v. Crescent Metal Prod., Inc*., 798 F. App'x 887, 888 (6th Cir. 2020) (citing *Grosjean v. First Energy Corp*., 349 F.3d 332, 335 (6th Cir. 2003) and *Mickey v. Zeidler Tool and Die Co*., 516 F.3d 516, 521 (6th Cir. 2008)). "In age discrimination cases, the protected class includes all workers at least 40 years old. . . ." *Grosjean*, 349 F.3d at 335. Where a plaintiff seeks to create an inference of discrimination by comparing herself to a younger person under the fourth element of a prima facie case, "the comparison must be between employees 'similarly situated' to the plaintiff in all relevant respects." *Tschappatt*, 798 F. App'x at 889 (internal citations omitted). The Court should consider "whether the younger individual

was under the same supervisor, had a similar prior disciplinary record, or engaged in comparably serious misconduct." *Id*.

An adverse employment action is a "materially adverse change in the terms and conditions of [the plaintiff's] employment." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575-76 (6th Cir. 2004) (quoting *Hollins v. Atlantic Co*., 188 F.3d 652, 662 (6th Cir. 1999)). A "bruised ego," a "mere inconvenience[,] or an alteration of job responsibilities" is not enough to constitute an adverse employment action. *Id*. (citing *White v. Burlington N. & Santa Fe R. Co*., 364 F.3d 789, 797 (6th Cir. 2004), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)) (quoting *Kocsis v. Multi-Care Mgmt. Inc*., 97 F.3d 876, 886 (6th Cir. 1996)). "[N]ot every act affecting an individual's employment constitutes a materially adverse change." *Stewart v. Esper*, 815 F. App'x 8, 17 (6th Cir. 2020) (citing *McMillian v. Potter*, 130 F. App'x 793, 796 (6th Cir. 2005)).

"A plaintiff seeking to show that [s]he 'was treated less favorably than a similarly-situated individual . . . must prove that all relevant aspects of her employment situation were similar to those of the employee with whom she seeks to compare herself." *Davis v. Ineos ABS (USA) Corp*., No. 09-773, 2011 WL 1114409, at *3 (S.D. Ohio Mar. 24, 2011) (quoting *Chamberlain v. Consol. Learning Centers, Inc.*, No. 1:09-cv-751, 2010 WL 5677050, at *6 (S.D. Ohio Dec. 2, 2010), *report and recommendation adopted*, 2011 WL 332547 (S.D. Ohio Jan. 31, 2011)). To be similarly-situated in a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for that conduct. *Ercegovich v.*

*Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

The employer is entitled to summary judgment if the plaintiff does not establish a prima facie case of age discrimination. If the plaintiff establishes a prima facie case, the employer can overcome the prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer carries its burden, the plaintiff must show that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Id*. at 804. In an age discrimination case, the ultimate burden of persuasion remains with the plaintiff to "prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 323-24 (6th Cir.), *cert. denied sub nom. Pelcha v. Watch Hill Bank*, 142 S. Ct. 461 (2021) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)). In other words, the plaintiff must establish that "age was the 'reason' that the employer decided to act." *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350-51 (2013)). Accordingly, to overcome the employer's motion for summary judgment, the plaintiff "must show a genuine dispute of material fact that, if resolved in her favor, could persuade a reasonable juror that age was the but-for cause of her termination." *Pelcha*, 988 F.3d at 324.

Honeywell acknowledges that Harmon meets the first element of her prima facie case because she was over 40 at the time in question. (Doc. 84 at PAGEID 2298). Honeywell argues that, nevertheless, Harmon cannot satisfy her prima facie case because there is no record evidence of an adverse action based on Harmon's age. (*Id*. at PAGEID 2296, 2298-2300).

40

Honeywell argues even if Harmon could establish that she suffered an adverse employment action, she "cannot establish the fourth prong of her prima facie case, i.e., that substantially younger people were treated more favorably or she was rejected in favor of a substantially younger person."  (*Id*. at PAGEID 2300).  Honeywell also argues that it can articulate a legitimate non-discriminatory reason for its alleged actions, and Harmon cannot demonstrate pretext.  (*Id*. at PAGEID 2300-02).

Harmon identifies five actions taken by Honeywell that constitute adverse actions for purposes of her age discrimination claim: (1) "her duties were stripped and transferred to younger employees" and later "were removed permanently"; (2) "Amanda Hale, age 25, and Maria Floyd, age 31, were both allowed to work from home while Harmon was denied this same opportunity"; (3) Melissa Maynard, age 30, was permitted to transfer from under Sanderson's supervision and provided two promotions while Harmon, who was more qualified, was passed over for these promotions; (4) Harmon lost the opportunity for overtime once she was transferred to the Accounting Department; and (5) Harmon was denied the opportunity to use her available vacation time.  (Doc. 89 at PAGEID 3847-48).

In terms of evidentiary support, Harmon argues that "the facts related to age discrimination have already been litigated in the OCRC proceedings."  (*Id*. at PAGEID 3846; *see also Id*. at PAGEID 3849).  Harmon further argues that "after discovery[,] there [are] email communications between Installation and HR that proves Harmon['s] responsibilities were taken in retaliation in a deliberate attempt to continue to harbor Honeywell's unlawfulness."  (*Id*. at PAGEID 3847).  Harmon contends her "Third Amended Complaint (Doc. 48), combined with the internal emails and documentation submitted along with the documents from the OCRC

proceedings verified Harmon's allegations; that similarly situated, younger co-workers were treated more favorably than Harmon." (*Id*.).

As an initial matter, the Court finds that Harmon's response to the summary judgment motion on her age discrimination claim suffers from the same deficiencies as her race discrimination claims. As previously explained, to the extent Harmon relies on the OCRC report and probable cause determination to support her argument that she met her burden to establish a prima facie case of age discrimination (*see* Doc. 89 at PAGEID 3846, 3849), the OCRC's documents fail to raise a fact question on summary judgment.

In addition to the OCRC report and probable cause determination, Harmon appears to cite this Court's prior rulings on Honeywell's partial motion to dismiss under Rule 12(b)(6) (*see* Docs. 29, 35) for support that Honeywell's motion for summary judgment should be denied. (Doc. 89 at PAGEID 3847-48). As best the Court can discern, Harmon argues that summary judgment should be denied because the Court had previously determined that Harmon's allegations state a claim upon which relief can be granted. (*Id*.). Harmon, however, misunderstands the difference between a Rule 12(b)(6) motion to dismiss for failure to state a claim and a Rule 56 motion for summary judgment. In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations of a complaint as true and make reasonable inferences in favor of the non-moving party. *Keys v. Humana, Inc*., 684 F.3d 605, 608 (6th Cir. 2012) (citing *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005)). On a motion for summary judgment, however, the Court cannot accept as true the allegations of Harmon's complaint. Rather, the Court examines the evidence presented by the parties to determine whether there is a genuine issue of fact necessitating a trial. *Alexander*, 576 F.3d at 558 (quoting *Anderson*, 477 U.S. at 251-52). It is well-established that stating "a viable claim under Rule

12(b)(6) and proffering sufficient evidence to defeat a Rule 56 motion on that claim are two entirely different tasks." *Burton v. Kakani*, No. 09-10893, 2011 WL 3330370, at *5 (E.D. Mich. Aug. 3, 2011), *aff'd*, 514 F. App'x 577 (6th Cir. 2013). Therefore, Harmon cannot use the Court's findings in the disposition of Honeywell's partial motion to dismiss under Rule 12(b)(6) to establish the presence of a genuine issue of material fact on summary judgment. *See Id*.

Harmon fails to point to any record evidence creating a genuine issue of fact on whether she suffered an adverse employment action or similarly situated younger employees were treated differently. Harmon argues that she suffered an adverse employment action when she was "moved to the Accounting Department and stripped of all Installation Department administrative duties by January 2018." (Doc. 89 at PAGEID 3848). Harmon contends that "Honeywell told the OCRC Harmon's transfer to the Accounting Department was temporary and that Harmon would be returned to her position and duties after the holidays[,] however emails prove this was mere pretext. Harmon was never going to be returned to the Installation Department. The internal email exposed verified that the Honeywell had no intentions of return Harmon to the Installation Department as Harmon was going to be 'traded in secret' and offered to the Accounting Department permanently." (*Id*.). Harmon contends that "after discovery[,] there [are] email communications between Installation and HR that proves Harmon['s] responsibilities were taken in retaliation in a deliberate attempt to continue to harbor Honeywell's unlawfulness." (*Id*. at PAGEID 3847).

In this regard, Harmon cites two emails produced by Honeywell during discovery. (Doc. 89-5, Ex. E, Honeywell000123-Honeywell000137, PAGEID 4097-4099). In a September 11, 2017 email, Sanderson states that Harmon will train "Andrea" on vendor labor requisitions, who will then take over those duties. (Doc. 89-5, Honeywell000123, PAGEID 4097). The email

does not identify "Andrea's" age or any circumstances suggesting she is a similarly situated employee.

The other email cited by Harmon, Honeywell000137 is from Balzer to Vidal-Clarisey regarding "Invoices Behind" and states:

> AP [Accounting Department] has expressed interest in maybe having her transfer full-time, provided she works well with their team, and provided Malissa is interested in moving. They need help bad. So this opportunity provides a nice trial run for everyone involved. I didn't mention that to Malissa; I am going to let AP make an offer to her if they see fit.
>
> So there is a possibility that this could work out well for all involved.

(*Id*. at PAGEID 4099). The email does not suggest that any younger employees would replace Harmon if she were to transfer to the accounting department or that Harmon was treated different than any similarly situated employee. The Court is unable to discern how these emails create an issue of fact on Harmon's prima facie case of age discrimination.

Moreover, Harmon failed to point any other to evidence in the record to support this allegation. Rather, the undisputed evidence in the record shows that Sanderson "openly took responsibilities away from" employees of all ages and races and "handed those responsibilities over to other people." (Doc. 84-5, Clifton Decl., at PAGEID 2388). For example, in addition to Harmon, Ms. Clifton also declared that Sanderson took away responsibilities from McClure (White, age 66), Milne (White, age 44), and Gomez (Hispanic, age 36) "by announcing that certain tasks were being re-delegated to other employees." (*Id*.). Harmon failed to cite any record evidence that contradicts this declaration.

Harmon fails to point to any other specific emails, or any exhibits, in support of this argument. Harmon cannot rely on mere allegations alone in response to a properly supported motion for summary judgment. *Emerson*, 446 F. App'x at 734. In addition, the Court has no

independent obligation to comb the record in search of evidence supporting Harmon's argument.
In response to a motion for summary judgment, Harmon "'has an affirmative duty to direct the
court's attention to those specific portions of the record upon which it seeks to rely to create a
genuine issue of material fact.'" *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th
Cir. 2007) (quoting *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)). As the Sixth Circuit has
stated:

> We have said time and again, district courts cannot be expected to dig through the
> record to find the seeds of a party's cause of action. *See, e.g.*, *Street v. J.C. Bradford
> & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Plaintiff must mark each site,
> identifying the genuine disputes of fact that preclude summary judgment on a
> particular claim. *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 847 (6th
> Cir. 2016). The district court had no obligation to do plaintiff's work for her, nor
> do we.

*Sumpter v. Wayne Cnty.*, 868 F.3d 473, 489-90 (6th Cir. 2017).

Even if Harmon was re-assigned to the Accounting Department, "[r]eassignments
without changes in salary, benefits, title, or work hours usually do not constitute adverse
employment actions." *Policastro v. Northwest Airlines, Inc*., 297 F.3d 535, 539 (6th Cir. 2002).
It is undisputed that during the periods of time when Harmon was assisting in the Accounting
Department, Harmon did not experience any change in her employment status, job title,
compensation, or benefits. (*See* Doc. 84-2, Hamilton Decl., at PAGEID 2381). Harmon has
presented no evidence to the contrary. *See Erwin v. Honda N. Am., Inc*., No. 2:20-cv-4350, 2022
WL 3716561, at *8 (S.D. Ohio Aug. 29, 2022) ("Critically, Plaintiff has not countered the Sixth
Circuit authority, cited by Defendant, that "[r]eassignments without changes in salary, benefits,
title, or work hours usually do not constitute adverse employment actions.") (quoting *Policastro*,
297 F.3d at 539). Accordingly, Harmon has failed to demonstrate the transfer to the Accounting

Department was an adverse employment action, and she cannot establish a prima facie case of age discrimination.

Harmon argues she suffered an adverse employment action because "Amanda Hale, age 25, and Maria Floyd, age 31, were both allowed to work from home while Harmon was denied this same opportunity." (Doc. 89 at PAGEID 3847). Harmon cites no evidence that these Honeywell employees were allowed to work from home. Harmon fails to produce any evidence that Harmon requested to work from home and that Honeywell refused Harmon's request. The Court has no independent obligation to comb through the record in search of evidence supporting Harmon's argument. *Sumpter*, 868 F.3d at 489-90. Accordingly, Harmon has failed to submit evidence sufficient to raise a genuine issue of material fact as to whether she was denied the ability to work from home while other younger Honeywell employees were permitted to do so.

Harmon also argues she suffered an adverse employment action because she "lost the opportunity for overtime" when she was transferred to the Accounting Department. (Doc. 89 at PAGEID 3848). Although "the denial of overtime can constitute an adverse employment action" *Broska v. Henderson*, 70 F. App'x 262, 267 (6th Cir. 2003) (citing cases), Harmon cites no evidence in the record that she was denied overtime opportunities. Instead, Harmon alleges she had an "average of 10-12 overtime hours per week" prior to being transferred to the Accounting Department and because of the transfer, "Harmon lost compensation she would have earned had Honeywell not transferred her responsibilities out of retaliation in order to harbor its unlawful accounting practices." (Doc. 89 at PAGEID 3848). Yet, Harmon fails to produce evidence comparing her earnings in the Installation Department to those in the Accounting Department showing she was denied overtime or the amount of overtime she made in each

department.[14]  Harmon has failed to submit evidence sufficient to raise a genuine issue of

material fact as to whether she was denied overtime opportunities as a result of her transfer to the

Accounting Department.

Harmon also argues that she suffered an adverse employment action because she was

"denied the use of her available vacation time which caused a loss in pay while others did not."

(Doc. 89 at PAGEID 3848-49).  Harmon cites a series of emails between her and Balzer as

evidence that she was denied the use of her vacation time.  (*Id.*, citing Doc. 89-5, Ex. E, at

PAGEID 4118-22).  These communications show that Harmon sent an email on October 16,

2017, saying she would not be at work due to personal family reasons.  (*Id.* at PAGEID 4122).

Balzer replied, "You have used 52/56 sick hours so far this year, so note that you are only

eligible for 4 hours of sick pay for yesterday should you choose to use it.  Also, if you plan on

using any more vacation time in the future please note that it needs to be requested/approved in

advance by your supervisor.  You have a balance of 8 vacation hours left for 2017."  (*Id.* at

PAGEID 4121).  Harmon indicated she was going to use the balance of her vacation hours for

her absence.  She stated, "To be clear so we are all on the same page and I am not going outside

your direction.  Am I not going to be allow[ed] to use my vacation hours in lieu of my absence

on Monday?  Installation has always followed the practice of being able to use paid time off (if

available) to this date.  Please advise if I am not being approved to use my vacation hours to

cover my missed time off of Monday 10/16/17."  (*Id.* at PAGEID 4119).  Balzer told Harmon he

checked with Sanderson, and Sanderson had "reminded her team on numerous occasions,

especially leading up to holidays, that they need to request vacation in advance, and only take

that vacation if approved.  Per company policy.  Every other member of my team follows this

---

[14] Harmon submitted copies of her pay stubs from October 9, 2017 onward, and the Court is unable to discern any disparity in overtime compensation from these documents.  (Doc. 89-11, Ex. K, at PAGEID 4355-63).

policy." (*Id.* at PAGEID 4118).  There is no indication from these email communications that Harmon was denied the use of "vacation time which caused a loss in pay while others did not." (Doc. 89 at PAGEID 3848-49).  To the contrary, these emails show that on the day of her absence, Harmon requested off due to personal reasons despite the policy that she needed to request vacation time in advance.  Harmon fails to cite any evidence that she was denied the use of her vacation time causing a loss of pay.  Even if this evidence showed an adverse action, Harmon fails to point to any evidence that younger employees in the Installation Department were permitted to use vacation time without prior approval when she was not.  Therefore, Harmon fails to establish this element of her prima facie case.

Harmon argues she was treated less favorably than Melissa Maynard, age 30, because Maynard was allowed to transfer out of Sanderson's department and harsh supervision and Harmon was not.  Harmon cites no evidence in the record that Maynard was transferred. Harmon fails to produce any evidence that Harmon asked for a transfer and her request was denied.  Moreover, even if Harmon was denied a transfer, the denial of a request to transfer out of the Installation Department is not a materially adverse action unless it is accompanied by a reduction in title, pay, or benefits, which did not occur here.  *Momah v. Dominguez*, 239 F. App'x 114, 123 (6th Cir. 2007) (citing cases).

Harmon argues she was treated less favorably because she "continued to be passed over on any and all promotional opportunities," while other Honeywell employees were "provided promotional opportunities. . . ."  (Doc. 89 at PAGEID 3848).  Harmon identifies Honeywell employee Melissa Maynard who was allowed to transfer out of Sanderson's department and was promoted.  (*Id.*).  Harmon, however, has failed to point to any evidence in the record that she was "passed over" or denied any promotional opportunities during her employment at Honeywell.

48

To the contrary, Harmon testified she was promoted for every promotion she applied for. (*See* Doc. 80-1, Pltf. Depo., at PAGEID 1857-58).

Further, to the extent Harmon argues that she was treated less favorably because "Sanderson took away Harmon's administrative responsibilities and gave these tasks to younger and less qualified white employees" (Doc. 89 at PAGEID 3848), Harmon has failed to specifically identify the younger employees who were allegedly treated more favorably than her. In *Tschappatt*, the Sixth Circuit granted the employer's motion for summary judgment on the plaintiff's age discrimination claim because, among other reasons, the plaintiff failed to create "a genuine fact dispute over whether the company treated younger employees better than it treated him." *Tschappatt*, 798 F. App'x at 889. In that case, the plaintiff introduced affidavits that "merely offer[ed] general assertions that younger employees were not disciplined for the violations that [the plaintiff] was disciplined for," such as, "I have seen other younger people go to the bathroom for up to 45 minutes or an hour and no one was ever written up for that except [the plaintiff],'" and the plaintiff "was being punished for minor mistakes that other people, including younger people, routinely make." *Id*. at 890. The Court of Appeals concluded the plaintiff failed to create a genuine fact dispute over whether the employer treated younger employees better than it treated him by failing to specifically identify the alleged employees. *Id*. The Sixth Circuit stated, "It never gets more specific than that. That means we cannot tell whether any of these supposed younger employees were 'similarly situated' to [the plaintiff], and that means he cannot make out a prima facie case of discriminatory unfavorable treatment." *Id*. (citing *Noble v. Brinker Int'l, Inc*., 391 F.3d 715, 730-31 (6th Cir. 2004); *cf. Mitchell*, 964 F.2d at 583-84). Just like the plaintiff in *Tschappatt*, Harmon failed to identify the allegedly "younger

49

and less qualified white employees" that Sanderson gave Harmon's administrative responsibilities and tasks to.[15]

Accordingly, Harmon failed to establish any genuine issue of material fact on the prima facie elements of her age discrimination claim including whether she suffered an adverse employment action or whether she was replaced by a significantly younger person or that similarly situated younger employees were treated more favorably. Therefore, Honeywell's motion for summary judgment should be granted on plaintiff's age discrimination claim.

### C. Count 3 of Harmon's TAC: Pregnancy Discrimination under the Pregnancy Discrimination Act and state law

The PDA "makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015). The PDA[16] protects pregnant women, women who have gone through childbirth, and women who are suffering pregnancy-related medical conditions from adverse employment actions. 42 U.S.C. § 2000e(k). Employers must treat protected employees "the same . . . as other persons not so affected but who are similar in their ability or inability to work." *Id.* This is notably different from other Title VII discrimination analyses where a plaintiff must demonstrate that the employee receiving favorable treatment is similarly situated in all respects. *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996).

---

[15] Even though Harmon does not raise the PIP as an adverse action in her age discrimination claim, there is no dispute that the PIP never went into effect and there is no adverse action relating to the PIP for this reason.

[16] 42 U.S.C. § 2000e(k) provides: "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits . . ., as other persons not so affected but similar in their ability or inability to work."

To establish a claim for pregnancy discrimination, Harmon must prove that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 573 (6th Cir. 2006) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000)).

In the absence of direct evidence of pregnancy discrimination, "a circumstantial case of discrimination can be established through the traditional *McDonnell-Douglas* burden-shifting format." *Panetta v. Sheakley Grp., Inc.*, 707 F. Supp. 2d 767, 772 (S.D. Ohio 2010). As previously explained, if the plaintiff establishes a prima facie case, the employer can overcome the prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer carries its burden, the plaintiff must show that the reasons offered by the employer were not its true reasons but were a pretext for discrimination. *Id*. at 804. *See Panetta*, 707 F. Supp. 2d at 772 ("The plaintiff can meet this burden by showing that the employer's reason has no basis in fact, did not actually motivate the employer, or was insufficient to motivate the adverse action." (citing *Tysinger*, 463 F.3d at 576).

Harmon's pregnancy discrimination claim arises from Honeywell's alleged denial of short term disability benefits in connection with her miscarriage. In her TAC, Harmon alleges her claim of pregnancy discrimination under the PDA arises from Honeywell's alleged denial of short term disability benefits. (TAC, Doc. 48 at PAGEID 1252). Harmon's claim under the PDA fails as a matter of law because it is undisputed that Cigna, Honeywell's third-party plan administrator, "independently determined Malissa Harmon's STD . . . benefits pursuant to its contractual obligations. . . ." (Doc. 84-7, Vandergriff Decl., at PAGEID 2405).

51

"It is well-settled Sixth Circuit law that "[u]nless an employer is shown to control administration of a plan, it is not a proper party defendant in an action concerning benefits." *Reddy v. JPMorgan Chase Bank, N.A.*, No. 2:09-cv-1152, 2013 WL 3147949, at *18 (S.D. Ohio June 19, 2013) (citing *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988)), *aff'd*, No. 13-3789, slip op. (6th Cir. Nov. 3, 2014) (unpublished). In *Reddy*, the court granted the employer's motion for summary judgment on the plaintiff's claim for unlawful denial of long-term disability benefits because the employer did not control the administration of the disability plan or otherwise make the decision to deny the plaintiff's application for disability benefits. *Id*. The court held the employer was "not a proper defendant" as to the plaintiff's stated claim for unlawful denial of long-term disability benefits because the plan administrator, as opposed to the employer, assumed the "complete authority to administer the plan and to determine whether benefits were payable under the plan." *Id*.[17] Although, *Reddy* did not concern a claim under the PDA, the Court finds the reasoning persuasive because both *Reddy* and the instant matter concern which entity has the authority to determine benefits under the relevant plan.

Here, Ms. Vandergriff, the Interim Director of HR Services Benefits Delivery, declared from "2017 through 2019, the period during which Malissa Harmon applied for and recovered STD and LTD benefits, Cigna was the third-party administrator of Honeywell's STD plan and the insurance provider for Honeywell's fully insured LTD plan." (Doc. 84-7, Vandergriff Decl., at PAGEID 2405). The Master Service Agreement governing Honeywell's contractual

---

[17] The Sixth Circuit affirmed this finding on appeal: "Additionally, the district court determined that the denial of long-term disability benefits did not constitute discrimination by [the defendant] because [the defendant's] long-term disability plan was administered by third parties. Indeed, despite [the plaintiff's] unsupported assertions to the contrary, the evidence establishes that Hartford Life and Accident Insurance Company (Hartford) and the Prudential Insurance Company of America (Prudential), rather than [the defendant], had sole decision-making authority in denying [the plaintiff's] long-term disability benefits. As a result, the defendants did not take adverse action against [the plaintiff] in these instances." *Reddy v. JP Morgan Chase Bank*, No. 13-3789, at slip op. at 5 (6th Cir. Nov. 3, 2014).

relationship with Cigna makes clear that Cigna is not an agent of Honeywell and acts independently.  (*Id.*, Ex. A at PAGEID 2426).  Ms. Vandergriff averred that "Honeywell does not provide Cigna with information relevant to the determination of any employee's STD or LTD benefits.  As such, Cigna independently determined Malissa Harmon's STD and LTD benefits pursuant to its contractual obligations. . . ."  (*Id.* at PAGEID 2405-06; *see also* Doc. 84-2, Hamilton Decl., at PAGEID 2381-82: "After Ms. Harmon went on disability leave, she remained inactive under the same title, but her benefits were subject to determination by Cigna, the third party administrator of Honeywell's Short Term Disability and Long Term Disability plans.").

Harmon directs the Court to an email communication between Cigna and Honeywell as evidence that "Cigna and Honeywell communicated at high levels regarding 'all' of Harmon's claims processed through Cigna since she had been on a medical leave."  (Doc. 89 at PAGEID 3854, citing Doc. 89-6, Ex. F, at PAGEID 4170-72).  Harmon, however, acknowledges the "email detailed *Cigna's processes, explanations and reasons for its denials* at great length to Honeywell."  (*Id.*) (emphasis added).  Cigna's denial of Harmon's STD benefits was made on April 19, 2018.  (Doc. 80-1, Ex. DD, at PAGEID 2013-15).  The email cited by Harmon, however, is dated September 24, 2018, over five months *after* Cigna made its determination on Harmon's STD claim.  (Doc. 89-6, Ex. F, at PAGEID 4170-72).  Harmon has not provided any evidence showing that Honeywell made, or influenced in any way, the decision pertaining to her STD benefits.  Instead, the undisputed evidence of record shows there is no genuine issue of material fact that Cigna solely made this decision independent and separate from Honeywell.

Accordingly, Harmon's claim under the PDA fails as a matter of law because Cigna, the plan administrator, as opposed to Honeywell, the plan sponsor, assumed the complete authority

to administer the plan and to determine whether benefits were payable under the plan.  The Court therefore recommends that Honeywell's motion for summary judgment on Harmon's claim under the PDA be granted.

### D.  Count 4 of Harmon's TAC: FMLA Retaliation

The FMLA enables employees covered by the Act to take up to 12 weeks of leave per year for the employee's own "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  At the conclusion of the employee's leave period, she must be reinstated to her position or to an equivalent position in terms of "benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).

The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]."  *Id*. at § 2615(a)(2).  To prove a prima facie FMLA retaliation claim, Harmon must show (1) she was engaged in a protected activity as defined by the FMLA; (2) Honeywell knew she was using FMLA; (3) she was subjected to an adverse employment action after Honeywell learned that she was exercising her FMLA rights; and (4) there was a causal connection between the protected activity and the adverse employment action. *Donald v. Sybra, Inc*., 667 F.3d 757, 761 (6th Cir. 2012) (citing *Killian v. Yorozu Auto. Tenn., Inc*., 454 F.3d 549, 556 (6th Cir. 2006); *Walton v. Ford Motor Co*., 424 F.3d 481, 485 (6th Cir.

2005)).  The burden-shifting test articulated in *McDonnell Douglas* is used in retaliation claims under the FMLA.  *See Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001) (applying the burden-shifting analysis to an FMLA-retaliation suit).

Harmon's FMLA claim is based upon the denial of an extension of her STD benefits while on an approved FMLA leave for her pregnancy-related condition.  (Doc. 48 at PAGEID 1252). When counsel for defendant asked Harmon at her deposition what she believed Honeywell did in retaliation for Harmon taking FMLA leave, Harmon responded: "I feel that they [Honeywell] participated by telling Cigna what to do.  They – they led that, and I believe there's enough documentation and information that proves that Honeywell knowingly knew about what was going on and did nothing."  (Doc. 80-1, Pltf. Depo., at PAGEID 1923).  Harmon fails to support this statement with any record evidence.  *Harvey*, 453 F. App'x at 565 (denying motion for summary judgment because the plaintiff relied "on speculative, unsupported allegations to create metaphysical doubt, which clearly does not amount to a genuine issue of material fact") (citing *Matsushita*, 475 U.S. at 586).

As explained in connection with the Court's recommendation to grant Honeywell's motion for summary judgment on Harmon's claim under the PDA, Harmon's FMLA retaliation claim fails as a matter of law because Cigna, the plan administrator, as opposed to Honeywell, the plan sponsor, assumed the complete authority to administer the plan and to determine whether to grant or deny Harmon's STD benefits.  Cigna was contractually obligated to administer Harmon's STD benefits claims while she was taking approved FMLA leave, and Harmon fails to present any evidence showing that Honeywell made, or influenced in any way, Cigna's decisions on her STD benefits.  The undisputed evidence shows that Cigna alone made

the decision to stop Harmon's STD benefits and reinstate those benefits at a later point in time. Accordingly, because Cigna, the plan administrator, as opposed to Honeywell, the plan sponsor, assumed the complete authority to administer the plan and to determine whether benefits were payable under the plan, Harmon's claim for FMLA retaliation against Honeywell fails as a matter of law.

### E. Count 5 of Harmon's TAC: Retaliation and Wrongful Termination in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A

Section 806 of the Sarbanes-Oxley Act, the whistleblower-protection provision, "makes it illegal for publicly traded companies to retaliate against an employee who reports suspected fraud, or who assists in a fraud investigation or enforcement proceeding." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 804 (6th Cir. 2015) (citing 18 U.S.C. § 1514A). Section 1514A whistleblower claims are analyzed under a burden-shifting framework:

> First, the plaintiff must establish a prima facie case by proving, under a preponderance of the evidence standard, that (1) [s]he engaged in protected activity; (2) the employer knew or suspected, either actually or constructively, that [s]he engaged in the protected activity; (3) [s]he suffered an unfavorable personnel or employment action; and (4) the protected activity was a contributing factor in the unfavorable action. The employer may then avoid liability if it proves by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity."

*Id.* at 805 (citations and quotations omitted).

Protected activity under § 1514A includes "any lawful act done by the employee" to provide information regarding "any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders[.]" 18 U.S.C. § 1514A(a)(1). *See Lawson v. FMR LLC*, 571 U.S. 429, 446 (2014) ("[A]ctivity protected under § 1514A is not limited to

56

'provid[ing] evidence of fraud'; it also includes reporting violations of SEC rules or regulations.") (quoting § 1514A(a)(1)).

A plaintiff asserting a claim under SOX must first exhaust the administrative remedies set forth in § 1514A(b)(1) by filing a complaint with the Secretary of Labor through the Occupational Safety and Health Administration ("OSHA"), before filing a civil action in federal district court.  Section 1514A(b) provides:

(b) Enforcement Action.

(1) In general.  A person who alleges discharge or other discrimination by any person in violation of subsection (a) may seek relief under subsection (c), by

(A) filing a complaint with the Secretary of Labor; or

(B) if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, bringing an action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy.

18 U.S.C. § 1514A(b)(1).  *See Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 770 (2018) ("Sarbanes-Oxley's anti-retaliation provision contains an administrative-exhaustion requirement and a 180-day administrative complaint-filing deadline. . . ."); *Daly v. Citigroup Inc.*, 939 F.3d 415, 427 (2d Cir. 2019) ("[T]ext of SOX makes clear that Congress intended for its administrative exhaustion requirements to be a jurisdictional prerequisite to suit in federal court. . . . [T]hat provision expressly grants federal jurisdiction only when specific administrative remedies have been exhausted.") (citing 18 U.S.C. § 1514A(b)(1)(A)-(B)).

Harmon alleges that beginning in June 2015, she "advised management of her suspension of unethical accounting practices within the Installation Department" after which "members of management started to interfere with Harmon's coordination efforts. . . ."  (Doc. 89 at PAGEID 3815).  As best the Court can discern, Harmon's SOX claim includes three adverse actions.

57

First, Honeywell retaliated against her in 2017 by "subjecting her to heightened scrutiny, criticism, unwarranted performance improvement plans and investigation which created a retaliatory, abusive and hostile work environment for her." (TAC, Doc. 48 at PAGEID 1253; *see also* Doc. 80-1, Ex. TT, at PAGEID 2053: "[S]he was harassed, [s]he received a PIP, moved to a less desirable job and that management cursed at her[.]"). Second, Harmon alleges that she suffered a "loss of employee benefits for complaining of a protected activity." (TAC, Doc. 48 at PAGEID 1254). Third, Harmon alleges she was "wrongfully terminated" on October 3, 2019. (*Id*. at PAGEID 1253).

Harmon's SOX claim concerning Honeywell's alleged retaliation against her for events that occurred in 2017 are time-barred. Harmon failed to exhaust her administrative remedies by not filing her complaint within the 180-day statutory filing period. It is undisputed that Harmon did not file a whistleblower complaint with OSHA until September 9, 2019 (Doc. 80-1, Pltf. Depo., at PAGEID 1929; *see also Id*., Ex. TT, at PAGEID 2052-53), well after the alleged retaliatory conduct that occurred in 2017 and the 180-day statutory filing period had run. *See* 18 U.S.C. § 1514A(b)(2)(D). Accordingly, to the extent that Harmon's SOX claim concerns conduct that occurred in 2017, Honeywell's motion for summary judgment should be granted on this statutory basis. *Id*.

To the extent Harmon bases her SOX claim against Honeywell on events surrounding the loss of employee benefits[18], Harmon's claim fails as a matter of law. For the reasons previously stated in connection with Harmon's PDA and FMLA claims, there exists no genuine issue of

---

[18] Harmon alleges she was denied her income benefits while on an approved medical leave between July 18, 2018 through November 12, 2018. (TAC, Doc. 48 at PAGEID 1247). Harmon alleges in August 2019, Honeywell and Cigna manipulated their LTD provisions and policies to unfairly lower her income benefits from $2,657 down to $100 per month. (*Id*.). She then filed a complaint against Honeywell with the United States Department of Labor alleging a SOX violation on September 9, 2019. (*Id*.).

material fact that Cigna, a third-party benefits administrator, and not Honeywell, made the sole decisions to grant, deny, suspend, or reinstate Harmon's STD and LTD benefits.

As to Harmon's SOX claim concerning her termination, the Court recommends that Honeywell's motion for summary judgment be granted for the following reasons.  Honeywell puts forth no argument as to the first, second, or third elements of Harmon's SOX claim, i.e., that Harmon engaged in a protected activity or conduct, Honeywell knew or suspected, actually or constructively, that she engaged in the protected activity, and she suffered an unfavorable personnel action.  Instead, Honeywell argues that Harmon cannot prove the fourth element of her claim:  that the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action.  Honeywell argues that Harmon fails to raise a genuine issue of material fact in support of her claim that she was terminated on October 3, 2019 in retaliation for her SOX whistleblower complaint.  (Doc. 84 at PAGEID 2310-11).  Pointing to documentation detailing Honeywell's maximum leave duration of 18 months, Honeywell argues that at the time Harmon's employment with Honeywell was terminated on October 3, 2019, Harmon had been off work since February 14, 2018, which was nearly 20 months.  Honeywell argues despite repeated inquiries, Harmon told Honeywell that she was unable to work and could not estimate when or whether she intended to return.  Honeywell argues it properly terminated Harmon's employment under its leave policy and not in retaliation for Harmon's SOX complaints.

With no citation to any evidence in the record, Harmon argues in opposition that her "termination was connected to Harmon's SOX claims the final move that Honeywell was trying to achieve."  (Doc. 89 at PAGEID 3867).  Harmon, however, fails to cite any evidence in this regard.  To the extent Harmon argues the alleged temporal proximity between her protected

59

activity and her termination is sufficient to raise an inference that the protected activity was

likely a contributing factor in her termination, "temporal proximity alone is usually insufficient

to constitute evidence that would prove that an employer retaliated against an employee for

engaging in alleged protected activity." *Riddle v. First Tennessee Bank, Nat. Ass'n*, 497 F.

App'x 588, 596 (6th Cir. 2012) (citing cases).

Even if Harmon established the four elements of her Section 806 violation, Honeywell

can avoid liability by proving "by clear and convincing evidence that it would have taken the

same unfavorable personnel action in the absence of that [protected] behavior." *Id*. (internal

citations and quotations omitted). Honeywell proffers evidence of its policy that the maximum

leave duration under its leave policy to maintain an employee's active job status is 18 months or

a reasonable time thereafter, after which an employee may be terminated. Consistent with this

policy, on August 15, 2019, Cigna communicated to Harmon:

> Honeywell has asked us to make you aware that you have been absent from work
> for more than 18 months. The maximum leave duration under Honeywell's
> Medical Leave of Absence Policy (the "Leave Policy") to maintain your active job
> status is 18 months or a reasonable time thereafter. As a result, you need to choose
> one of the following options.
>
> If you are able to return to work in the foreseeable future, please contact Marilia
> Clarisey at 513-701-7281 as soon as possible to discuss your return. If after you
> contact Honeywell, your prior position is not available, you will be provided 30
> days (without pay) in which to seek another Honeywell position. If, however,
> Honeywell does not hear from you within 2 weeks of the date of this letter,
> Honeywell will assume you are not able to return to work and Honeywell will
> terminate your employment. . . .

(Doc. 80-1, Ex. OO, at PAGEID 2039-40).

Harmon responded to Honeywell on August 27, 2019 by email to Vidal-Clarisey stating

she was still under her doctor's care, but she was "not resigning nor have I advised Honeywell

that I am not returning." (*Id*. at 2043). Harmon further stated, "I am unable to work due to my

mental hea[l]th condition that has continued to get worse due to the constant FLMA interference and FLMA retaliation that I have been subjected to from both Cigna and Honeywell. . . ." (*Id.*).

By email dated August 29, 2019, Vidal-Clarisey advised Harmon:

It is certainly not Honeywell's intent to place pressure on you to return to work if you are unable to do so, nor is it our intent to cause confusion regarding your benefits and/or leave options. It is Honeywell's (and Cigna's) standard process to regularly communicate with employees concerning the status of their benefits and leaves of absence. As set forth in Cigna's August 15, 2019 letter, the maximum leave duration under Honeywell's Medical Leave of Absence Policy (the "Leave Policy") is 18 months. You have now been absent from work for more than 18 months. Accordingly, pursuant to Honeywell's Leave Policy, to maintain your current job status, you must be able to return to work in the foreseeable future. According to your email, you are not currently able to return to work and you do not identify a foreseeable date upon which you will be able to return to work. Your request is thus for an indefinite leave of absence, which is not a reasonable accommodation under the ADA. *Accordingly, unless you are able to provide us with a reasonable return to work date your employment will be terminated. We need to hear from you by September 6th.*

(*Id.* at PAGEID 2041) (emphasis added). That same day, Harmon emailed Vidal-Clarisey and informed her that Honeywell and Cigna were placing pressure and continued stress on her. (*Id.*). Harmon again told Vidal-Clarisey that she was still under the care of her doctor and to contact Cigna or her doctor for more direct information. (*Id.*).

Harmon does not present evidence that she advised Honeywell of a return to work date prior to the September 6, 2019 deadline. She filed her SOX complaint three days later on September 9, 2019. Honeywell terminated Harmon's employment on October 3, 2019, because she had "been absent from work under Honeywell's Medical Leave of Absence Policy for more than 18 months." (*Id.*, Ex. QQ, at PAGEID 2044).

Although Honeywell terminated Harmon's employment less than one month after she filed her SOX claim, the Court finds Honeywell has shown by clear and convincing evidence that it would have taken the same action despite Harmon's SOX complaint. Honeywell had

61

already put into motion the necessary steps to terminate Harmon's employment *prior* to the SOX complaint filing because Harmon had already been absent from work more than 18 months. It is undisputed that on August 15, 2019, when she was notified that she had exceeded Honeywell's policy on maximum medical leave duration, Harmon had been absent from work for more than 18 months. Harmon was advised that to maintain active job status, she needed to return to Honeywell's employment within "a reasonable time" after the 18 months. Harmon repeatedly advised Honeywell that she continued to be under a doctor's care, she was unable to return to work, but she was not resigning. Vidal-Clarisey again advised Harmon on August 29, 2019, that Harmon must be able to return to work in the foreseeable future, and she was not eligible for an indefinite leave of absence under the ADA. Harmon was advised that unless she was able to provide Honeywell with a reasonable return to work date by September 6, 2019, her employment would be terminated. (*Id*. at PAGEID 2041). Harmon's response did not indicate a reasonable return to work date, and she reiterated she was still under the care of her doctor. (*Id*.). Harmon never advised Honeywell she was able to return to work. Harmon has not presented any evidence calling into question Honeywell's termination decision, which was fully consistent with its policy and actions prior to the filing of Harmon's SOX complaint. Honeywell has therefore proven by clear and convincing evidence that it would have terminated Harmon in the absence of any protected behavior.

Citing Ohio Rev. Code § 3319.16, entitled "Termination of contract by board of education,"[19] Harmon argues that "employees who are temporarily and totally disabled ('TTD')

---

[19] Ohio Rev. Code § 3319.16 provides, in pertinent part, "The contract of any teacher employed by the board of education of any city, exempted village, local, county, or joint vocational school district may not be terminated except for good and just cause. Notwithstanding any provision to the contrary in Chapter 4117 of the Revised Code, the provisions of this section relating to the grounds for termination of the contract of a teacher prevail over any conflicting provisions of a collective bargaining agreement entered into after the effective date of this amendment." Ohio Rev. Code § 3319.16.

as a result of their work-related injuries have a right not only to the compensation provided in the act, but also to whatever period of absence from work is deemed medically necessary to complete their recovery or stabilize their injuries." (Doc. 89 at PAGEID 3871). Harmon argues that her "'absence' and 'inability to work' were due entirely to a (sic) Honeywell's actions for which she was receiving ongoing TTD compensation, [and] Harmon's discharge constitutes a violation of public policy and, therefore, is without 'good and just cause' under R.C. 3319.16." (*Id*., quoting Ohio Rev. Code § 3319.16). In support, Harmon relies on *Coolidge v. Riverdale Loc. Sch. Dist*., 797 N.E.2d 61 (Ohio 2003).

*Coolidge*, however, is inapposite to the facts of this case and has no bearing on the outcome in this matter. In *Coolidge*, the Ohio Supreme Court held that "employees who are temporarily and totally disabled as a result of their work-related injuries have a right not only to the compensation provided in the [Worker's Compensation Act], but also to whatever period of absence from work is deemed medically necessary to complete their recovery or stabilize their injuries." *Id*. at 69. There, the plaintiff, a public-school teacher, was injured by one of her students. *Id*. at 62. As a result of her injuries, the plaintiff remained off work, exhausted her available options for leave, and received ongoing temporary total disability ("TTD") compensation under the Workers' Compensation Act. *Id*. at 62-63. The plaintiff was terminated due to her continued inability to return to work. *Id*. at 63-64. The Supreme Court of Ohio held that an "employee who is receiving TTD compensation pursuant to R.C. 4123.56[20] may not be discharged solely on the basis of absenteeism or inability to work, when the absence or inability to work is directly related to an allowed condition." *Id*. at 62. The court stated the plaintiff's "absence and inability to work were due entirely to a work-related injury for which she was

---

[20] Ohio Rev. Code § 4123.56 provides the amount of compensation an employee may receive in the case of temporary disability.

receiving ongoing TTD compensation, her discharge constitutes a violation of public policy and, therefore, is without 'good and just cause' under R.C. 3319.16." *Id*. at 71.

Unlike the plaintiff in *Coolidge*, here, there is no evidence in the record that Harmon suffered a work-related injury or that she was "temporarily and totally disabled" as a result of a work-related injury. Further, Harmon fails to point to any evidence that, at any point, she received, or was receiving, compensation under the Workers' Compensation Act for any alleged injury. Finally, Ohio Rev. Code § 3319.16 has no bearing on the instant matter because Harmon was not a "teacher employed by the board of education of any city, exempted village, local, county, or joint vocational school district. . . ." Ohio Rev. Code § 3319.16. Accordingly, Harmon's reliance on *Coolidge* and Ohio Rev. Code § 3319.16 are without support in the record.

Harmon also argues that Honeywell improperly terminated Harmon's employment because "Honeywell's LTD Plan allows its employees [24 months] to recover from a 'Mental Illness', a qualifying condition under Honeywell's own Plan[, and] Honeywell terminated Harmon prior to the two-year allowance and for exhausting Honeywell's leave policy." (Doc. 89 at PAGEID 3871, citing Doc. 84-7 at PAGEID 2477). Harmon, however, acknowledges that "Harmon remained on an approved employer medical leave 10 months after her termination," consistent with the Plan. (Doc. 89 at PAGEID 3831).

The Court recommends that Honeywell's motion for summary judgment on Harmon's SOX claim be granted because even if Harmon establishes the elements of a SOX claim, Honeywell has proven by clear and convincing evidence that it would have terminated Harmon in the absence of any protected behavior.

Accordingly, the undisputed evidence shows there exists no genuine issue of material fact on any of Harmon's claims.  The Court therefore recommends that Honeywell be entitled to summary judgment on all of Harmon's claims.

## IV.  Harmon's motion for leave to file fourth amended complaint (Doc. 99)

Harmon filed her complaint on August 27, 2019.  (Doc. 3).  Since then, Harmon amended her complaint two times, thus making her third amended complaint the operative complaint in this lawsuit.  (*See* Docs. 19, 48).  Despite Harmon's two prior amendments, Harmon, yet again, seeks leave to amend her complaint to add claims under the Federal Unemployment Compensation Act, the Federal Unemployment Tax Act, and the Ohio Unemployment Compensation Statute.  (Doc. 99).[21]  Harmon filed her motion roughly eight months after the discovery deadline had passed and approximately two months after Honeywell filed its motion for summary judgment.

Honeywell opposes Harmon's motion because the "case has been pending since 2019, discovery is closed[,] and Defendant's Motion for Summary Judgment is fully briefed."  (Doc. 100 at PAGEID 5722).  Honeywell contends that Harmon "unduly delayed [] seeking the proposed amendments and Honeywell would suffer undue prejudice given that discovery is closed and dispositive motion briefing is complete."  (*Id*. at PAGEID 5723).  Honeywell explains:

> The prejudice to Honeywell were the Court to grant Plaintiff's Motion is obvious.  This case has been pending for more than three years, and Defendant has had to defend against theories in three different complaints, spending significant time and resources on discovery and motion practice.  Discovery is now closed and Honeywell has filed a Motion for Summary Judgment on all counts, which is fully briefed.  This most recent leave to amend is nothing more than a last resort effort by Plaintiff to salvage this case from a decision on that Motion.

(*Id*. at PAGEID 5729-30).  Honeywell also contends the proposed amendments would be futile.

---

[21] Harmon failed to attach a proposed fourth amended complaint to her motion.

(*Id*. at PAGEID 5724-29).

The granting or denial of a motion to amend under Rule 15(a)(2) is within the discretion of the trial court, and leave to amend should be liberally granted. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005). "[A]t least some significant showing of prejudice" is required to deny a motion to amend based solely upon delay. *Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 934 (6th Cir. 2020) (quoting *Siegner v. Twp. of Salem*, 654 F. App'x 223, 228 (6th Cir. 2016)). "The longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Id.* (quoting *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 641 (6th Cir. 2018)). "Allowing an amendment after discovery is closed and summary judgment motions are fully briefed imposes significant prejudice on defendants." *Id.* (quoting *Siegner*, 654 F. App'x at 228) (quotation omitted) (finding prejudice to the defendant when the amendment was filed one month after the motion cut-off date).

Harmon's motion for leave to file a fourth amended complaint (Doc. 99) should be denied. As a general matter, Harmon failed to attach her proposed amended complaint specifying the desired amendments, leaving the Court to decipher Harmon's full intent. *See Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) ("Normally, a party seeking an amendment should attach a copy of the amended complaint.") (finding no abuse in discretion in denying leave to amend where the plaintiffs "did not present an adequate motion and because they did not attach a copy of their amended complaint"). More importantly,

Harmon did not timely file her motion. As stated, Harmon filed her motion some eight months after the discovery deadline had passed and two months after Honeywell filed its motion for summary judgment. Allowing Harmon to amend her complaint a fourth time at this stage of the lawsuit would substantially prejudice Honeywell. Discovery has concluded, the dispositive motion deadline has passed, and Honeywell's motion for summary judgment is fully briefed. If Harmon were permitted to amend the complaint yet again, the Court would need to reopen discovery and extend the other already expired deadlines. Honeywell would be required to expend additional resources to respond to the complaint as amended and the resolution of the lawsuit would be delayed. *See Pittman*, 901 F.3d at 642 ("allowing amendment months after the close of discovery and after dispositive motions were filed and briefed would have resulted in significant prejudice" to defendant). Harmon's delay in seeking to amend her complaint a fourth time, and the prejudice to Honeywell that would result, warrant denying Harmon's motion to amend her third amended complaint to add new factual allegations and claims. *See Permasteelisa CS Corp. v. Airolite Co., LLC*, No. 2:06-cv-0569, 2007 WL 1683668, at *3 (S.D. Ohio June 8, 2007) ("delay coupled with demonstrable prejudice either to the interests of the opposing party or of the Court can justify such denial.").

In addition, to the extent the Court is able to discern Harmon's proposed amended claims against Honeywell, amendment to add those claims would be futile. Harmon alleges she seeks to add an "Unemployment Compensation Interference and Retaliation Cause of Action" based on Honeywell's alleged "failure to properly report Harmon's disability payments ('wages') paid to her during her employment with Honeywell." (Doc. 99 at PAGEID 5683). Harmon alleges she filed a claim for Ohio unemployment compensation in August 2020, which was disallowed by the Ohio Department of Job and Family Services in October 2020. Harmon appealed that

67

determination administratively through the Unemployment Compensation Review Commission, which upheld the decision to disallow the benefit.  Harmon then appealed to the Butler County Court of Common Pleas, which affirmed the disallowance in July 2021.  The Twelfth District Ohio Court of Appeals reversed that decision, ultimately resulting in the allowance of her unemployment claim on July 15, 2022.  (Doc. 99 at PAGEID 5687).  Harmon asserts that Honeywell "was put on notice of Harmon's unemployment compensation benefits appeals but failed to participate or defend itself." (*Id*. at PAGEID 5685).  Harmon alleges Honeywell's actions (or inaction) is "evidence" of Honeywell's "continued retaliation claims against" Harmon.  (*Id.* at PAGEID 5687).

Amendment of the complaint to add this claim would be futile.  Harmon has not cited, and this Court has not found, any cause of action based on an employer's refusal to participate in or oppose a claim for unemployment compensation.  In fact, even where an employer does oppose a former employee's claim for unemployment compensation, that action does not constitute retaliation under the federal civil rights statutes.  As this Court recently explained:

> Federal district courts in the Sixth Circuit, however, have consistently held that an employer's mere opposition to an unemployment benefits claim does not constitute retaliation under Title VII or analogous state law. *See e.g.*, *Powell v. Honda of Am.*, No. 06-cv-979, 2008 WL 2872273, at *2 (S.D. Ohio July 22, 2008) ("[A] former employer's opposition to a request for unemployment benefits is not, as a matter of law, actionable retaliatory misconduct."); *Kowalski v. Kowalski Heat Treating, Co.*, 920 F. Supp. 799, 805 (N.D. Ohio 1996) (explaining that opposition to unemployment benefits is not the type of conduct that Ohio lawmakers sought to prevent with anti-retaliation statutes because the state's own administrative process allows employers to oppose unemployment benefits); *Spencer v. CSL Plasma, Inc.*, No. 3:10-cv-00262, 2011 WL 4054715, at *7 (E.D. Ky. Mar. 8, 2017) ("[L]egitimate opposition to an unemployment compensation claim cannot be the basis for a retaliation claim."); *Hatton v. United Parcel Serv.*, No. 05-97-JBC, 2006 WL 1895724, at *3 (E.D. Ky. July 7, 2006) ("An employer may challenge a former employee's application for unemployment benefits without running afoul of anti-retaliation laws".)

*Morningstar v. Circleville Fire & EMS Dep't*, No. 2:15-cv-3077, 2018 WL 3721077, at *8 (S.D. Ohio Aug. 6, 2018) (Marbley, J.). If an employer's opposition to an unemployment compensation claim does not constitute retaliation, the Court is hard pressed to understand how an employer's failure to oppose such a claim would be retaliatory. Nor has Harmon cited any Ohio authority for the proposition that an employer's failure to accurately report wages or disability income to the Ohio Department of Job and Family services gives rise to a private cause of action.[22] Therefore, amendment of the complaint to add an "Unemployment Compensation Interference and Retaliation Cause of Action" should be denied as futile.

To the extent Harmon seeks to add a claim under the "Federal Unemployment Compensation Act," Harmon fails to cite any statutory provision supporting such a claim, and the Court has been unable to identify any. "Unemployment benefits are governed by state law." *Adams v. Potter*, No. 06-cv-14933, 2007 WL 1098539, at *4 (E.D. Mich. Apr. 11, 2007) (citation omitted) (dismissing "Federal Unemployment Compensation Act" claim). *See also Burns v. Dir., Ohio Dep't of Job & Fam. Servs.*, Nos. 2004-T-0071, 2004-T-0072, 2005 WL 3150238 (Ohio Ct. App. Nov. 25, 2005), *aff'd sub nom. Burns v. Ohio Dep't of Job & Fam. Servs.*, 870 N.E.2d 162 (2007) ("in Ohio, unemployment compensation is a statutory scheme governed by [Ohio Rev. Code §] 4141"). Therefore, amendment of the complaint to add this claim would be futile.

Finally, Harmon seeks to add a claim under the Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3301 et seq. Harmon's motion to amend to add this claim should be denied because "FUTA does not expressly or impliedly create a private right of action." *Ednacot v. Mesa Med.*

---

[22] The Court has not found, nor has Harmon cited, any Ohio cases adopting the Kentucky Supreme Court's holding in *Hickey v. General Elec. Co*., 539 S.W.3d 19 (2018) (finding a private right of action under Kentucky unemployment compensation law against employer for an alleged violation of Kentucky's criminal prohibition against making false statements during unemployment proceedings).

*Grp., PLLC*, No. 5:14-cv-96, 2014 WL 2527095, at *6 (E.D. Ky. June 4, 2014) (and numerous

cases cited therein), *aff'd as modified*, 790 F.3d 636 (6th Cir. 2015).

      For these reasons, Harmon's proposed amendments would be futile and the motion to

amend (Doc. 99) should be denied.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Honeywell's motion for summary judgment (Doc. 84) be **GRANTED**.

2.  Harmon's motion for leave to file a fourth amended complaint (Doc. 99) be **DENIED**.

Date: _2/15/2023_

                                            Karen L. Litkovitz
                                            Chief United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MALISSA R. HARMON,                                Case No. 1:19-cv-670
     Plaintiff,                                     Cole, J.
                                                  Litkovitz, M.J.

     vs.

HONEYWELL INTELLIGRATED,
     Defendant.

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation within **FOURTEEN (14) DAYS** after being served with a copy thereof.  This period may be extended further by the Court on timely motion by either side for an extension of time.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).